ORIGINAL

**FILED IN OPEN COURT**
U.S.D.C. Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAN 2 1 2015

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA

*v.*

MARC E. BERCOON,
WILLIAM A. GOLDSTEIN, AND
PETER P. VEUGELER

Criminal Indictment

No.   **1:15 C R 0 2 2**

UNDER SEAL

THE GRAND JURY CHARGES THAT:

### Count One
(Conspiracy to Commit Mail and Wire Fraud Relating to Find.com)
18 U.S.C. § 1349

1. From on or about May 26, 2009 through at least June 3, 2010, in the
Northern District of Georgia and elsewhere, the Defendants, MARC E.
BERCOON and WILLIAM A. GOLDSTEIN, together with others known and
unknown to the Grand Jury, did knowingly and willfully and unlawfully
combine, conspire, confederate, agree and have a tacit understanding with each
other and others known and unknown to the Grand Jury, to commit certain
offenses against the United States, including the following:

### Objects of the Find.com Conspiracy

2. The objects of this conspiracy included:

    a. To knowingly devise and intend to devise a scheme and artifice to
       defraud, and to deprive others of money and property, by means of
       materially false and fraudulent pretenses, representations, and

promises, and in furtherance thereof to utilize the United States mails, in violation of Title 18, United States Code, Section 1341.

b. To knowingly devise and intend to devise a scheme and artifice to defraud, and to deprive others of money and property, by means of materially false and fraudulent pretenses, representations and promises, and in furtherance thereof to utilize interstate wire communications, in violation of Title 18, United States Code, Section 1343.

## Background of the Find.com Conspiracy

3. MARC E. BERCOON is a resident of Dunwoody, Georgia.

4. WILLIAM A. GOLDSTEIN is a resident of Atlanta, Georgia.

5. Find.com Acquisition, Inc., also known as Findcom Acquisition, Inc., ("Find.com") is a Delaware corporation organized on or about June 2, 2009.

6. BERCOON and GOLDSTEIN used sales representatives to solicit investors in Find.com. Additionally, GOLDSTEIN personally solicited some investors.

7. Investors were provided with written offering materials purporting to explain the terms of the investment. Generally, these materials told investors that their investments would be used to develop an internet search engine website business at the URL www.find.com.

8. Over $1.5 million was paid by investors buying stock in Find.com.

2

## Manner and Means of the Find.com Conspiracy

9. At a date unknown to the Grand Jury, but beginning on or before May 26, 2009 and continuing through on or about June 3, 2010, BERCOON and GOLDSTEIN, directly and indirectly through sales representatives, made false statements to investors and prospective investors in Find.com, including but not limited to statements concerning the way in which the proceeds of their investment would be used. BERCOON and GOLDSTEIN made these false statements to induce individuals to invest and maintain their investments. The Defendants' scheme to defraud with regard to Find.com is described in greater detail below.

10. Beginning on or about May 26, 2009, directly and through sales representatives, BERCOON and GOLDSTEIN began distributing a document titled "Find.com Confidential Investor Information" to prospective investors. This document, which BERCOON and GOLDSTEIN had participated in drafting, contained numerous representations, including that:

> a. Find.com owned certain intellectual property, described as "Propriety [sic] Indexing Methodology and Technology Assets," that "monetize [Find.com's] Pay Per Click vertical in a very efficient way while grabbing source material from multiple platforms . . .";
>
> b. Find.com offered its clients with internet connected cell phones a suite of programs designed to keep them safe while surfing on the internet; and

3

  c. Preliminary revenue projections from the Will Find Management Team for 2009 to 2011 ranged from $25 to $35 million, assuming a successful capital injection.

 11. The "Find.com Confidential Investor Information" document also stated that Find.com was "seeking investment funds primarily for working capital to fund three areas of growth in the company over the next twelve months." The three areas were listed as: "1. Increasing personnel to handle sales, service, and development efforts"; "2. Increasing marketing efforts to assure future customers/strategic partners and consumers are aware of our online marketing offerings"; and "3. Performing research and development to bring new products and services to market."

 12. BERCOON and GOLDSTEIN also participated in drafting a "Confidential Private Placement Memorandum" ("PPM") dated June 4, 2009, which was similarly distributed to prospective investors, both directly and indirectly through sales representatives. The PPM stated that five million shares of common stock in Find.com were being offered, at a price of $1.00 per share.

 13. The PPM also stated that the selling commission to be paid by Find.com was 12.5¢ per share, such that for every $1.00 invested, $0.125 in commission would be paid and the company would receive $0.875 in proceeds.

 14. In a standalone paragraph titled "Use of Proceeds," the Find.com PPM stated: "The company contemplates utilizing the net proceeds of this Offering for [sic]: (i) Reschedule, refinance, retire and service all of the Company [sic]

4

existing debt; (ii) Retaining consultants to assist with the growth of our business; [and] (iii) Other Corporate purposes."

15. Later in the PPM, Find.com specified that it "is seeking investment funds primarily for working capital to fund five areas of growth in the company over the next twelve months: 1) Increasing personnel to handle sales, service, and ongoing technology development efforts, 2) Increasing marketing efforts and strategic partnerships; 3) Investing in online R&D to ensure that find.com is utilizing best-of-breed and the most efficient available technology, 4) Increasing traffic to find.com, [and 5)] Service and refinance debt the website has incurred to achieve the progress it has made to date."

16. Still later in the PPM, Find.com provided a more detailed breakdown of the use of proceeds of the offering. Yet again, investors were told, in essence, that with the exception of $625,000 in sales commissions, all investment proceeds would go to business expenses of Find.com.

17. On or about June 3, 2009, in the Northern District of Georgia, BERCOON and GOLDSTEIN opened a business checking account in the name of Find.com Acquisition, Inc. at Wachovia Bank, with an account number ending in 6570 (hereinafter, the "Wachovia 6570 Account"). BERCOON signed the signature card for the Wachovia 6570 Account as President. GOLDSTEIN signed the signature card for the Wachovia 6570 Account as Chief Executive Officer.

18. On or about September 4, 2009, in the Northern District of Georgia, BERCOON and others opened a business checking account in the name of

5

Findcom Acquisition, Inc. at Suntrust Bank, with an account number ending in 5494 (hereinafter, the "Suntrust 5494 Account"). BERCOON signed the signature card for the Suntrust 5494 Account as President.

19. On or about April 2, 2010, GOLDSTEIN entered into a subscription agreement with an investor, K.G., in which the investor purchased 400,000 shares of Find.com for $130,000.

20. The representation made to investors that the offering was being made at a price of $1.00 per share was misleading, in that it failed to disclose that BERCOON and GOLDSTEIN were planning to sell, and had sold, shares to various investors at various discounts from the stated $1.00 per share price.

21. The representations made to investors in the written offering materials concerning sales commissions were false. In fact, BERCOON and GOLDSTEIN had agreed to pay, and did pay, sales commissions well in excess of the 12.5% figure provided to investors – in some cases, sales commissions as high as 35%.

22. The representations made to investors about the use of proceeds were also false. As BERCOON and GOLDSTEIN well knew, the proceeds would not be used exclusively for business purposes of Find.com as represented to investors. Instead, BERCOON and GOLDSTEIN intended to use, and did use, the proceeds of the Find.com investments for personal purposes, for the benefit of various business ventures they were involved in that were unrelated to Find.com, and to repay various individuals who had previously invested in their other unsuccessful business ventures.

6

23. In fact, a large portion of the funds invested in Find.com were simply withdrawn in cash from the Suntrust 5494 Account, typically within only a few days of having been deposited.

All in violation of Title 18, United States Code, Section 1349.

## Counts Two Through Five

(Mail Fraud Relating to Find.com)
18 U.S.C. § 1341

24. The Grand Jury incorporates and re-alleges Paragraphs 2-23 above as if fully set forth herein.

25. On or about the dates specified in Column A, the Defendants, MARC E. BERCOON and WILLIAM A. GOLDSTEIN, having knowingly devised the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing and attempting to execute the same, with intent to defraud did, in the Northern District of Georgia and elsewhere, take and receive from the United States Postal Service and from a private or commercial interstate carrier, and knowingly cause to be delivered by mail and such carrier according to the direction thereon, the mail matter described in

7

Column B, from the investor whose initials appear in Column C, from the state listed in Column D, for investment in Find.com:

| Count | A | B | C | D |
|-------|---|---|---|---|
| 2 | 2/25/2010 | $10,000 investment check | G.P. | Massachusetts |
| 3 | 3/1/2010 | $25,000 investment check | J.S. | Florida |
| 4 | 3/23/2010 | Subscription agreement for $25,000 investment | T.W. | Florida |
| 5 | 4/16/2010 | Subscription agreement for $5,000 investment | W.H. | Virginia |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## Counts Six Through Nine

(Wire Fraud Relating to Find.com)
18 U.S.C. § 1343

26. The Grand Jury incorporates and re-alleges Paragraphs 2-23 above as if fully set forth herein.

27. On or about the dates specified in Column A, the Defendants, MARC E. BERCOON and WILLIAM A. GOLDSTEIN, having knowingly devised the aforesaid scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing and attempting to execute the same, in the Northern District of Georgia and elsewhere, with intent to defraud did cause to be transmitted by means of wire communication in interstate commerce, certain signs, signals and sounds, that is, wire transfers of monies into the Wachovia

8

6570 Account in Atlanta, Georgia, in the amounts specified in Column B, from the investor whose initials appear in Column C, from the state listed in Column D, for investment into Find.com:

| Count | A | B | C | D |
|-------|-----------|----------|------|-----------|
| 6 | 5/21/2010 | $12,500 | B.M. | Louisiana |
| 7 | 5/24/2010 | $12,500 | B.M. | Louisiana |
| 8 | 6/3/2010 | $20,000 | B.M. | Louisiana |
| 9 | 6/3/2010 | $20,000 | D.J. | Kansas |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## Count Ten
(Money Laundering Conspiracy Relating to Find.com)
18 U.S.C. § 1956(h)

28. The Grand Jury incorporates and re-alleges Paragraphs 2-23 above as if fully set forth herein.

29. Beginning on a date unknown to the Grand Jury, but at least by on or about June 16, 2009, and continuing at least through on or about June 3, 2010, in the Northern District of Georgia and elsewhere, the Defendants, MARC E. BERCOON and WILLIAM A. GOLDSTEIN, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and others known and unknown to the Grand Jury, to commit money laundering by:

9

a. conducting and attempting to conduct financial transactions involving the proceeds of specified unlawful activity affecting interstate commerce, that is, the scheme to defraud relating to Find.com described in Counts 1-9 of this Indictment, in violation of 18 U.S.C. §§ 1341 and 1343, knowing that the funds involved in those financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of such unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b. conducting and attempting to conduct financial transactions involving the proceeds of specified unlawful activity affecting interstate commerce, that is, the scheme to defraud relating to Find.com described in Counts 1-9 of this Indictment, in violation of 18 U.S.C. §§ 1341 and 1343, knowing that the funds involved in those financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of Title 18, Untied States Code, Section 1956(a)(1)(B)(i); and

c. knowingly engaging, and attempting to engage, in monetary transactions in criminally derived property affecting interstate

10

commerce of a value greater than $10,000.00, namely, transfers of the

proceeds of specified unlawful activity to themselves and for their

benefit, which transactions involved proceeds of a specified

unlawful activity, that is, the scheme to defraud relating to Find.com

described in Counts 1-9 of this Indictment, in violation of 18 U.S.C.

§§ 1341 and 1343, in violation of Title 18, United States Code, Section

1957.

All in violation of Title 18, United States Code, Section 1956(h).

## Counts Eleven Through Thirteen

(Money Laundering Relating to Find.com)
18 U.S.C. § 1957

30. The Grand Jury incorporates and re-alleges Paragraphs 2-23 above as if
fully set forth herein.

31. Beginning on or about March 3, 2010, and continuing at least through on
or about March 25, 2010, in the Northern District of Georgia, the Defendants,
MARC E. BERCOON and WILLIAM A. GOLDSTEIN, did knowingly engage
and attempt to engage in monetary transactions of greater than $10,000 in
criminally derived property affecting interstate commerce, such property having
been derived from a specified unlawful activity, that is, the scheme to defraud
relating to Find.com described in Counts 1-9 of this Indictment, in violation of 18
U.S.C. §§ 1341 and 1343, by making wire transfers from the Suntrust 5494

11

account to a Wachovia Bank account in the name of HMRZ Consulting, LLC, account number x1382 ("the HMRZ account"), which was controlled by BERCOON and GOLDSTEIN, on or about the dates listed in Column A, in the amounts listed in Column B of the chart below:

| Count | A | B |
|-------|-----------|----------|
| 11 | 3/3/2010 | $15,000 |
| 12 | 3/5/2010 | $15,000 |
| 13 | 3/25/2010 | $16,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## Count Fourteen
(Conspiracy to Commit Securities Fraud and Wire Fraud
relating to MedCareers)
18 U.S.C. § 371

### The MedCareers Conspiracy and its Objects

32. From an unknown date, but at least by July 2009, and continuing thereafter until at least September 2011, in the Northern District of Georgia and elsewhere, the defendants, MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER, unlawfully, willfully and knowingly combined, conspired, confederated, agreed, and had a tacit understanding with one another and others known and unknown to the Grand Jury to commit offenses against

the United States, to wit: (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

33. It was a further part and an object of the conspiracy that the defendants, MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER, and others known and unknown to the Grand jury, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

34. It was a part and object of the conspiracy that the defendants, MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER, and others known and unknown to the Grand jury, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing

devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of securities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Background of the MedCareers Conspiracy

35. From approximately September 1, 2010 through at least August 15, 2011, BERCOON served as Chief Financial Officer and Treasurer of MedCareers Group, Inc. ("MedCareers" or "MCGI").

36. From approximately September 1, 2010 through at least August 15, 2011, GOLDSTEIN served as Chief Executive Officer, President, Secretary and Sole Director of MedCareers.

37. PETER VEUGELER is a resident of Windermere, Florida.

38. The United States Securities and Exchange Commission ("SEC") is an independent agency of the United States government responsible for enforcing the federal securities laws, which are designed to provide the investing public with full disclosure of all material facts regarding matters involving the offer, purchase, and sale of securities, among other things. These laws protect the investing public in the purchase of stock that is publicly distributed by

14

maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the price of stock.

### The Manner and Means of the MedCareers Conspiracy

39. It was part of the conspiracy that BERCOON, GOLDSTEIN, VEUGELER and their co-conspirators sought to dominate and control virtually all of the freely trading shares of MCGI.

40. It was part of the conspiracy to conceal the involvement of BERCOON and GOLDSTEIN in MedCareers from the investing public and the SEC through various means, including the use of nominee officers and directors, until after the market manipulation was complete.

41. It was further part of the conspiracy that BERCOON, GOLDSTEIN and VEUGELER arranged for brokerage accounts to be opened in the names of nominees.

42. It was further part of the conspiracy that its members engaged in promotional efforts designed to generate investor demand for stock. These promotional efforts included the issuance of false and misleading corporate press releases, false and misleading Internet postings, and stock and cash payoffs to professional stock promoters.

43. It was further part of the conspiracy that BERCOON, GOLDSTEIN and others generated artificial investor demand for stock by orchestrating trading activity in the nominee brokerage accounts under their control. This activity

15

made it appear that an active market for MCGI existed, with many different buyers and sellers.

44. It was further part of the conspiracy that, to make MedCareers stock more attractive to potential investors, BERCOON, GOLDSTEIN and others caused MedCareers to enter into sham transactions with other businesses and individuals, so that it could publicly report what appeared to be favorable news, both in its financial filings with the SEC and in press releases.

45. It was further part of the conspiracy that, as investor demand for stock developed, BERCOON, GOLDSTEIN and VEUGELER arranged to fill that demand by having nominees sell shares of stock from the nominee accounts, at or near the prevailing market price.

46. It was further part of the conspiracy that, following sales of stock by the nominees, BERCOON, GOLDSTEIN and VEUGELER directed that sales proceeds be transferred to themselves, their family members, and various other entities and individuals.

## Overt Acts of the MedCareers Conspiracy

47. In furtherance of the conspiracy, within the Northern District of Georgia and elsewhere, the defendants BERCOON, GOLDSTEIN and VEUGELER, did commit and cause to be committed the following overt acts, among others:

**The Planning Stage**

48. In the summer of 2009, GOLDSTEIN and a business associate, Associate A, travelled to Florida to meet with Trader A and Trader B, two conspirators not

charged in this Indictment. At the meeting, GOLDSTEIN stated that he wanted to raise capital for his business ventures. Trader A and Trader B advised GOLDSTEIN that the best way to raise money was to buy a shell company, and then merge a private company into the shell company. In this way, GOLDSTEIN could get control of a public company. Trader A and Trader B would then help GOLDSTEIN raise capital using the public company's stock.

49. In July 2009, BERCOON and GOLDSTEIN travelled to Las Vegas, Nevada to meet with Trader A and VEUGELER. Trader A introduced VEUGELER to BERCOON and GOLDSTEIN as a "market maker." VEUGELER agreed to help BERCOON and GOLDSTEIN raise money.

50. At the July 2009 meeting in Las Vegas, Trader A explained to BERCOON and GOLDSTEIN that he had a network in place to promote a publicly traded company, once BERCOON and GOLDSTEIN acquired control of one. Trader A would arrange for Trader C, a co-conspirator not charged in this Indictment, to send email blasts to thousands of potential investors. BERCOON and GOLDSTEIN would prepare a number of press releases ahead of time, to provide content for press releases and for the email blasts to potential investors. Trader A described this procedure as "social networking." Trader A, VEUGELER, Trader C, and any other co-conspirators involved in carrying out the "social networking" would be paid from the money raised through it.

51. VEUGELER's role was to sell shares in the public company, during the time that the press releases and email blasts were generating demand for the

17

stock. During one of the meetings, VEUGELER explained that he wanted the shares under his control to be held in 7-12 different brokerage accounts before the "market making" event, in order to ensure better acceptance of the stock being sold into the market.

## The MCGI Market Manipulations

### Acquiring Control of a Publicly Traded Company

52. On September 25, 2009, BERCOON and GOLDSTEIN purchased a controlling interest in RX Scripted, Inc., a publicly traded company.

53. On or about December 16, 2009, BERCOON and GOLDSTEIN caused RX Scripted, Inc., to change its name to MedCareers Group, Inc. As a result, MedCareers became a publicly traded entity with millions of issued shares, the vast majority of which BERCOON, GOLDSTEIN and their co-conspirators controlled.

54. On or about January 7, 2010, MedCareers' ticker symbol on the OTCBB was changed to "MCGI".

### Preparing for the "Pump and Dump"

55. In January 2010, BERCOON instructed a business associate, Associate A, to open a personal brokerage account at Morgan Stanley. Subsequently, BERCOON caused shares of MCGI to be transferred into Associate A's new account at Morgan Stanley.

56. BERCOON prepared and provided Associate A with a fictitious bill of sale stating that Associate A had purchased the shares for $45,000.00.

18

57. BERCOON provided Associate A with a script for Associate A to use with Morgan Stanley to describe trading activity BERCOON directed Associate A to execute.

58. From time to time, BERCOON and GOLDSTEIN directed Associate A to execute certain trades in the Morgan Stanley account.

59. From January through March 2010, Associate A made net sales of approximately 119,438 shares of MCGI, yielding approximately $195,751.91 in proceeds, through the account at Morgan Stanley.

60. Later, BERCOON accompanied Associate A to a Scottrade office on Roswell Road in Atlanta, Georgia, to transfer shares of MCGI from the Morgan Stanley account to an existing Scottrade account in Associate A's name.

61. BERCOON and GOLDSTEIN used Associate A's user identification and password codes to execute numerous trades in MCGI in Associate A's Scottrade account. GOLDSTEIN also instructed Associate A to call Scottrade on several occasions to place trades in MCGI stock by phone.

**The March, 2010 MCGI Pump and Dump**

**March, 2010 Fraudulent and Misleading Press Releases**

62. Between February 26, 2010 and March 8, 2010, MedCareers filed Current Reports with the SEC on Form 8-K and issued press releases announcing plans to acquire a variety of different business concerns. Those filings and releases included the following:

19

     a.  A February 26, 2010 Form 8-K concerning the domain name MedCAREERS.com;

     b.  March 2 and March 8, 2010 Forms 8-K concerning a website, workabroad.com;

     c.  A March 4, 2010 Form 8-K concerning StaffMD and its website, www.physicianwork.com; and

     d.  A March 8, 2010 press release concerning StaffMD.

63. These Current Reports and press releases omitted to state various material facts, without which they were misleading.  For instance, these Current Reports and press releases minimized or omitted completely discussion of the costs associated with the acquisitions and the challenges MedCareers would face in raising funds to pay for them, while exaggerating the business prospects associated with them.

**March, 2010 Trading Activity**

64. In March, 2010, GOLDSTEIN travelled to Clearwater, Florida to meet with VEUGELER, and stayed for several days in VEUGELER's condominium.  For at least three days, GOLDSTEIN and VEUGELER sat next to one another during trading hours, each using a laptop computer to trade MCGI stock.  GOLDSTEIN traded stock out of Associate A's Scottrade brokerage account.  From time to time, VEUGELER gave GOLDSTEIN instructions about what trades to make and at what prices.

20

65. On Tuesday, March 2, 2010, MCGI closed at a price of $1.07, with 14,800 shares trading.  On Wednesday, March 3, 2010, MCGI closed at a price of $1.61, with 883,844 shares trading.  Thus, the price increased by 50%, and the volume skyrocketed -- increasing by 5,872% -- between March 2 and March 3.  The pattern continued into March 4, 2010, with a closing price of $2.03 and 1,502,260 shares trading:  a one-day increase of 26% in closing price and 70% in trading volume.  The price continued to increase into March 5, when it closed at $2.33; however, volume declined to 1,237,202 as the manipulation had peaked.  Trading volume continued to decline, while still remaining at far above the normal amount through March 16, 2010.

66. From February 26, 2012 through March 12, 2010, while market demand for MCGI and price for the same were both artificially high because of the promotional campaign described above, BERCOON and GOLDSTEIN caused approximately 119,428 net shares of MCGI to be liquidated through Associate A's brokerage account at Morgan Stanley, yielding approximately $195,751.91 in net proceeds.

67. In addition to the MCGI shares sold by BERCOON and GOLDSTEIN through the Morgan Stanley brokerage account in the name of Associate A during the March, 2010 pump and dump, even greater numbers of shares were sold by entities controlled by VEUGELER during the same time period.

**The May, 2010 MCGI Pump and Dump**

**May, 2010 Fraudulent and Misleading Press Releases**

68.  Between May 7, 2010 and May 10, 2010, MedCareers filed Current Reports with the SEC on Form 8-K and issued press releases concerning additional planned acquisitions.  Those filings included the following:

a.  A Friday, May 7, 2010, Form 8-K concerning a "strategic alliance" with Premier Healthcare Professionals, Inc.; and

b.  A Monday, May 10, 2010, Form 8-K announcing a letter of intent to acquire a nurse staffing agency.

69. These Current Reports and press releases omitted to state various material facts, without which they were misleading.  For instance, these Current Reports and press releases minimized or omitted completely discussion of the costs associated with the acquisitions and the challenges MedCareers would face in raising funds to pay for them, while exaggerating the business prospects associated with them.

70. Many of the Current Reports and press releases described above in connection with the March and May, 2010 MCGI Market Manipulations were reprinted, republished, and restated in various email and internet-based stock newsletters and bulletins, ensuring wide dissemination among potential investors.

**May, 2010 Trading Activity**

71. On or about May 10, 2010, GOLDSTEIN travelled to a hotel in Orlando, Florida to meet again with VEUGELER. Once again, GOLDSTEIN stayed with VEUGELER for several days while the two men coordinated their trading activity in MCGI, working from side-by-side laptop computers.

72. On Friday, May 7, 2010, MCGI closed at $1.60, with 37,940 shares trading. On Monday, May 10, MCGI reached an intraday high price of $2.31, closing at $2.30, with 1,567,233 shares trading -- an increase of 43.75% in price and 4,030% in volume. Price and trading volume of MCGI remained inflated through May 18, 2010.

73. From May 10, 2012 through May 18, 2010, while market demand for MCGI and price for the same were both artificially high because of the promotional campaign described above, BERCOON and GOLDSTEIN caused approximately 162,623 net shares of MCGI to be liquidated through Associate A's brokerage account at Scottrade, yielding approximately $319,600.98 in net proceeds.

**Proceeds from the MCGI Market Manipulations**

74. The bulk of the proceeds raised by BERCOON and GOLDSTEIN from the sale of stock in Associate A's brokerage accounts from both the March and May, 2010 MCGI manipulations were ultimately deposited into a Wachovia Bank account in the name of HMRZ Consulting, LLC ("the HMRZ account"), which was controlled by BERCOON and GOLDSTEIN.

75. From the HMRZ account, BERCOON and GOLDSTEIN caused proceeds of the MCGI sales from the March and May, 2010 manipulations to be paid out to themselves and to relatives.  Additionally, BERCOON and GOLDSTEIN used those proceeds to pay various business debts and expenses, including some that were related to their other business concerns, rather than to MedCareers.

76. In addition to the MCGI shares sold by BERCOON and GOLDSTEIN through the Morgan Stanley and Scottrade brokerage accounts in the name of Associate A during the March and May, 2010 manipulation, numerous shares were sold by entities controlled by VEUGELER during the same time periods.

**Settling the Tab from the MCGI Market Manipulations**

77. On July 11, 2010, Trader A sent a text message to GOLDSTEIN attempting to collect payment for his work in the pump and dump scheme.  The text message stated, "Will, I just got home and the checks are not here, I'm sending someone to Pete's tomorrow to pick them up, please call me to make arrangement for the balance."

All in violation of Title 18, United States Code, Section 1349.

**Counts Fifteen Through Eighteen**
(Wire Fraud Relating to MedCareers)
18 U.S.C. § 1343

78. The Grand Jury incorporates and re-alleges Paragraphs 35-77 above as if fully set forth herein.

24

79. On or about the dates specified in Column A, the Defendants, MARC E. BERCOON, WILLIAM A. GOLDSTEIN and PETER P. VEUGELER, having knowingly devised the aforesaid scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing and attempting to execute the same, in the Northern District of Georgia and elsewhere, with intent to defraud did cause to be transmitted by means of wire communication in interstate commerce, certain signs, signals and sounds, that is, wire transfers of monies into the HMRZ account at Wachovia Bank in Atlanta, Georgia, account number x1382, in the amounts specified in Column B, as further specified below:

| Count | A | B | C |
|---|---|---|---|
| 15 | 3/10/2010 | $155,000 | Wire transfer from Associate A's account at Suntrust Bank to the HMRZ account |
| 16 | 4/28/2010 | $60,000 | Wire transfer from U.S. Bank, on behalf of Scottrade, with funds originating from Associate A's Scottrade brokerage account, to the HMRZ account |
| 17 | 5/13/2010 | $310,000 | Wire transfer from U.S. Bank, on behalf of Scottrade, with funds originating from Associate A's Scottrade brokerage account, to the HMRZ account |
| 18 | 5/14/2010 | $12,000 | Wire transfer from U.S. Bank, on behalf of Scottrade, with funds originating from Associate A's Scottrade brokerage account, to the HMRZ account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

25

**Count Nineteen**

(Securities Fraud relating to MedCareers, Inc.)
15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. §§ 240.10b-5 and 240.10b5-2;
and 18 U.S.C. § 2

80. The Grand Jury incorporates and re-alleges Paragraphs 35-77 above as if fully set forth herein.

81. From an unknown date, but at least by in or about July 2009, and continuing thereafter until at least in or about September 2011, in the Northern District of Georgia and elsewhere, the defendants, MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ, and cause to be used and employed, and did aid and abet the employment of, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, by participating in pump and dump schemes involving securities of MedCareers Group, Inc.

26

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.

## Forfeiture

82. Upon conviction of the offenses alleged in Counts One through Nine and Counts Fourteen through Eighteen of this Indictment, the defendants, BERCOON, GOLDSTEIN and VEUGELER, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 18 United States Code, Section 982(a)(2),  and Title 28, United States Code, Section 2461(c), any property constituting or derived from proceeds obtained directly or indirectly as a result of said violations.

83. Additionally, as a result of committing the offenses alleged in Counts Ten through Thirteen of this Indictment, the defendants, BERCOON and GOLDSTEIN, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A), Title 18, United States Code, Section 982(a)(1),  and Title 28, United States Code, Section 2461(c), all property, real and personal, involved in said offense.

84. If, as a result of an act or omission of a defendant, any property subject to forfeiture:

       a.  Cannot be located upon the exercise of due diligence;

       b.  Has been transferred or sold to, or deposited with, a third person;

27

c.  Has been placed beyond the jurisdiction of the Court;

d.  Has been substantially diminished in value; or

e.  Has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 982 (b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property.

A _____ True _____ BILL

_____
FOREPERSON

JOHN HORN
*Acting United States Attorney*

ALANA R. BLACK
*Assistant United States Attorney*
Georgia Bar No. 785045

STEPHEN H. MCCLAIN
*Assistant United States Attorney*
Georgia Bar No. 143186

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

28