IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER,

Defendants.

CRIMINAL CASE NO.

1:15-CR-022-LMM-JFK

## **FIRST ORDER AND REPORT AND RECOMMENDATION**

Pending before the court are various pre-trial motions filed on behalf of Defendants Marc E. Bercoon, William A. Goldstein, and Peter P. Veugler.  This order and report and recommendation addresses the following pending motions: Defendants' motions [Docs. 46 and 54] for severance, motion [Doc. 48] for a bill of particulars, motion [Doc. 53] to strike surplusage and motions [Docs. 51, 75, 77 and 118] to suppress evidence obtained from wiretaps.[1]  After consideration of these motions,

---

[1]This order and report and recommendation does not address the remaining pending motions, Defendants Bercoon's and Goldstein's motions [Docs. 47 and 147] to suppress evidence received by the Government from a cooperating witness and Defendant Goldstein's motion [Doc. 55] for disclosure of communications with the Securities and Exchange Commission ("SEC") and to suppress evidence obtained by the SEC which will be addressed in a supplemental order and report and recommendation.  Additionally, Defendant Goldstein's motion [Doc. 39] to participate

briefs filed in support of and opposition to the motions, and the record before the court, the court makes the following findings of fact, conclusions of law and enters the following orders and recommendations.

## Motions to Suppress Wiretap Evidence

### I.      Arguments of the Parties

Pending before the court are motions to suppress evidence obtained by the Government as a result of the execution of four wiretap orders signed by District Judges sitting in this District.  [Docs. 51, 75, 77, 118].  On May 6, 2015, Defendant Goldstein filed a preliminary motion to suppress wiretap evidence obtained from the execution of four orders authorizing electronic intercepts from June 24, 2011, through October 2011.  [Doc. 51].  In that motion, after asserting as a named individual on each intercept order that he was an "aggrieved person" under 18 U.S.C. § 2511 and had standing to challenge each wiretap [Id. at 3-4], Defendant contended that the affidavits offered in support of each wire intercept order (1) failed to establish the requisite "necessity," see 18 U.S.C. § 2518(1)(c), offering general arguments based on the contents of the affidavits but focusing on the fact that the investigation included the successful use of two confidential informants and parallel civil investigation(s) by the

_____

in voir dire has been deferred to the trial court [Doc. 58].

AO 72A
(Rev.8/8
2)

SEC, (2) failed to establish probable cause (including due to the failure to establish the reliability of the confidential informants) and (3) may have included false information or omitted material information requiring a Franks[2] hearing.  Defendant noted that additional review of the discovery materials was necessary in order to perfect the motion to suppress.  [Id. at 5-17].[3]

---

[2]Franks v. Delaware, 98 S. Ct. 2674 (1978).

[3]Defendant makes a request for an evidentiary hearing at which the Government would be required to establish necessity for the wiretaps, which would include an explanation of false statements or omissions by the affiant to the affidavits for the wire intercepts.  [Doc. 51 at 17].  When the issue to be determined is whether the affidavit for a warrant, or in this case, intercept order, establishes probable cause or necessity, the court is restricted to consideration of the four corners of the affidavit offered in support of the order or warrant.  See Aguilar v. Texas, 84 S. Ct. 1509, 1511 n.1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention."), abrogated on other grounds Illinois v. Gates, 103 S. Ct. 2317 (2012); United States v. Casillas, 304 Fed. Appx. 561, 562-63 (9th Cir. 2008) ("Looking only to the four corners of the wiretap application," the court will review whether a "substantial basis" exists for a finding of probable cause.) (citation omitted); United States v. Milton, 153 F.3d 891, 894 (8th Cir. 1998) (same); United States v. Brown, 2014 WL 6674452, at *2 (E.D. Tenn. November 19, 2014) (no valid reason for hearing when issue of necessity is determined from four corners of affidavit).  Only if, as will be discussed infra, Defendants carry their burden under Franks will an evidentiary hearing be set on that issue.  See United States v. Heilman, 377 Fed. Appx. 157, 183 -184 (3rd Cir. 2010) (rejecting the defendant's claim that he is, apart from Franks, entitled to a "necessity" hearing); United States v. Bussell, 2011 WL 6258827, at *5 (E.D. Tenn. December 15, 2011) (rejecting the defendant's request for a necessity hearing).

AO 72A
(Rev.8/8
2)

The court thereafter entered an order detailing the requirement for each Defendant seeking to challenge one or more wiretaps to establish that he is an "aggrieved person" and to allege sufficiently, as to each wiretap, challenges to the affidavits offered in support. [Doc. 59]. Defendants Bercoon [Doc. 75] and Veugler [Doc. 77] then filed preliminary motions to suppress the wiretap orders in this case asserting that they are "aggrieved persons" as they were named as interceptees in each authorization. The Government does not contest each Defendant's standing to challenge all four wiretap orders [Doc. 123 at 25], and the court finds each Defendant is a "aggrieved person" as defined by the wiretap statute and entitled to challenge all four wiretap orders. Defendants each requested additional time to review discovery in order to perfect the motions to suppress, which this court granted.

### a. Defendant Bercoon's Contentions

On November 17, 2015, Defendant Bercoon filed a supplemental brief in support of his motion to suppress the first three wiretap orders, entered on June 24, 2011, July 26, 2011, and August 25, 2011, all of which involved interception of a cellular telephone used by Defendant. [Doc. 117 at 5-6]. After setting forth his chronology of the events surrounding obtaining the wiretap orders [Id. at 5-7], Defendant provided his summary of the information supporting the wiretap orders and

4

the necessity for the wiretaps [Id. at 7-15] and of the information he contends was omitted from the affidavits for the wiretap orders entitling him to a Franks hearing on whether the affidavits establish necessity for the orders [Id. at 15-22]. The omitted information focuses on SEC civil investigations and litigation which Defendant contends were not discussed by the affiant when addressing the necessity for the wiretaps. [Id. at 15-16]. Defendant asserts that two parallel SEC investigations were being conducted against Defendants Bercoon and Goldstein for almost a year before the first wiretap application, one in Atlanta ("SEC ARO") involving stock trading in MedCareers ("MCGI") and one in Los Angeles, California ("SEC LARO") involving selling shares of stock in LADP Acquisition, Inc. ("LADP").

Defendant asserts that:

[T]he FBI and the United States Attorney's Office for the Northern District of Georgia were all jointly involved in these twin investigations. An FBI-302 report from August 30, 2010 described an interview with Marc Rosenberg, "CS-1." AUSA's McClain, and Anand were present, along with Atlanta SEC Staff Attorneys Brunson, Lipson and Wilhelm. Participating in the session by phone was SEC Staff Attorney Lee from the Los Angeles office.

[Id. at 16]. Defendant outlines the course of the two SEC investigations which obtained information from entities and individuals associated with Defendants Bercoon and Goldstein from June 2010 onward for the SEC investigation involving MCGI and

5

the SEC investigation involving LADP.  Defendant points out that on August 18, 2010, an SEC ARO Staff Attorney sent documents from a proffer session with CS-2 to an SEC LARO Staff Attorney.  [Id. at 17].

In late summer 2010, the SEC ARO received information resulting from apparently informal requests regarding the investigation of MCGI.  And in that investigation, in mid-August 2010, subpoenas were issued to companies associated with Defendants Bercoon and Goldstein and responsive information was provided to the SEC on September 27, 2010, and October 18, 2010, by Defendants' civil counsel, which included email communications, information regarding telephones they used and personal addresses.  [Id. at 17-18].

In the SEC LARO investigation, in June and July 2010, after notification of the civil investigation into LA Digital Post, Inc., an affiliate of LADP, informal requests for production of documents for the company resulted in production of information.  On September 14, 2010, an *ex parte* civil suit was filed in Los Angeles, SEC v. LADP Acquisitions, Inc., et al., 2:10-cv-06835, seeking a temporary restraining order, against LADP and Defendants Bercoon and Goldstein.  Hearings were held regarding an asset freeze, and an order was issued requiring that Defendants make a full accounting of their finances.  An injunction entered on September 17, 2010, ordered Defendants "to

6

provide lists of all accounts, business and personal" and then to turn over to the SEC "all of their computers and electronic equipment, . . . email accounts, passwords for all accounts, and other financial information."  [Id. at 18-19].  On November 23, 2010, Defendant Bercoon's counsel contends that the SEC was provided a ten-page list of the information which identified eighteen bank accounts used in Defendants' businesses, identified and "turned over" ninety-four computers and electronic storage devices, as well as "identified and provided passwords for 49 internet accounts they used . . . ." [Id. at 19-20].  Defendant then states, after a judgment was entered against them in February 2011, that in April 2011, Defendants "agreed to turn over to the Los Angeles office of the SEC all of the physical equipment and account information pursuant to the Court's Judgment in that case. . . .  The Defendants turned over this trove of information in late April, 2011."[4]  [Id. at 20].

Relying on the trial judge's decision in United States v. Rajaratnam, 09-cr-1184,[5] Defendant Bercoon contends that a Franks hearing is required because the

---

[4]This statement is an apparent conflict with the previous statement that the information and these items were "turned over" in late 2010.

[5]The district court's order following submission of briefs after a Franks evidentiary hearing was conducted is found in United States v. Rajaratnam, 2010 WL 4867402 (S.D. N.Y. November 24, 2010), and the Second Circuit Court of Appeals' review of that order is found at United States v. Rajaratnam, 719 F.3d 139 (2nd Cir.

affidavits in this case "never mentioned that the two SEC investigations yielded all of the Defendants' computers, internet accounts, and financial information[,] . . . failed to mention that through counsel the Defendants had made significant concessions and admissions to the SEC[,] . . . [and] barely describes the vast quantity of information the Defendants and others provided to these joint and parallel investigations." [Doc. 117 at 21-22].

### b.    Defendant Goldstein's Contentions

Also on November 17, 2015, Defendant Goldstein filed a perfected motion to suppress the wiretap orders focusing on the orders issued on June 24, 2011, July 26, 2011, and August 25, 2011. [Doc. 118]. Defendant contends that the affidavits for these wiretap orders do not establish probable cause for the wire intercepts because the information supporting the affidavits is stale and because the affiant's use of his subjective interpretations and opinions as to the meaning of various intercepted conversations is insufficient to establish probable cause.[6] [Id. at 6-8]. And echoing

_____

2013).

[6]Defendant states that for the purposes of his argument, he is assuming that information regarding the data obtained from the cellular telephones produced to the Government by Marc Rosenberg, as will be discussed *infra*, will remain included in the affidavit. [Id. at 6 n.2]. However, due to the pending motion [Doc. 47] to suppress that information and all fruits flowing therefrom, the court will *not* consider that

8

the arguments made by Defendant Bercoon, Defendant Goldstein contends that the affidavits do not establish necessity for the wiretap orders because the affiant did not "establish the futility in using investigative means either already undertaken or considered by the police . . . ." [Id. at 8-11]. Defendant then discusses each affidavit in more detail.

With respect to the wiretap order signed on June 24, 2011, Defendant provides his summary of the affidavit's probable cause which presents a market manipulation scheme by Defendants Bercoon and Goldberg and Veugeler and Defendant Veugeler's wife involving MCGI occurring in March and May of 2010, but he takes issue with the contention that the scheme is ongoing and that another market manipulation occurred in March 2011. Defendant also summarizes the information and cooperation provided by individuals identified as CS-1 and CS-2 in the affidavit relating to the alleged market manipulations in March and May of 2010 and further describes CS-1's consensual calls to Defendant Bercoon from February 2011 to May 2011. [Id. at 12-16]. This information, according to Defendant, established that two co-conspirators provided eye-witness testimony as to the 2010 market manipulations, thus, negating

_____

information in resolving the motions to suppress the wiretap orders and will determine if probable cause is established excising references to the data from those cellular telephones.

the need for the wiretaps.  [Id. at 16].  Defendant also summarizes the information, SEC data and trading records from January 25, 2010, through April 8, 2011, upon which the affiant, without any real basis according to Defendant, concludes another market manipulation occurred in March 2011.  [Id. at 16-17].  Defendant contends neither Defendant had shares in or access to MCGI in March 2011 but were dealing with the SEC ARO investigation and the civil suit arising out of the SEC LARO investigation.  [Id. at 17].

As to the necessity for the wiretap, Defendant contends that affiant's statements are "perfunctory conclusions" and fail to explain why any further investigation was needed regarding the 2010, or even a March 2011, market manipulations.  [Id. at 18-19].  Defendant points specifically to the information available from CS-1 and CS-2 regarding the 2010 market manipulations.  [Id. at 20-21].  Defendant again points to all of the information provided to the SEC LARO in the civil litigation and, referencing the same FBI-302 concerning the August 30, 2010, debriefing, infers that all of the SEC LARO information was available by April 2011 to the affiant.  [Id. at 21-22].

With respect to the July 26, 2011, wiretap order, Defendant first attacks the affidavit by contending that neither probable cause nor necessity can be established by

10

"piggy backing" on prior affidavits by using boilerplate language in each affidavit. [Id. at 24-25].  In the attack on this affidavit, Defendant focuses on the affiant's interpretation of intercepted conversations during the first wiretap period.  [Id. at 25-28].  Defendant contends because the affiant is not, as in a drug investigation, interpreting "code words," the interpretation offered in this case is not of the type routinely relied on by courts and that the affiant is, in fact, "engaging in full-blown translation not only of the substance and context of the conversation (that are simply not apparent) but also about the intentions of the parties to the conversations." [Id. at 26].  Defendant identifies one specific conversation which he asserts establishes that the affiant's interpretation was simply wrong and constituted a material misrepresentation.  The conversation is set forth in the affidavit as, "Goldstein: I got this [inaudible] PR guy . . . . .  He's the one, who had that 'Go to Call' or whatever, or 'Go to Meeting' or something."  [Id. at 26 n.9 (emphasis added)].  Identifying this as "a prime example of an incorrect guess at the substance of a conversation[,]" Defendant identifies the correct company intending to be referenced, "Go Link Up," and the person being referenced as "Bakthiar."  Although acknowledging that PR sounds like Bakthiar, Defendant nonetheless says that the affiant's attempt to use the conversation as evidence of ongoing market manipulation is "baseless" and a "material

11

AO 72A
(Rev.8/8
2)

misrepresentation." [Id.].  And Defendant asserts that new information regarding bank accounts and the SEC LARO information and IP addresses undermines the necessity for the wiretap.  [Id. at 28-3].

And, with respect to the August 25, 2011, affidavit, which sought to monitor not only the cellular telephone used by Defendant Bercoon but also the cellular telephone used by Defendant Veugeler, Defendant again provides his summary of the affidavit focusing on the affiant's interpretation of various intercepted conversations as failing to establish probable cause because there was no ongoing scheme to conduct market manipulations.  [Id. at 30-35].  Defendant takes issue with the affiant's interpretation of a June 29, 2011, conversation with a manager of a venture capital firm which Defendant interprets as involving Defendant Veugeler's problems with the SEC but not market manipulation.[7]  [Id. at 31-32].  Among other conversations, Defendant also takes issue with the affiant's interpretation of several intercepted conversations between Defendants Bercoon and Goldstein on August 15, 2011, following the FBI's visit to Defendant Goldstein's home to the discuss the March and May 2010 activity.

---

[7]Counsel for Defendant apparently offers this interpretation based on his "understanding that the manager's concern stemmed from personal financial dealings with Mr. Veugeler and had nothing to do with stock or trading of any kind . . . ."  [Id. at 32].

However interpreted, Defendant asserts that these conversations do not establish a need for additional monitoring.  [Id. at 33].   And Defendant challenges the affiant's interpretation of intercepted conversations between Defendants Bercoon, Goldstein and Veugeler on August 16 which the affiant interprets as discussing fraudulent market manipulations involving GNZR, an entity controlled by Defendants Bercoon and Goldstein.  Defendant contends that neither he nor Defendant Goldstein controlled GNZR, that, by that point, neither Defendant owned shares in MCGI, GNZR or Find.com,[8] and that neither Defendant had any beneficial interest in or control over any free trading shares.  Accordingly, Defendant contends that affiant's statement to the contrary is "simply incorrect and a material misrepresentation."  [Id. at 34-35].  And Defendant attacks the boilerplate recitation for necessity and contends that the affiant's interpretation of an August 16, 2011, intercepted conversation involving all three Defendants that they "discussed a future market manipulation of stock controlled by them" is wrong.  [Id. at 36-37 (emphasis added)].  Linking that conversation back the discussion about GNZR stock, Defendant asserts that the affiant's speculation is wrong because Defendants did not control GNZR.  [Id. at 37].

---

[8]Find.com is another entity allegedly involved in the market manipulation scheme.

13

Defendant also challenges the necessity for the wiretap on other grounds, including that two SEC offices had been investigating Defendants for over a year and had a wealth of information which was not mentioned in the affidavit.  Defendant noted that the affiant's contention that interviews would be ineffective was a "hollow statement" given the fact that the SEC ARO had spoken to Defendant Goldstein in June 2010, that the FBI had approached Defendant Goldstein in August 2011, and that Defendant Bercoon agreed to be interviewed in October 2011.  As Defendant Bercoon had yet to make a proffer, Defendant fails to explain how affiant, in August 2011, could be aware of this future event.  [Id. at 37 & n.10].[9]

---

[9]Defendant also takes issue with the suggestion that Defendants Bercoon and Goldstein, being aware of two SEC investigations and the FBI's interest, would engage in further criminal conduct and contends that such "is simply not credible or based in reliable fact."  [Id. at 38].  The court does not intend to address this statement further than to note this court's experience over the last thirty plus years does not bear out Defendant's assertion.  Individuals knowing that they are under investigation for criminal conduct or charged with criminal conduct - in fact, individuals in custody having been convicted of criminal conduct - have in this court's experience continued to engage in the same or other illegal activities.  Just as the court would not conclude solely based on prior illegal conduct that an individual is now engaging in criminal conduct; the court will not say that under these circumstances, Defendants Bercoon and Goldstein may not have been continuing to engage in illegal market manipulation.  In any event, the District Judge reviewing the affidavit for this wiretap order was aware of the sequence of events outlined by Defendant and nonetheless determined that there was probable cause to believe that Defendants were continuing to at least attempt to engage in the market manipulation scheme.  This determination is not subject to second-guessing by this court.

14

c.      **Defendant Veugeler's Contentions**

Defendant Veugeler filed his supplemental brief in support of his motion to suppress the wiretap orders, including the fourth wiretap order signed on October 3, 2011, on November 18, 2015. [Doc. 119].  Defendant contends that the affidavits for each wiretap failed to establish probable cause and necessity, and he seeks an evidentiary hearing on his motion.  [Id. at 1-2].  With respect to the wiretap orders dated June 24, 2011, July 26, 2011, and August 25, 2011, Defendant adopted the briefs filed by Defendants Bercoon and Goldstein.  [Id. at 10].  With respect to arguments in support of suppressing the wire intercepts following the fourth wiretap order, Defendant notes that the first fifty-three paragraphs of the affidavit do not refer to him by name and that from that point forward the information provided by CS-2 regarding the March 2010 alleged market manipulation and then the affiant's interpretation of intercepted conversations do not establish probable cause.   Defendant notes information that CS-2 was unable to provide regarding the March 2010 events and missing information in the intercepted conversations interpreted by the affiant. However, as to the intercepted conversations, Defendant provides no specifics nor explains why the agent's interpretation was not reasonable and should have not been relied on by the issuing District Judge.  [Id. at 12-16].  Defendant provides no

AO 72A
(Rev.8/8
2)

additional basis for finding that the fourth wiretap affidavit failed to establish necessity for the wiretap order.   [Id.].   Defendant Veugeler's arguments frankly lack the specificity necessary to call into question the District Judge's probable cause and necessity determinations.

### d.    The Government's Response

In response to Defendants' perfected motions to suppress the wiretap orders, the Government provided to the court unredacted applications, affidavits and orders for all four wiretaps.   [Doc. 123 at 5 n.1].[10]   The Government summarized the wiretap affidavits all of which "focused on investigating a market manipulation scheme, primarily concerning trading in MCGI."[11]   [Id. at 5].   The Government provided a summary of the SEC ARO and SEC LARO investigations and the criminal investigation in this case.[12]   [Id. at 7-13].

_____

[10]The court is forwarding to the District Judge these materials for consideration in reviewing this report and recommendation.

[11]The Government states that each affidavit "defined market manipulation as 'intentional conduct designed to deceive investors by controlling or artificially affecting the market for a security or commodity.'"   [Id. (citation omitted)].

[12]Because the SEC investigation and case in Miami, Florida, of Defendant Veugeler was not raised by Defendants as a source of undisclosed materials and data, the Government did not address that investigation and case.   [Doc. 123 at 12].

16

With respect to the SEC LARO investigation and lawsuit, as Defendant Bercoon noted, on September 14, 2010, the SEC filed a civil injunctive action in <u>SEC v. LADP Acquisition, Inc., et al.</u>, which was litigated and investigated by SEC LARO staff and did not involve market manipulation but involved allegations that Defendants Bercoon and Goldstein "carried out a 'bait-and-switch' scheme, in which they had sold over 100 investors shares in a private company, [LADP], for over $3.2 million[,]" by tricking investors into believing that they were investing in L.A. Digital Post, Inc. Accordingly, investors received worthless LADP share certificates. Defendants allegedly misappropriated a portion of the investor funds. [<u>Id.</u> at 8, citing SEC litigation release dated September 17, 2010]. Defendants were represented in the Los Angeles litigation. [<u>Id.</u> (citation to docket omitted)]. Defendants apparently failed to produce the financial accounting ordered, and a show cause hearing was scheduled. [<u>Id.</u> at 9 (citation to docket omitted)]. On February 11, 2011, pursuant to settlement agreements, the judge in the Los Angeles litigation entered permanent injunctions against Defendants prohibiting them from future securities fraud violations. [<u>Id.</u> at 9-10 (citation to docket omitted)].

On April 22, 2011, the judge in that case entered a stipulated order governing the collection of electronic media which required Defendants to allow immediate

17

access to all electronic media, other than their computers, to the SEC and required allowing access to their computers by a third party vendor who was to conduct a privilege review of the materials on the computers, based on information provided by Defendants, remove all identified privileged documents and then produce a copy of the remaining materials on the computers to the SEC; however, the order required the third party vendor to maintain the confidentiality of the information on the computers except as provided in the order or absent a stipulation entered by the parties or further order of the court. [Id. at 10-11 (citations to docket entry omitted)]. According to the Government, the data from the computers "remains in legal limbo" and in the possession of the third party vendor. [Id. at 11 n.5].

After Defendants were indicted in this court, at their request, the Government sought the materials from the SEC LARO previously produced by Defendants as part of the civil litigation. The Government received that information in September 2015 and produced the data received from the SEC LARO to Defendants on September 25, 2015. [Id. at 11].[13]

_____

[13]With respect to Defendants' list of information provided in April 2011, in the Los Angeles litigation, allegedly including "ninety-four computers and electronic storage devices" [Doc. 117 at 19-20], the data received from SEC LARO in September 2015 did not contain any data from non-computer storage devices. Government counsel states that criminal authorities in Atlanta have never had any data from any

AO 72A
(Rev.8/8
2)

In Atlanta, the FBI instituted the criminal investigation after SEC ARO began the civil investigation of Defendants and was contacted by the SEC staff about a cooperating source who had information about Defendants Bercoon's and Goldstein's involvement in market manipulation.  The interview of that individual occurred on August 30, 2010, as discussed by Defendant Bercoon, and was attended by SEC ARO staff attorneys as well as FBI and U.S. Attorney's Office personnel.  An SEC LARO staff attorney participated by telephone.  [Id. at 12-13].  As set forth in the affidavits for the wiretap orders, criminal investigating authorities obtained and relied on data and information obtained by the SEC ARO's market manipulation investigation.  [Id. at 13 (citing June 24, 2011, Affidavit ¶¶ 70-79, 82-83, 112)].

After discussing the general principles of law applicable to challenges to wiretap orders [Id. at 13-25], the Government addressed the specific claims asserted by each Defendant [Id. at 25-36].  As to Defendant Bercoon's contention that the affidavits for the first three wiretap orders would not establish necessity for the wire intercepts if the information from the SEC LARO investigation and civil case had been disclosed to the issuing judge and that the failure to disclose that information constitutes grounds for a Franks hearing, the Government first responds that Defendant presents no factual

---

electronic storage devices imaged as part of the SEC LARO case.  [Id. at 11 n.5].

19

basis upon which to conclude that, at the time the first three (or the fourth for that matter) orders were obtained, criminal investigating authorities in Atlanta had access to that information.  [Id. at 25-28].  The Government points out that counsel for Defendant in seeking additional time to perfect the motion to suppress acknowledged that the Government, as of July 16, 2015, did not have the data from the SEC LARO civil case, including any images from Defendants' computers, but would obtain that material and that Defendants would need time to review those materials once received.[14]  [Id. at 25 n.6 (citing Doc. 105)].  The Government also points out that, despite having been allowed the additional time to review the materials, Defendant Bercoon failed to identify any fact or facts from the SEC LARO file which would have impacted the necessity determination.  [Id. at 25 n.6 & 26].  The Government also challenges Defendant's reliance on the self-reported information provided by Defendants to SEC LARO, which may lack trustworthiness, as support for a Franks hearing.  [Id. at 26-27].  The Government asserts that Defendant Bercoon's offer of proof fails to show that the affiant for the affidavits was in possession of the SEC

---

[14]The Government also points out that the publically available information in the SEC LARO civil case did not include Defendants' passwords for on-line accounts, including email accounts; that information had been redacted.  [Id. at 27 (citation to docket entry omitted)].

20

LARO information at the time he prepared the affidavits; instead, at best, the Government contends that Defendant may have shown that the affiant erred in overlooking the potential usefulness of the SEC LARO information which would, at most, establish negligence.  [Id. at 27-28].  And the Government argues that, even if the information obtained from the SEC LARO files in September 2015 had been included in the affidavits, necessity for the wiretap orders would not have been negated and that Defendant's reliance on the district court decision in Rajaratnam is misplaced. [Id. at 29-31].

The Government also addressed the arguments raised by Defendant Goldstein. Defendant had argued in support of a Franks hearing, regarding failure to disclose information impacting a finding of necessity,[15] that on one of the devices, a Blackberry 9700, turned over to the Government by the confidential informant, there were over 1,000 emails.  In response, the Government points outs, as established at one of the evidentiary hearings on Defendant Goldstein's motion to suppress [Doc. 47; Doc. 120], that these emails were not located until Defendant's expert conducted a broader search of the devices in 2015 and that Defendant presented no facts establishing that the

---

[15]The Government also noted that Defendant Goldstein, with respect to the allegedly omitted SEC LARO materials, failed to point to any facts in those materials which would have undermined the necessity determination.  [Id. at 32].

affiant was aware of these emails until that time [Doc. 123 at 31 n.7].[16]   The Government next addressed Defendant's contention that the affidavits for the orders lacked probable cause primarily due to the inclusion of stale information, that is, that the only illegal activity being investigated occurred in March and May of 2010.  The Government contends that Defendant's arguments ignore the information provided about the March 2011 market manipulation, CS-1's consensual conversations with Defendant Bercoon in 2011 and the information obtained from intercepts after the first wiretap order was obtained which indicated that additional market manipulations were being discussed.  [Id. at 32-34].  With respect to Defendant's contention that the affiant's interpretation of various intercepted conversations were materially incorrect, the Government summarily states that such an allegation "is not the type of intentional misstatement requiring a Franks hearing."  [Id. at 34-35].

Regarding Defendant Veugeler's motion to suppress, the Government correctly notes (as already pointed out by the court) that his motion, as to the fourth wiretap order, fails to provide the requisite particularity to overcome the presumption of

---

[16]With respect to the information obtained from the devices turned over to the Government, evidence introduced at the evidentiary hearing also established that the ending date for data retrieved from any of the devices was August 3, 2010.  [Doc. 120, Def. Exhibits. 1A-D, 2A, 4B].

AO 72A
(Rev.8/8
2)

validity attributed to a wiretap order.  A defendant has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained.  <u>See</u> <u>United States v. Mitchell, III</u>, 274 F.3d 1307, 1310 (10th Cir. 2001) ("a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption") (citations and internal quotation marks omitted); <u>United States v. Cooper</u>, 203 F.3d 1279, 1284 (11th Cir. 2000) (It is well settled that "'[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .  A court need not act upon general or conclusory assertions. . . .'") (quoting <u>United States v. Richardson</u>, 764 F.2d 1514, 1527 (11th Cir. 1985)); <u>and see</u> <u>United States v. Moody</u>, 762 F. Supp. 1491, 1495 (N.D. Ga. 1991) ("In passing upon the validity of the authorization, the court accords 'great deference' to the issuing judge's probable cause determination.").  Defendant Veugeler's conclusory allegations, which he failed to particularize as directed by the court [Doc. 59], do not come close to overcoming the presumption of validity attached to the fourth wire intercept order. And the court has reviewed the affidavit in support of that order and finds that Defendant's arguments do not otherwise support granting his motion to suppress this wiretap order.  The affidavit for the wiretap order establishes both probable cause and

23

necessity.  Defendant's adopted challenges to the first, second and third wiretap orders will be addressed in considering Defendants Bercoon's and Goldstein's motions to suppress.

Finally, as to all four wiretap orders, the Government invokes the good faith exception to the exclusionary rule, which the Eleventh Circuit Court of Appeals applies to wiretap orders.  [Doc. 123 at 36].

### e.    Defendants' Replies

Defendants Bercoon and Goldstein filed replies in support of their  motions to suppress.  [Docs. 130 & 131].  Defendant Bercoon contends that the Government was silent in its response regarding access to his email accounts noting that in late 2010, "the United States had access to <u>all</u> of the Defendants' email accounts, <u>including the passwords for those accounts</u>" and that the Government failed to explain why, when it is "common knowledge" that "email is the preferred medium of communication for many people," that information was not provided to the issuing judges and why the wiretap was nonetheless necessary.  [Doc. 130 at 2].  Contrary to Defendant's assertion, as set forth *supra*, the Government did address lack of access to the email accounts, specifically "<u>the passwords for those accounts</u>[,]" that is, that Defendants did not actually turn over any of this information to the SEC LARO until April 2011 (as

AO 72A
(Rev.8/8
2)

Defendant's apparently concedes [Doc. 117 at 20]) and that the passwords were redacted from the public information in the SEC civil case. [Doc. 123 at 8-10 & n.5, 27]. Defendant also takes issue with the Government's arguments that information in the SEC LARO's investigation was not in the possession of prosecuting authorities in Atlanta until September 2015. [Doc. 130 at 3]. Interestingly, Defendant opines that this assertion is not supported by affidavit or sworn statement. [Id.]. As will be discussed further *infra*, the burden is on Defendants, not the Government, to produce affidavits or sworn statements (notably missing without explanation by all Defendants) in order to make a preliminary showing to obtain a <u>Franks</u> hearing. Defendant does not dispute the Government's outline of the circumstances resulting in the Government obtaining the SEC LARO materials in September 2015, that is, that the Government sought and obtained information from the SEC LARO in September 2015 at Defendants' request [Doc. 123 at 11-12 & n.5],[17] but he points again to the two

_____

[17]In fact, had Defendants honestly believed that the SEC LARO materials were in the Government's possession before July of 2015, when the Government agreed to seek those materials, but that the Government had not turned over the materials in the months of discovery leading up to that point, Defendants would have made that complaint at that time. They did not. Defendant Goldstein likewise argues that at a minimum a hearing is needed to test the Government's unsworn statement that prosecuting authorities were unaware of the SEC LARO matter or of the voluminous data obtained there. [Doc. 131 at 12]. The court notes that the Government made no such claim with respect *to the existence* of the SEC LARO proceeding. However,

incidents where information in the SEC ARO investigation was relayed *to* the SEC LARO as evidence that "both offices *routinely* communicated with one another about the *joint* effort to go after these Defendants." [Id. (emphasis added)].  Two instances of the SEC ARO providing information to the SEC LARO does not establish that any contact was occurring *routinely* or that a *joint* investigation was taking place involving the SEC LARO and the *prosecuting* authorities in Atlanta.  Defendant also notes that if the court finds a Franks violation, then the good faith exception does not apply.  [Id. at 4].

Defendant Goldstein, in his reply, again asserts that the information in the affidavit for the wiretap orders is stale and is devoid of facts establishing probable cause of continued market manipulation.   He also contends that the affiant's "unsupported, speculative conclusions about 'market manipulation'" is the reason a hearing is necessary. [Doc. 131 at 3-4].  A hearing is only granted, as discussed *supra*, if Defendants make a preliminary showing under Franks; all other attacks on the

_____

being aware of that civil investigation and that information is being gathered is a far cry from being in possession of that information and intentionally, or even recklessly, omitting to disclose details about the information to the issuing district judges to avoid negating a finding of necessity.  As the Government points out, at best, Defendants might establish that the Government should have asked for the information and did not before seeking the wiretap orders.  [Doc. 123 at 27-28].

26

affidavits for the wiretap orders are judged on the four corners of the affidavits.[18] <u>See</u> <u>Casillas</u>, 304 Fed. Appx. at 562-63; <u>Milton</u>, 153 F.3d at 894; <u>Brown</u>, 2014 WL 6674452, at *2. And Defendant points out that the Government offered no substantive explanation why the alleged mistakes in interpreting or the unsupported opinions in interpreting intercepted conversations by the affiant does not provide a basis for a <u>Franks</u> hearing. [Doc. 131 at 6-11]. Defendant contends that he has offered to prove another explanation for the conversations; however, as will be discussed *infra*, that is a burden that Defendant must meet to obtain the hearing. [<u>Id.</u> at 8]. And Defendant again argues that the "boilerplate" or "blanket" assertions supporting necessity are insufficient. [<u>Id.</u> at 11-14].

## II.    Wiretaps Procedural Background

On June 24, 2011, the Government presented an application and affidavit for interception of wire communications for thirty days to District Court Judge Amy Totenberg, who signed the order authorizing the wire intercept on that date.

---

[18]Defendant also notes that the Government's reliance on the consensual conversations between Defendant Bercoon and CS-1 from February 2011 to May 2011 to establish an ongoing conspiracy are invalid because a defendant cannot conspire with a cooperating witness, citing <u>United States v. Livesay</u>, 803 F.2d 1124, 1126 (11th Cir. 1986). Defendant paints these conversations as attempts to gather evidence about past crimes. [Doc. 131 at 5]. The court is not quite sure why Defendant believes that a wiretap order cannot be obtained, at least in part, to gather historical evidence.

AO 72A
(Rev.8/8
2)

[Government Exhibits 1A ("6/24/11 Application"); 1B ("6/24/11 Affidavit"); 1C ("6/24/11 Order")].  This wiretap application sought to intercept communications over cellular telephone number (678) 764-2702, subscribed to MedCareers Group, Inc., and used by Defendant Bercoon ("TT1"), of named interceptees including, Defendants Bercoon, Goldstein and Veugeler.  The application was based on the affidavit of R. Wallace Taylor, Federal Bureau of Investigation ("FBI") Special Agent ("Affiant"). [6/24/11 Application & Affidavit].

On July 26, 2011, the Government presented an application and affidavit for interception of wire communications for thirty days to District Court Judge Richard W. Story, who signed the order authorizing the wire intercept on that date. [Government Exhibits 2A ("7/26/11 Application"); 2B ("7/26/11 Affidavit"); 2C ("7/26/11 Order")].   This wiretap application sought to continue to intercept communications over the TT1, that is, number (678) 764-2702, subscribed to MedCareers Group, Inc., and used by Defendant Bercoon, of named interceptees including, Defendants Bercoon, Goldstein and Veugeler.  The application was based on the affidavit of FBI Special Agent Taylor/Affiant.   [7/26/11 Application & Affidavit].

28

On August 25, 2011, the Government presented an application and affidavit for interception of wire communications for thirty days to District Court Judge Charles A. Pannell, Jr., who signed the order authorizing the wire intercept on that date. [Government Exhibits 3A ("8/25/11 Application"); 3B ("8/25/11 Affidavit"); 3C ("8/25/11 Order")].   This wiretap application sought to continue to intercept communications over the TT1, that is, number (678) 764-2702, subscribed to MedCareers Group, Inc., and used by Defendant Bercoon, and to begin interception over cellular telephone number (727) 421-2688, subscribed to and used by Defendant Veugeler ("TT2"), of named interceptees including, Defendants Bercoon, Goldstein and Veugeler.   The application was based on the affidavit of FBI Special Agent Taylor/Affiant.  [8/25/11 Application & Affidavit].

On October 3, 2011, the Government presented an application and affidavit for interception of wire communications for thirty days to District Court Judge Timothy C. Batten, Sr., who signed the order authorizing the wire intercept on that date. [Government Exhibits 4A ("10/3/11 Application"); 4B ("10/3/11 Affidavit"); 3C ("10/3/11 Order")].   This wiretap application sought to continue to intercept communications over the TT2, that is, number (727) 421-2688, subscribed to and used by Defendant Veugeler, and to begin interception over cellular telephone number (813)

29

690-0960, subscribed to and used by Robert Esposito (TT3")), of named interceptees including, Defendants Bercoon, Goldstein and Veugeler.  The application was based on the affidavit of FBI Special Agent Taylor/Affiant.  [10/3/11 Application & Affidavit].

## III.   Discussion

### a.   Probable Cause

As noted, Defendant Goldstein contends that the first three affidavits for the wiretap orders do not establish probable cause because the information in each affidavit is stale, failing to establish an ongoing conspiracy to engage in market manipulation, and because Affiant's use of his subjective interpretations and opinions as to the meaning of various intercepted conversations, to demonstrate an ongoing conspiracy to obtain the July 2011 and August orders, did not establish probable cause. [Doc. 118].

Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the government must meet before electronic surveillance (wiretaps) may be authorized.  One of those requirements is that an "application must include a full and complete statement of the facts and circumstances . . . including (I) details as to the particular offense that has been, is

AO 72A
(Rev.8/8
2)

being, or is about to be committed."[19]  18 U.S.C. § 2518(1)(b)(I).  Accordingly, "[a]n application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant. . . .  The issuing [district judge] is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained."  United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990); see also United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1375-76 (N.D. Ga. 2001) (the same standard for judging adequacy of affidavit for search warrant is applied to affidavits in support of wiretap, and in this regard, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information'").

Like other types of warrants, probable cause must exist at the time surveillance is authorized.  United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985).  Accordingly, "'[i]t is fundamental that the information provided to a judge in the application for a wiretap order . . . must be timely.'"  United States v. Degaule, 797 F.

---

[19]A wire intercept order may be authorized based on a showing that a crime "has been" committed not necessarily that the offense under investigation is ongoing or being planned.  However, as will be discussed *infra*, the type and nature of the criminal conduct under investigation will impact the probable cause determination especially regarding the allegedly stale information in the affidavits.

31

Supp. 2d 1332, 1356 (N.D. Ga. 2011) (citation omitted).  In <u>Degaule</u>, the court summarized the case law on this issue:

> Whether information submitted in support of a wiretap order is stale is an issue that is decided on the particular facts of each case. . . .  Courts traditionally allow a fairly long period of time to elapse between information and search warrant in cases where the evidence shows a long-standing, on-going pattern of criminal activity. . . .  This is even more reasonable in wiretap cases than in ordinary search warrant cases, because no tangible objects that can be quickly carried off are sought. . . . Furthermore, [i]t is well established . . . that stale information is not fatal when . . . updated information corroborates the alleged stale information.

<u>Id.</u> (citations and internal quotation marks omitted).

Because a wiretap order is presumed to be valid, a defendant has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained.  <u>See</u> <u>Mitchell, III</u>, 274 F.3d at 1310 ("'a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption'") (citation omitted); <u>Nixon</u>, 918 F.2d at 900 ("We have also said that the practical nature of the [district judge's] decision justifies 'great deference' upon review and calls for upholding the [district judge's] findings even in marginal or doubtful cases."); <u>Moody</u>, 762 F. Supp. at 1495 ("In passing upon the validity of the authorization, the court accords 'great deference' to the issuing judge's probable cause determination.").  This court has carefully reviewed the affidavits for the wiretap

AO 72A
(Rev.8/8
2)

orders challenged by Defendants and finds that the totality of the circumstances set forth in the affidavits support each District Court Judge's probable cause determination.

The affidavit for the June 24, 2011, wiretap order began by outlining Affiant's training and experience as an FBI Special Agent, including white collar fraud investigations. [6/24/11 Affidavit ¶¶ 1-4]. The wiretap order was sought to obtain evidence concerning a conspiracy, 18 U.S.C. § 371, mail and wire fraud and a conspiracy to commit to those offenses, 18 U.S.C. §§ 1341, 1343 and 1349, and money laundering, 18 U.S.C. §§ 1956 and 1957 [Id. ¶ 7], involving Defendants and other as yet unknown targets [Id. ¶ 8]. Affiant set forth the basis for the facts stated, including that comments and explanations regarding consensual recordings constitute his "interpretation of the meaning of these words and conversations based on [his] training and experience, and the context of the conversations as they related to the investigation to date." [Id. ¶ 15].

In support of probable cause, Affiant began by explaining Defendants Bercoon's and Goldstein's relationship with MCGI and that a market manipulation scheme involving MCGI began in January 2010, when MCGI became publicly traded, and that the scheme continues. Defendants engaged in the scheme along with Defendant

33

Veugeler and others, as well as two cooperating witnesses, CS-1 and CS-2. [Id. ¶ 18].

Citing the SEC website, Affiant then explained in detail how a market manipulation

might operate in deceiving investors by controlling or artificially affecting the market

for a stock using techniques such as "spreading false or misleading information about

a company; improperly limiting the number of publicly-available shares; or rigging

quotes, prices or trades to create a false or deceptive picture of the demand for a

security." [Id. ¶ 19]. Affiant then explained that such conduct may constitute mail

and/or wire fraud. [Id.]. Affiant also provided an overview of the disclosures required

by the SEC for companies such as MCGI concerning security transactions, which are

immediately available online; these transactions by directors, officers or principal

shareholders of companies, such as Defendants, requiring disclosures are "insider"

transactions. [Id. ¶ 21]. Because financial markets consider insider sales as a

"bearish" or a negative indicator, typically depressing price or spurring further sales,

a director, officer or principal shareholder engaged in market manipulation may evade

or ignore disclosure requirements, for example by transferring shares to a third party,

designated as a gift, with the understanding that the proceeds of the sales will be

returned to the original owners after the shares are sold. [Id. ¶ 22]. Further, as Affiant

explained, these transactions have tax consequences and are reported on a Form 1099,

AO 72A
(Rev.8/8
2)

and such consequences are often taken into account, if not before the sale then after, by market manipulators who use third parties to sell shares. [Id. ¶¶ 23-24]. Affiant also explained the impact of "Level II" quotes on security trading. In order to avoid triggering concerns by individuals monitoring Level II quotes resulting in reducing the share price and success of a manipulation, which could occur if a market manipulator liquidated all of his shares, nominees are used to liquidate shares. [Id. ¶ 26]. Affiant stated that this transfer of the proceeds after a market manipulation can constitute money laundering. [Id. ¶ 27].

With this background, Affiant then explained the relationship between CS-1 and CS-2 and Defendants Bercoon and Goldstein. CS-1 had known Defendant Goldstein for over thirty years, and the men had a business relationship. [Id. ¶¶ 28-30]. Based on this business relationship, CS-1 identified TT1 as the cellular telephone used by Defendant Bercoon over which they frequently communicated. [Id. ¶ 31]. A bank account at Wachovia Bank in the name HMRZ Consulting, LLC ("HMRZ") was used by Defendants and by CS-1, at their direction, for business expenses. [Id. ¶ 32]. Defendant directed CS-1 to open a brokerage account to trade stock in MCGI, and accompanied by Defendant Bercoon, CS-1 opened a personal account with Morgan Stanley in January 2010. Shares of MCGI stock, based on a fictitious bill of sale

35

prepared by Defendant Bercoon, were transferred to the account.  [Id. ¶¶ 33-34].  At Defendants' direction and under their supervision, CS-1 traded MCGI stock shares. [Id. ¶ 35].  When Morgan Stanley no longer would handle the sales, CS-1 began using his personal account at Scottrade; in March 2010, working with Defendant Bercoon, CS-1 transferred stock from MCGI and Generation Zero Group, Inc. ("GNZR") into the account.  Defendants Bercoon and Goldstein, according to CS-1, controlled all of the trading activity in MCGI and GNZR stock using access information provided by CS-1 to utilize the Scottrade account.  [Id. ¶¶ 36-38].  The proceeds from the sales were transferred by Defendants from the account to the HMRZ bank account and to pay stock promoters in Florida.  [Id. ¶ 39].  Due to a dispute over not being paid, CS-1's employment with Defendants ended in July 2010,[20] and thereafter, he began cooperating in the SEC's investigation, initiated in July 2010.  [Id. ¶¶ 40-41].

Affiant explained that due to the stock trading in his accounts, CS-1 was facing tax liability, and acting under the supervision of Affiant, on February 1, 2011, CS-1 made consensual calls to Defendant Bercoon, at TT1, to discuss payment of those

---

[20]Defendant Bercoon, although pleading lack of funds, advised CS-1 that Defendants "were planning 'one more raise' of stock" and would pay CS-1 out of that activity.  On one occasion after this point, CS-1 attempted to spend time with Defendants but Defendant Bercoon "told him to go away, because he had 'gone over to the other side.'"  [Id. ¶ 41].

taxes.  [Id. ¶¶ 43-44].  CS-1 advised Defendant Bercoon about documentation from Scottrade and Morgan Stanley and Penson which showed a $83,000 tax liability to which Defendant responded he would have to take "a look at it and . . . go through it with" CS-1.  CS-1 explained that he was nervous about the "$83,000 y'll owe[,]" to which Defendant responded, "I understand. . . ."  Based on his training, experience and knowledge of the investigation, Affiant "believed"[21] that the discussion was about CS-1 trading securities at Defendants' direction and the tax consequences, not previously discussed (as he was advised by CS-1), from those trades, that Defendant Bercoon agreed with CS-1 about the tax consequences, and that, while not explicit admissions, Defendant Bercoon's responses indicated agreement with CS-1's statements about Defendants' responsibility for the taxes and involvement in the trading activity.  [Id. ¶ 45].  On February 3, 2011, CS-1, who was recording the conversation, met with Defendant Bercoon, who reviewed the account statements, stating, "689,000," as if surprised.  CS-1 replied, "You all did a lot of trades," or words to that effect, to which Defendant did not reply.  Affiant believed this conversation indicated a tacit agreement

---

[21]Affiant began each interpretation of a conversation involving Defendants, in all of the affidavits, with the statement outlining the basis for his "belief" or "opinion." The court will not repeat that phrase in discussing Affiant's comments about both consensual and intercepted conversations.

AO 72A
(Rev.8/8
2)

by Defendant Bercoon that he and Defendant Goldstein conducted the trading activity. [Id. ¶¶ 46-47]. And on April 13, 2011, and May 9, 2011, CS-1 placed two more consensually recorded calls to TT1 and spoke with Defendant Bercoon about the tax consequences, tax filing deadline and problems caused by the taxes on the trades, with CS-1 stating to Defendant, "Okay, I mean, I'm now regretting letting my account be used for anything like that." Defendant Bercoon replied, in part, "Marc, I know, I know all this shit. . . . Alright, I'm trying to do what I can. Alright?" Affiant stated that he believed Defendant and CS-1 "were conferring in furtherance of the conspiracy"[22] and that Defendant was acknowledging responsibility for the taxes,

---

[22]Defendant relies on the decision in Livesay, 803 F.2d 1124, to argue that these conversations cannot be used to "freshen" probable cause as to the alleged on-going conspiracy to engage in market manipulation because at the time of the conversations CS-1 was an informant not a co-conspirator. That reliance is misplaced. In United States v. Arbane, 446 F.3d 1223 (11th Cir. 2006), the court stated, "It is axiomatic that you cannot have a conspiracy without an agreement between two or more culpable conspirators. . . . If there are *only two* members of the conspiracy, neither may be a government agent or informant who aims to frustrate the conspiracy." Id. at 1228 (citations omitted; emphasis added). However, the market manipulation investigation, as alleged in the affidavits in support of the wiretap orders, involved at least three individuals besides the cooperating witnesses, that is, Defendants Bercoon, Goldstein and Veugeler. And, while the referenced conversations involved only Defendant Bercoon and CS-1, Defendant's actions in trying to resolve the tax consequences of the 2010 trading worked to the benefit of his co-conspirators, that is, dealing with CS-1's complaints.

38

acknowledging use of CS-1's accounts in 2010 to trade MCGI stock. [Id. ¶¶ 48-51]. The court finds no reason to not defer to District Judge Totenberg's decision to rely on Affiant's interpretation of these conversations as support for probable cause.

Generally, it is well-accepted that a judge reviewing an affidavit for a warrant or a wiretap order may consider and rely on an agent's interpretation of conversations based on the agent's training, experience and/or participation in an investigation. See United States v. Booker, 2013 WL 2468694, at *17 (N.D. Ga. June 7, 2013) ("'Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiant-agents as to the code, slang or obtuse language used by those persons engaged in allegedly conspiratorial communications.'") (citation omitted). The court fails to find persuasive Defendant Goldstein's contention (made primarily as to Affiant's interpretation of intercepted conversations in the subsequent affidavits) that, because Affiant is not, as in a drug investigation, interpreting "code words," the interpretation in this case is not of the type routinely relied on by courts. And Defendant's conclusory claim that Affiant is, instead, "engaging in full-blown translation not only of the substance and context of the conversation (that are simply not apparent) but also about the intentions of the parties to the conversations" does not undermine reliance on those interpretations.

39

[Doc. 118 at 26]. Affiant, in every situation where he interpreted a conversation, stated that he was basing his comments on his training, experience and involvement in the investigation, couched his comments as his "belief" and never as a statement of fact, and provided for the reviewing judge the actual conversations that he interpreted. See United States v. Davis, 2013 WL 322122, at *5 (M.D. Ala. January 10, 2013) ("Relying on his experience, training and knowledge, coupled with evidence gained from other authorized intercepts, the court conclude[d] that [the affiant's] interpretations of the conversations . . . were reasonable.") (citing United States v. Bervaldi, 226 F.3d 1256, 1266 (11th Cir. 2000) ("Determinations of reasonable belief are based on the facts and circumstances within the knowledge of the law enforcement agents.") (citation and internal quotation marks omitted))). As the court in United States v. Thompson, 2011 WL 4455244 (S.D. Fla. March 31, 2011), stated in rejecting a similar attack on an agent's interpretation of intercepted conversations, "[The] Agent . . . included excerpts of the actual conversations, as well as his interpretations, in the Affidavit. The Court could have declined to sign the wiretap order if it did not agree with the agent's interpretations." Id., at *9. Defendant's general arguments against reliance on Affiant's interpretations, not only in the first affidavit but subsequent

40

affidavits, in this case simply do not justify declining to give the deference due to the District Judges' findings of probable cause.

Affiant then provided information concerning CS-2's association with Defendants Bercoon and Goldstein and involvement with Defendant Veugeler during the market manipulations alleged to have taken place in March and May of 2010. [6/24/11 Affidavit ¶¶ 52-65]. CS-2 traveled with Defendant Goldstein to Florida in 2009 to meet with David Levy to discuss raising money and buying a shell company and placing an existing company into that shell. CS-2 then explained how Defendants Bercoon and Goldstein contacted an attorney, David Loev, from whom they purchased a shell company which became MCGI. [Id. ¶¶ 54-55]. Levy also introduced Defendants to Defendant Veugeler, described as a "market maker," which Affiant noted appeared to mean someone "in the business of creating temporary liquidity in markets that are otherwise illiquid." [Id. ¶ 56 & n. 17]. Defendant Veugeler agreed to assist Defendants Bercoon and Goldstein. [Id. ¶ 56]. Levy established a network to "social network" the promotion of MCGI in February-March 2010, at which time CS-2 traveled with Defendant Goldstein to Florida to meet Defendant Veugeler. He was present as Defendants Goldstein and Veugeler, using laptops, traded in MCGI stock, including using CS-1's Scottrade account. Defendant Veugeler advised that the

41

stock needed to be held in multiple accounts before executing the "market making" event for better results. This activity continued for several days. [Id. ¶¶ 57-59]. A second "market making" event took place in early May 2010, again in Florida, with CS-2 present with Defendants Goldstein and Veugeler.[23]  [Id. ¶¶ 60, 65].

Based on his observations and subsequent conversations with Defendant Goldstein, CS-2 understood the "market making" events as follows. First, Defendants purchased some MCGI stock through nominee accounts, known as "sweeping the stock," which tends to increase stock price and restrict who has shares. Levy then conducted email blasts of promotional press releases over the next three days to potential investors. Due to the initial stock activity and press releases, the value of MCGI stock would rise as investors purchased stock before falling back down. [Id. ¶ 65].[24]

---

[23]Defendant Veugeler advised that the SEC was investigating his prior stock market conduct involving Seven Palms Investments, LLC, and that a civil complaint had been filed in Miami against him for conduct occurring in 2007 through 2009. [Id. ¶¶ 61-62]. Whether Defendants Bercoon and Goldstein would continue to engage in unlawful stock market conduct after the litigation against them was filed in Los Angeles, it appears that at least Defendant Veugeler had no such qualms.

[24]Paragraphs 66-68 contain the information obtained from the cellular telephones turned over to the Government by CS-1, which will not be considered by the court.

AO 72A
(Rev.8/8
2)

Next, Affiant discussed the trading records obtained by the SEC ARO civil investigation, including historical trading or "bluesheeting" data for MCGI for January 2010 through April 8, 2011, as information corroborating CS-1 and CS-2 and to explain in part why Affiant believed market manipulations occurred in March and May 2010 and March 2011. [Id. ¶¶ 70-83]. Affiant, based on records and analysis provided by the SEC ARO, for the period January 25, 2010, through May 18, 2010, (1) outlined the brokerage accounts under the control of Defendants, (2) explained the trading activity in those accounts, including in "thinly traded" stock, that is, stock with limited buyers and volatile pricing, and penny stock, such as MCGI, and (3) identified the price fluctuations in MCGI stock, which indicated increased demand and higher stock prices in early March 2010 and early May 2010 - at the times that CS-2 advised the market manipulations were occurring.[25] [Id. ¶¶ 71-72 & n.20, 73-77, 82]. Affiant also provided examples of trading activity in MCGI stock by accounts controlled by Defendant Veugeler during this time to illustrate the market manipulation scheme. [Id. ¶¶ 78-79].

---

[25]Based on his training and experience, as well as information provided by law enforcement officers experienced with market manipulations, Affiant explained the significance of tracking higher demand, generated by inflating stock prices and issuing press releases, before the manipulators liquidate their stock. [Id. ¶ 75].

43

Affiant then provided information obtained from a website tracking penny stock manipulations, which was corroborated by MCGI trading data, about a paid promotion issued on March 3, 2010, touting MCGI as the top pick of 2010 - conduct Affiant, based on his experience, stated is typical of market manipulators.  [Id. ¶ 80].  On March 28, 2011, the same website announced that MCGI was starting another promotional campaign, and, according to Affiant, trading data "support[s] a claim that an internet promotion, a market manipulation, or both took place on March 28."  That data indicated that on Friday, March 25, 2011, MCGI closed at $0.25, with 7,400 shares trading, and on Monday,  March 28, 2011, MCGI closed at $0.52, with 615,102 shares trading for "a one day increase of 108% in price and 8,212% in volume."  [Id. ¶ 81].  Similar percentage price and trading volume changes occurred in connection with the May 2010 market manipulation.  [Id. ¶ 82].  In further support of this opinion, Affiant provided a summary of the telephone toll analysis on TT1, particularly for the time frame surrounding the apparent March 2011 market manipulation.  [Id. ¶¶ 84-91].  That analysis indicated that on March 22, 2011, Defendant Bercoon contacted a telephone number for Gerard Adams, whose stock promotion company has been, according to SEC ARO, associated with at least nineteen companies investigated by the SEC for market irregularities, and then contacted Defendant Goldstein, indicating

44

that Adams may have been hired regarding the March 28, 2011, manipulation.  The analysis further indicated that on March 28, 2011, the volume of Defendant Bercoon's texts and calls were much higher than normal, indicating that he apparently was coordinating the market manipulation.  [Id. ¶¶ 87-91].

As set forth *supra*, Defendant takes issue with the Affiant's conclusion that a market manipulation occurred in March 2011.  However, Affiant in painstaking detail set out for District Judge Totenberg (and in the subsequent affidavits for District Judges Story and Pannell) (1) how market manipulations operate, (2) the SEC ARO's evaluation of MCGI trading data for the periods in March and May 2010 (including in accounts controlled by Defendants) and in March 2011, (3) the market promotions during both periods and (4) the toll record analysis for the District Judges to consider in determining whether to credit Affiant's opinion.  Defendant may disagree with the District Judges' apparent determination to accept that opinion; however, his arguments fall far short of that required for this court to second-guess the reasonableness of those determinations, especially given the fact that this court would likewise accept Affiant's opinion that Defendants' market manipulation conduct - no matter how busy they were otherwise dealing with the SEC ARO investigation and the SEC LARO litigation - continued into at least March 2011.

45

Because the court finds that Defendants Bercoon, Goldstein and Veugeler were engaged in an ongoing scheme involving market manipulation of MCGI stocks, at least through March 28, 2011, the court rejects Defendant's contention that information in support of probable cause is stale.  And the court finds that the lapse of a less than three months, March 28, 2011, to June 24, 2011, between the last apparent market manipulation and the first wiretap application, is not fatal to a finding of probable cause.  As found by the court in <u>Degaule</u>, and likewise present this case, "'[w]here the supporting affidavit paints a picture of continuing conduct, as opposed to an isolated instance of wrongdoing, . . . the passage of time between the last described act and the presentation of the application becomes less significant.'"  797 F. Supp. 2d at 1357 (citation omitted); <u>and see</u> <u>United States v. Johnson</u>, 290 Fed. Appx. 214, 223 (11th Cir. 2008) (per curiam) (collecting cases in the Eleventh Circuit Court of Appeals rejecting challenges to affidavits based on staleness involving information from six months to two years old); <u>Bervaldi</u>, 226 F.3d at 1265 (in deciding whether information in a warrant is stale, "[t]here is no particular rule or time limit for when information becomes stale").

The affidavit for the 6/24/11 order established probable cause for issuance of the wiretap order.  The affidavits for the 7/26/11 wiretap order and 8/25/11 wiretap orders

46

AO 72A
(Rev.8/8
2)

provided District Judges Story and Pannell, respectively, with the same information concerning the market manipulation scheme, how such schemes operate, Defendants' roles in the scheme and the involvement of CS-1 and CS-2.  [7/26/11 Affidavit; 8/25/11 Affidavit].[26]  The primary grounds for continuing probable cause in the affidavit for the July wiretap order was Affiant's interpretation, based on his training, experience and involvement in the investigation, of conversations intercepted during execution of the June wiretap order.  And adding to that information, continuing probable cause for the August wiretap order was based on Affiant's interpretation of intercepted conversations during execution of the June and July wiretap orders. Defendant's attack on probable cause focuses, as noted, on Affiant's interpretation of identified intercepted conversations.

Initially, the court finds - after a careful review of the July and August affidavits offered in support of the wiretap orders and focusing on Affiant's interpretation of intercepted conversations - that Affiant's opinions, for the reasons he states, as to meaning of the conversations recounted appear reasonable and that no basis exists to question each District Judge's reliance on Affiant's interpretations.  As noted, for each

---

[26]Although the 7/26/11 affidavit summarized some of this information, Affiant incorporated by reference and attached to the affidavit his prior June affidavit for consideration by District Judge Story.  [7/26/11 Affidavit ¶ 24, Exhibit 1].

conversation recounted and interpreted, Affiant set out the actual words used by the individuals being intercepted, explained the basis for his interpretation of each conversation - in light of his experience and involvement in the investigation - and never claimed to "know" that his interpretation was correct but that he was providing for each District Judge his "belief" as to the conversation's meaning. The District Judges were entitled, if they so chose, to rely upon Affiant's training, experience and involvement in the investigation. See Booker, 2013 WL 2468694, at *17. And the District Judges were entitled to rely upon Affiant's interpretation of the conversations discussed in the affidavits. See Davis, 2013 WL 322122, at *5; Thompson, 2011 WL 4455244, at *9. The question is whether Defendant has carried his burden of overcoming the deference due to the District Judges' finding that the affidavits established probable cause for the two wiretap orders. See Nixon, 918 F.2d at 900; Moody, 762 F. Supp. at 1495. He has not.

Defendant Goldstein challenges a several of the conversations interpreted by Affiant offering a different interpretation and contending that Affiant's interpretation of some of those conversations was materially false and misleading and should be omitted from consideration in support of probable cause. [Doc. 118 at 25-35; Doc. 131 at 6-9]. A challenge to a wiretap authorization on the grounds of material and

48

intentionally false or reckless statements in the supporting affidavit is handled the same as a similar challenge to an ordinary search warrant, pursuant to <u>Franks</u>. <u>See</u> <u>United States v. Wilson</u>, 314 Fed. Appx. 239, 243-44 (11th Cir. 2009); <u>United States v. Bascaro</u>, 742 F.2d 1335, 1344 (11th Cir. 1984), <u>abrogated on other grounds by</u> <u>United States v. Lewis</u>, 492 F.3d 1219 (11th Cir. 2007).

In <u>Franks</u>, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  <u>Franks</u>, 98 S. Ct. at 2684-85; <u>see also</u> <u>United States v. Sarras</u>, 575 F.3d 1191, 1218 (11th Cir. 2009).  Likewise, <u>Franks</u> also applies when the "misinformation" involves omissions from the affidavit "'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting <u>United States v. Martin</u>, 615 F.2d 318, 329 (5th Cir. 1980)).  However, "[o]missions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . .  Indeed, even intentional or reckless omissions will invalidate a warrant only if

49

inclusion of the omitted facts would have prevented a finding of probable cause." Id. at 1327 (citations omitted); accord United States v. Brown, 370 Fed. Appx. 18, 21 (11th Cir. 2010) (same).

To mandate a Franks evidentiary hearing,

> the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Franks, 98 S. Ct. at 2684-85; United States v. Flowers, 531 Fed. Appx. 975, 981 (11th Cir. 2013) ("Franks requires the defendant to offer proof that the affiant had the requisite intent[;]" noting that Franks offered as examples of supporting proof, including, "'affidavits or sworn or otherwise reliable statements of witnesses,' apart

from the warrant affidavit") (quoting <u>Franks</u>, 98 S. Ct. at 2684); <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1267 (11th Cir. 2001) ("[T]o prevail in a <u>Franks</u> challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant.") (citation omitted).  Defendant Goldstein's <u>Franks</u>' challenge to Affiant's interpretation of various intercepted conversations fails for the following reasons.

Defendant identifies one specific conversation in the affidavit for the 7/26/11 wiretap order which he asserts establishes that Affiant's interpretation was simply wrong and constituted a material misrepresentation.  The part of the conversation cited by Defendant is set forth in the affidavit as, "Goldstein: I got this [inaudible] <u>PR guy</u> . . . .  He's the one, who had that 'Go to Call' or whatever, or 'Go to Meeting' or something."  [Doc. 118 at 26 n.9 (emphasis added by Defendant) (quoting 7/26/11 Affidavit ¶ 45)].[27]  Defendant identifies this as "a prime example of an incorrect guess

---

[27]The conversation between Defendants continues as follows:

BERCOON:       "I remember him.  Yeah, what about him?"
GOLDSTEIN:     "Well, you know, he put money in - he wants to get out of this stock and wanted to see if we wanted to do something bigger."

at the substance of a conversation"[28] and identifies the correct company intended to be referenced, "Go Link Up," and the person being referenced as "Bakthiar."  Although acknowledging that PR sounds like Bakthiar (which undermines the argument that Affiant's interpretation was intentionally or recklessly incorrect), Defendant nonetheless says that Affiant's attempt to use the conversation as evidence of ongoing market manipulation is "baseless" and a "material misrepresentation."  [Doc. 118 at 26 n.9].  Defendant's argument fails.  He makes no offer of proof that "PR" is "Bakthiar" or that the correct company name is "Go Link Up," or how, even if the correct reference is to Bakthiar and "Go Link Up," to conclude that those facts were intentionally or recklessly misstated by Affiant in the affidavit (that is, that Affiant knew his references to PR and the company name were incorrect) and, if corrected, would alter his interpretation of the conversation.[29]  The allegations by Defendant's

---

BERCOON:          "Umm, there's nothing to do with any of these guys until you get the filings current . . . . [pause] Hello?"

[7/26/11 Affidavit ¶ 45].  Then the conversation appears to change to another topic.

[28]Affiant interprets the conversation as "PR guy" being someone who has shares of MCGI stock that he wants to liquidate through a market manipulation with the assistance of Defendants.  [7/26/11 Affidavit ¶ 45].

[29]In fact, based on an intercepted conversation between Defendants Bercoon and Veugeler on August 16, 2011 (discussed further *infra*), and an intercepted call between

AO 72A
(Rev.8/8
2)

counsel in the brief in support of the motion to suppress, "without more, cannot be considered by the Court in making up for [the] deficiency" in providing no offer of proof.  United States v. Underwood, 2011 WL 2036498, at *1 (M.D. Fla. May 24, 2011); and see Thompson, 2011 WL 4455244, at *9 (although counsel for Defendant may have provided an alternative interpretation of the conversation, he "did not set forth any evidence that the incorrect interpretations were made knowingly or intentionally or with reckless disregard for the truth").  Defendant has not carried his burden to show an intentional or reckless material misstatement by Affiant in the July affidavit.

Although not argued in support of suppressing the 7/26/11 wiretap order, but only to challenge probable cause in the 8/25/11 wiretap order [Doc. 118 at 31-32], the

---

Defendant Veugeler and Bakthiar on September 20, 2011, Affiant's interpretation of the discussion between Defendants Bercoon and Goldstein in June 2011 appears to be reasonable.  During the conversation on August 16, 2011, in discussing the type of "deal" being considered, Defendant Veugeler references Bakthiar, whom they "took the money from," and who has an idea "of what he can do with" Defendants in merging "Go Link Up" with GNZR and Find.com which would apparently leave Defendants "a block of stock" for the deal and allow Defendants "to pay off all the people [they] owe."  [8/25/11 Affidavit ¶ 117].  And during the lengthy conversation recounted in the 10/3/11 Affidavit, Defendant Veugeler discusses with Bakthiar using one of Bakthiar's brokerage accounts to conduct a market manipulation, apparently with Bakthiar's acknowledgment of the purpose of Defendant's access to the account. [10/3/11 Affidavit ¶¶ 109-10].

AO 72A
(Rev.8/8
2)

next conversation targeted by Defendant was relied on by Affiant in the affidavit for both wiretap orders [7/26/11 Affidavit ¶ 46; 8/25/11 Affidavit ¶ 106]. Defendant takes issue with Affiant's interpretation of a June 29, 2011, conversation with a manager of a venture capital firm which Defendant interprets as involving Defendant Veugeler's problems with the SEC but not market manipulation.[30]   Counsel for Defendant apparently offers this interpretation based on his counsel's "understanding that the manager's concern stemmed from personal financial dealings with Mr. Veugeler and had nothing to do with stock or trading of any kind . . . ." [Doc. 118 at 31-32]. The most glaring problem with Defendant's contention is, again, that he offers no proof that Affiant had any reason to be aware of counsel for Defendant's "understanding" of the conversation when the affidavits were prepared. Defendant also fails to provide

_____

[30]The managing director is questioning Defendant Bercoon about the "SEC black mark" against Defendant Veugeler and his "Seven Palms" company and asks Defendant what did Defendant Veugeler do, "general penny stock manipulation, not otherwise classified?" [8/25/11 Affidavit ¶ 106]. Defendant Bercoon offers an explanation for the SEC civil litigation, including, that an attorney messed up the offering, that Defendant Veugeler did not do anything wrong, and that what occurred is not illegal "if you do it right." [Id.]. Affiant offered the interpretation that Defendant Bercoon was providing a "'white-washed,' but otherwise essentially accurate, description of Defendant Veugeler's" conduct, as he had provided to CS-2 and referenced earlier in the affidavit. [Id.].

54

evidence supporting the basis for that "understanding." See Underwood, 2011 WL 2036498, at *1; Thompson, 2011 WL 4455244, at *9.

Defendant also challenges Affiant's interpretation of two intercepted conversations, the first between Defendants Bercoon and Veugeler and the second between Defendants Bercoon and Goldstein, on August 16, 2011, which Affiant interpreted as discussing fraudulent market manipulations with a third person involving GNZR, an entity Affiant states is controlled by Defendants Bercoon and Goldstein. [Doc. 118 at 34-35].   The first conversation, between Defendants Bercoon and Veugeler is lengthy and the quoted parts begin with Defendant Veugeler advising that he might have a deal with David, whom Affiant believes is Levy, and asking Defendant Bercoon about the ownership of GNZR "right now[.]"  [8/25/11 Affidavit ¶ 117].  Defendant Bercoon responds that he does not have the information handy but at most five people and that he does not know how many shares.  [Id.].  Defendant Veugeler then asks if "Sisk" could be spun out and get "it back to Find," to which Defendant Bercoon responds that the people they have been talking to want to do that. Defendants also discuss GenZero (that is, GNZR) being involved in the deal including the shares in that company with Defendant Veugeler stating that "he would do a deal tomorrow if [Defendant Veugeler] . . . just had it structured properly."  [Id.].

55

Defendant Veugeler then brings up Bakthiar's idea involving Find.com.  [Id.].  When Defendant Bercoon asks how to get money from Find, Defendant Veugeler responds, ". . . from you and me . . . . [W]e got the shares . . . . We have the free trading shares." [Id.].  And when Defendant Bercoon states that there is a simpler way to do the deal than involving these companies, Defendant Veugeler responds that they want to "get done in thirty days."  [Id.].[31]  Defendant Bercoon then calls Defendant Goldstein to report on the conversation with Defendant Veugeler and states that Levy, identified by name, "wants to do a deal with Find where Bakthiar puts Go Link Up into Find, Levy puts money into Find and then they do a promotion."  [Id. ¶ 119].  Based on these conversations, referencing particular parts of the conversations, Affiant states that Defendants are appearing to discuss a market manipulation involving GNZR and another deal using nominee accounts under Defendants' control that Defendant Veugeler wants to complete within thirty days.  [Id. ¶¶ 118, 120].

Defendant, through argument of his counsel, contends that neither he nor Defendant Goldstein controlled GNZR, that, by that point, neither Defendant owned shares in MCGI, GNZR or Find.com, and that neither Defendant had any beneficial

---

[31]The parts of the conversation recounted in the affidavit by Affiant are lengthy and only summarized herein.

AO 72A
(Rev.8/8
2)

interest or control over any free trading shares.  Accordingly, Defendant argues that Affiant's statement to the contrary is "simply incorrect and a material misrepresentation."  [Id. at 34-35].  Defendants' contentions, unsupported by any showing other than his counsel's averments in the brief is insufficient to make a Franks showing.[32]  See Underwood, 2011 WL 2036498, at *1; Thompson, 2011 WL 4455244, at *9.  Defendant's self-serving denial of ownership in any of the identified companies also appears to be undermined by the discussion about the companies in the two referenced conversations and, frankly, provides no basis for establishing Affiant's intent to misrepresent in offering his opinion about the conversations.  See United States v. Souffront, 338 F.3d 809, 823 (7th Cir. 2003) ("The presumption of validity [for a wiretap order] cannot be overcome by defendant's self-interested inferences and conclusory statements.").  Defendant offered no proof that the Affiant, through word or deed, has otherwise stated that the interpretations he offered in the affidavits were false or intended to be misleading or that he lacked a good faith and reasonable belief in his interpretation of the conversations.  See O'Ferrell v. United States, 32 F. Supp.

---

[32]And the court notes that, as pointed out in the affidavits explaining the market manipulations conducted by Defendants, use of nominee accounts and avoiding holding shares in the companies involved in the market manipulations is Defendants' modus operandi, making these self-serving denials suspect.

AO 72A
(Rev.8/8
2)

2d 1293, 1301 (M.D. Ala. 1998) ("Reckless disregard for the truth . . . occurs where a government agent or instrumentality harbored or should have harbored serious doubts about the truth of a statement but made the statement anyway."); accord United States v. Gonzalez, 2010 WL 2721882, at *13 (N.D. Ga. May 25, 2010) ("Additionally, [r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (citations and internal quotation marks omitted).

With respect to the remaining conversations discussed by Defendant [Doc. 118 at 26-35], he challenges Affiant's interpretation but does not offer another interpretation or provide, even without evidentiary support, a basis for concluding that Affiant's interpretation was intentionally or recklessly misleading.  As to these conversations, Defendant has simply argued that he does not agree with the interpretation offered by the Affiant and has offered nothing but conclusory allegations in support of his disagreement.  See, e.g., United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995) (the defendant's contention, because he interpreted the notes as telephone numbers, that the affiant's interpretation in the affidavit that seized notes were "drug notes" was deliberately or recklessly false was found insufficient under Franks, the court noting that "the drug notes are ambiguous and the affiant's

interpretation of them was plausible"); <u>United States v. Thomas</u>, 2006 WL 3694613, at *3 (E.D. Mich. December 14, 2006) (finding insufficient showing under <u>Franks</u> because the defendant's interpretation of conversations on the wiretaps "are no more reasonable than the . . . agent's interpretation" as to whether the defendant was a large scale or small-time drug dealer); <u>United States v. Gotti</u>, 42 F. Supp. 2d 252, 280-81 (S.D.N.Y. 1999) (because the conversations are ambiguous, "[r]easonable differences over them . . . fall short of establishing deliberate falsehood or reckless disregard for the truth" and "even if [the defendant's] proffered conclusions were more plausible . . ., he has failed to demonstrate that [the agent's] interpretations were deliberate falsehoods instead of anything other than subtle differences over ambiguities in intercepted conversations").

Defendant has not challenged the factual accuracy of any of the quoted conversations[33] only Affiant's interpretation.  When Defendant did offer another interpretation of a conversation, no evidence was offered that Affiant's allegedly "incorrect interpretations were made knowingly or intentionally or with reckless

---

[33]The one exception involved the conversation on June 28, 2011, discussing the "PR" guy which Defendant contends was "Bakthiar."  However, as noted, Defendant acknowledges that, on the recording, "PR" sounded like "Bakthiar."  [Doc. 118 at 26 n.9].

59

disregard for the truth. . . .   [And Affiant] included excerpts of the actual conversations" for consideration by the reviewing judges.  Thompson, 2011 WL 4455244, at *9.  "Thus, [with respect to establishing probable cause for each wiretap order,] a Franks hearing is not warranted."  Id.  Accordingly, Defendant has failed to overcome the deference accorded each District Judge's determination that the affidavits for the wiretap orders established probable cause.

### b.   Necessity

Defendant Bercoon contends that information was intentionally omitted from the affidavit for the wiretap orders entitling him to a Franks hearing on whether the affidavits establish necessity for the orders [Id. at 15-22].  His contention focuses on SEC civil investigations and litigation in Atlanta and Los Angeles which Defendant argues were not discussed by Affiant when addressing the necessity for the wiretaps. [Id. at 15-16].  Defendant asserts that two parallel SEC investigations were being conducted against Defendants Bercoon and Goldstein for almost a year before the first wiretap applications, SEC ARO involving trading in MCGI stock and SEC LARO involving selling shares of LADP stock, which produced a wealth of financial and electronic information negating the need for the wiretaps.  [Id. at 16-17].  According to Defendant Bercoon, a Franks hearing is required because the affidavits "never

AO 72A
(Rev.8/8
2)

mentioned that the two SEC investigations yielded all of the Defendants' computers, internet accounts, and financial information[,] . . . failed to mention that through counsel the Defendants had made significant concessions and admissions to the SEC[,] . . . [and] barely describes the vast quantity of information the Defendants and others provided to these joint and parallel investigations." [Doc. 117 at 21-22, citing Rajaratnam, 09-cr-1184]. And Defendant Goldstein, adopting these arguments by Defendant Bercoon [Doc. 118 at 8-11] on the issue of necessity, additionally contends that Affiant's statements in the affidavits are "perfunctory conclusions" or "boilerplate" regarding necessity and fail to explain why any further investigation was needed regarding the 2010, or even a March 2011, market manipulations; he points specifically to the information available from CS-1 and CS-2 regarding the 2010 market manipulations [Id. at 18-21] and to new information regarding bank accounts referenced in one of the affidavits and to the SEC LARO information and IP addresses [Id. at 28-3]. Defendant Goldstein contends that Affiant's assertion that interviews would be ineffective was a "hollow statement" given the fact that the SEC ARO had spoken to Defendant Goldstein in June 2010, that the FBI had approached Defendant Goldstein in August 2011, and that Defendant Bercoon had agreed to be interviewed in October 2011. [Id. at 37 & n.10].

61

With respect to the showing of necessity, an application for interception must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.  18 U.S.C. § 2518(1)(c); United States v. Carrazana, 921 F.2d 1557, 1564-65 (11th Cir. 1991); United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).  "Full and complete" means a description with specificity as to why in this particular investigation ordinary means of investigation would fail or are too dangerous.  United States v. Weber, 808 F.2d 1422 (11th Cir. 1987); see also United States v. Cartagena, 593 F.3d 104, 110 (1st Cir. 2010) (the statute's "'full and complete statement' requirement does not mandate that officers include every single detail of an investigation, even if relevant to the need for a wiretap[,]" that is, "[p]rovided that sufficient facts are included supporting the need for a wiretap over other investigative procedures, the officer need not set forth the minutiae of an investigation").  The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.  United States v. Giordano, 94 S. Ct. 1820, 1826-27 (1974); United States v. Kahn, 94 S. Ct. 977, 983 n.12 (1974).

The affidavit need not, however, show a comprehensive exhaustion of all possible techniques but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.[34] See, e.g., Nixon, 918 F.2d at 901; Van Horn, 789 F.2d at 1496; United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984); United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978).  As the Eleventh Circuit Court of Appeals recently reaffirmed, "[A] comprehensive exhaustion of all possible investigative techniques is not necessary before applying for a wiretap." United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010); see also Cartagena, 593 F.3d at 110-11 ("We have never required the government to 'run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap[.]'") (citation omitted).  The court continued stating, "The statute was not intended 'to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'"  De La Cruz Suarez, 601 F.3d at 1214 (quoting Alonso, 740 F.2d at 868).  Thus, "[t]he burden of

_____

[34]Contrary to Defendant Goldstein's assertion that "[w]here a wiretap affidavit does not establish the *futility* in using investigative means already undertaken or considered by the police, exhaustion has not occurred[,]" [Doc. 118 at 11 (emphasis added)], the Eleventh Circuit Court of Appeals does not place that burden on the Government in establishing necessity.

AO 72A
(Rev.8/8
2)

establishing necessity is 'not great,' and [a court] must review the government's compliance with the necessity requirement in a 'practical and common-sense fashion.'" United States v. Gray, 410 F.3d 338, 343 (7th Cir. 2005) (citation omitted); see also United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995) (the burden imposed upon the government "is not great" and "the adequacy of such a showing is to be tested in a practical and common sense fashion") (citations and internal quotation marks omitted); United States v. De La Fuente, 548 F.2d 528, 538 (5th Cir. 1977) ("The [necessity] provisions contemplate that 'the showing be tested in a practical and commonsense fashion.'") (citation omitted).

And the effectiveness of traditional investigative techniques must be judged in light of the goals of the investigation and not based on whether one or more of the conspiracy participants can be successfully prosecuted for some criminal conduct. See, e.g., United States v. Reed, 575 F.3d 900, 909-10 (9th Cir. 2009) ("This court has 'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators.'") (citation omitted); United States v. Wilson, 484 F.3d 267, 281 (4th Cir. 2007) ("wiretaps 'are necessary tools of law enforcement, . . . particularly where crimes are committed by large and

64

sophisticated organizations[,]'" accordingly, "[c]ourts must be careful not to read the statute in 'an overly restrictive manner' . . . which could result in helping insulate more complex and sophisticated conspiracies") (citation omitted); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) ("Circuit precedent clarifies that a court may authorize the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope.") (citations and internal quotation marks omitted); Degaule, 797 F. Supp. 2d at 1360-61 (noting that "'[the Eleventh Circuit Court of Appeals] has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members'") (citation omitted).

Again, Defendants have the burden of overcoming the presumption of validity that attaches to the District Judges' findings that the statutory necessity provision has been satisfied. Mitchell, 274 F.3d at 1310. And, likewise, in reviewing whether each affidavit satisfies this statutory requirement, great deference is accorded the District Judges' determinations. United States v. McGuire, 307 F.3d 1192, 1197 (9th Cir. 2002); Oriakhi, 57 F.3d at 1298; Moody, 762 F. Supp. at 1495. For the reasons stated

AO 72A
(Rev.8/8
2)

*infra*, the court finds that Defendants' arguments fail to overcome the presumption of validity attached to the wiretap orders and to make a sufficient showing to entitle them to a <u>Franks</u> hearing.

As was true with Defendant Goldstein's attack on probable cause, Defendants' challenge to the necessity findings by the District Judges places too much focus on whether or not traditional law enforcement efforts could have successfully prosecuted Defendants Goldstein, Bercoon and Veugeler for the March and May 2010 and March 2011 alleged market manipulations. Defendants fail to acknowledge that, in addition to gathering evidence to prosecute all of the potential conspirators for conduct occurring before June 2011, the Government was seeking evidence of ongoing criminal activity involving market manipulations for which the historical documents and financial information - as well as confidential informant disclosures - were of marginal assistance.[35]   In each affidavit, Affiant stated that traditional methods of investigation would not accomplish the goals of the investigation, which included discovering:

---

[35]The court notes that the information gathered in both SEC investigations, and from CS-1 and CS-2, apparently all relate to conduct occurring prior to June 2011. Defendants pointed to no information gathered in either SEC investigation that offered evidence of or even provided traditional investigative leads concerning the ongoing scheme to engage in market manipulation in or after June 2011.

AO 72A
(Rev.8/8
2)

(I) the nature, extent and methods of operation of the TARGET SUBJECTS; (ii) the identities of the TARGET SUBJECTS, their accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities; (iii) the locations and items used in furtherance of those activities; (iv) the existence and locations of records; (v) the locations and sources used to finance their illegal activities; and (vi) the locations and dispositions of the proceeds of those activities.

[6/24/11 Affidavit ¶ 92; 7/26/11 Affidavit ¶ 57; 8/25/11 Affidavit ¶ 121].[36]

In each wiretap affidavit, Affiant provided an overview of the success or lack of success of various traditional investigative techniques or gives reasons why, based in his training and experience, other investigative techniques will not achieve the stated goals. Defendant Goldstein takes issue with Affiant's evaluation of the usefulness of CS-1 and CS-2, both of whom possessed direct knowledge of and participated in the market manipulations occurring in March and May 2010. CS-1 worked for Defendants Bercoon and Goldstein until late summer 2010, knew about the March and May 2010 market manipulations and provided, as Affiant acknowledged, a wealth of historical information. Likewise, CS-2 was present for the March and May 2010 market manipulations, and, as Affiant stated, also provided a wealth of historical information.

---

[36]Affiant adds, in requesting the August 2011 wiretap order, that based on his interpretation of recent conversations that "a market manipulation is in the planning stages and it is the intent of the TARGET SUBJECTS to execute a fraudulent manipulation within the next thirty days[,]" further supporting the necessity for that wiretap order. [8/25/11 Affidavit ¶ 121].

AO 72A
(Rev.8/8
2)

[6/24/11 Affidavit ¶¶ 96-101].[37]  However, as Affiant pointed out, neither informant was privy to continuing plans to conduct market manipulations or likely to be able to obtain such information given Defendants' suspicions about CS-1 and CS-2 cooperating with investigating authorities.  [Id.].  And Affiant correctly points out that the wire intercepts will supply corroboration of the information provided by CS-1 and CS-2 about events in 2010 and early 2011 - a valid concern due to the fact that Defendants will quite likely attack both informants' reliability at trial.  [Id. ¶ 100].

The fact of successful utilization of informants does not foreclose use of wiretaps.  In United States v. Canales Gomez, 358 F.3d 1221 (9th Cir. 2004), the Ninth Circuit Court of Appeals discussed the successful use of informants, which was pointed to by the defendant as evidence of the lack of necessity in the wiretap affidavit. The court, after noting that the wiretap affidavit explained why the informants would

---

[37]The same information is provided concerning CS-1 and CS-2 in the July and August 2011 affidavits.  [7/26/11 Affidavit ¶¶ 28-43; 8/25/11 Affidavit ¶¶ 36-74].  To the extent that Defendants challenge Affiant's evaluation of the potential usefulness of CS-1 and CS-2 in obtaining the goals of the investigation, as noted, Affiant provided a detailed accounting of both informants' relationship with Defendants and involvement with the market manipulation schemes in March and May 2010 for the District Judges to independently determine the informants' potential ongoing usefulness.  [See, e.g., 6/24/11 Affidavit ¶¶ 28-66].

AO 72A
(Rev.8/8
2)

be unlikely to secure information about the entire criminal network under investigation, stated:

> Indeed, we have previously acknowledged the limitations of individual informants in such broad investigations and often upheld government requests for such wiretaps when large-scale organizations are under investigation. . . . The informants' previous success is inapposite. "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap."

Id. at 1225 (citations omitted); see also United States v. Hyppolite, 609 Fed. Appx. 597, 607 (11th Cir. 2015) (noting that, "[s]ignificantly, the government's use of confidential informants was limited by the defendants' suspicion that the informants were working with law enforcement" and by the fact that "information obtained by the informants was predominately historical"); McGuire, 307 F.3d at 1197-99 (noting that findings of necessity are upheld where traditional investigative methods, including use of informants, only identify and lead to the prosecution of some members of a conspiracy, the court rejected the defendant's argument that necessity was not established because informants had infiltrated the conspiracy and stated, "[n]ot only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding"); Degaule, 797 F. Supp. 2d at 1360 ("'the fact that the traditional methods in use were producing evidence'" does

69

not undermine the necessity determination because "'[n]othing in the law requires that the traditional methods be entirely useless'") (citation omitted); <u>United States v. Olmedo</u>, 552 F. Supp. 2d 1347, 1363 (S.D. Fla. 2008) ("Even if alternative investigative techniques yield a certain degree of measurable success, this does not preclude the Government from seeking a wiretap.").

Defendant Goldstein also contends that Affiant failed to establish why interviews and other similar investigative techniques would not be successful, especially when considering the August 2011 wiretap affidavit, due to the facts that the SEC ARO had spoken with Defendant Goldstein in June 2010, that agents had approached and attempted to talk with Defendant Goldstein earlier in August 2011 and that Defendant Bercoon gave a proffer in October 2011. Affiant's explanation for finding this investigative technique ineffective to obtain the goals of the investigation is best set out in the affidavit for the August 2011 wiretap order which builds upon the information provided in the June and July affidavits about this investigative technique. The attempt to interview Defendant Goldstein was fully set forth in the affidavit, along with Defendant's subsequent conversations with Defendant Bercoon about the agents' visit. [8/25/11 Affidavit ¶¶ 109-114, 137]. Both Defendants declined to talk to agents conducting the investigation evidencing, not refuting, that this tactic - at least at that

point in time - would not be fruitful.[38]   Affiant explained why these investigative

techniques would not be fully successful.

And Defendant Goldstein, as well as Defendant Bercoon, asserts that Affiant

failed to establish necessity for the warrant given the wealth of financial records

obtained through the SEC ARO investigation.[39]   However, Affiant provided an

overview of the materials obtained from the SEC ARO, which included banking

information for companies associated with Defendants and, as explained in detail in

setting out probable cause, included securities and stock purchasing and market

---

[38]And, absent crediting Affiant with clairvoyance, when this affidavit was being prepared in August 2011, he cannot be charged with knowledge that Defendant Bercoon would make a proffer in October 2011.  See United States v. Padilla, 2007 WL 188146, at 3 n.5 (S.D. Fla. January 22, 2007) (discussing a Franks challenge based on information allegedly omitted from an affidavit, the court stated that the only knowledge imputed to the affiant must have been known to him at the time the affidavit was prepared; "[a]ny facts which may have come to light subsequent to this date are irrelevant to the ultimate resolution of this issue").  Also Affiant's assertion that, based on his training and experience, interviews with the subjects of the investigation "would contain a significant number of untruths[,]" appears to be substantiated by the self-serving telephone interview Defendant Goldstein had with an SEC ARO lawyer in June 2010 in which Defendant minimized his involvement in MCGI and the company's trading activities.  Statements that are arguably discredited by the information in the affidavits.  [Doc. 159, Gov't Exhibit 3].  If Affiant had included information about this interview in the affidavits, his opinion about the lack of potential usefulness of interviews would have been strengthened not undermined.

[39]The court will address the allegedly omitted information regarding the SEC LARO investigation separately.

71

manipulation information developed during the Atlanta SEC investigation.  [See, e.g., 6/24/11 Affidavit ¶¶ 19-27, 65 n. 18, 70-83, 108-09, 112].  And Affiant explained why, in his opinion, such information - and any development of new information - has mainly historical value, that is, "account records are generally not available until after the financial transactions have occurred" and "show past transactional activity" which "would be of no value in identifying ongoing market manipulation activity . . . ."[40] [6/24/11 Affidavit ¶ 109].  Affiant also pointed out that the SEC information "is entirely historical in nature" and, with respect to establishing Defendants' intent to engage in illegal market conduct, is "generally circumstantial."[41]   [Id. ¶ 112].  Defendant's backward focus on the investigation, that is, to solely obtain information allowing the Government to prosecute Defendants for market manipulations prior to

---

[40]In the July 2011 affidavit, Affiant provided updated information regarding identification of banking records, noting that as of July 25, 2011, fifteen bank accounts belonging to or under the control of Defendants had been identified.  [7/26/11 Affidavit ¶ 73].  In other respects, Affiant's discussion of these traditional investigative techniques in the July and August affidavits is essentially the same as presented in the June affidavit.  [7/26/11 Affidavit ¶¶ 72-73, 76; 8/25/11 Affidavit ¶¶ 139-40, 143].

[41]In fact, the court need look no further than Defendant Goldberg's arguments that the SEC trading information and the banking information outlined in the affidavits failed to establish probable cause that another market manipulation occurred in March 2011 to observe that Affiant's opinion about the limitations on usefulness of this information is reasonable.

AO 72A
(Rev.8/8
2)

the first wiretap order, refuses to acknowledge the accuracy of Affiant's reasoning as to the usefulness of financial and SEC information to address the ongoing conspiracy to engage in market manipulation. Moreover, as was true with respect to the use of confidential informants, the affidavits provide in the probable cause section and necessity section of the affidavits an overview of the financial and SEC ARO information available and how that information had been successfully used to identify past market manipulations; the District Judges had sufficient information to make an independent evaluation of whether access to that information negated probable cause. Again, the fact that traditional investigative methods are useful does not preclude obtaining a wiretap order. See Hyppolite, 609 Fed. Appx. at 607 ("'The partial success of alternative investigative measures . . . does not necessarily render electronic surveillance unnecessary.'") (citation omitted); Degaule, 797 F. Supp. 2d at 1360.

In addition to discussing the traditional investigative techniques cited *supra*, in each affidavit, Affiant explained why a number of other investigative options either would have limited success or would not be successful in achieving the goals of the investigation, including, pen register and toll record analysis, surveillance, search warrants and mail covers. [6/24/11 Affidavit ¶¶ 94-95, 102-05, 110-11, 113; 7/26/11 Affidavit ¶¶ 57-58, 66-69, 74-75, 77; 8/25/11 Affidavit ¶¶ 125-26, 133-36, 141-42,

144].  Defendant Goldstein argues, in part because the necessity showing for each wiretap order relies on the same information, with few updates, that Affiant merely offers boilerplate language to attempt to establish necessity.  However, contrary to Defendant's assertions, each affidavit does not offer merely boilerplate recitations of the reasons why traditional investigative techniques will not work but includes specific reasons why, given the events to date in the investigation, traditional investigative techniques, although providing some success, would not achieve the goals of the investigation.  As noted, in each affidavit, Affiant provided a detailed accounting of the information gathered utilizing traditional investigative techniques to develop probable cause [See, e.g., 6/24/11 Affidavit ¶¶ 18-91] and then explained why, in order to achieve the goals of the investigation, further use of those techniques or others would not be fully successful [Id. ¶¶ 92-113].  See, e.g., United States v. Torres, 908 F.2d 1417, 1423 (9th Cir. 1990) ("The presence of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity."); Sobamowo, 892 F.2d at 93 ("In this case, the government's conclusions followed upon a detailed description of the course of the investigation and the specific investigative procedures already employed."); United States v. Savoy, 883 F. Supp. 2d 101, 107 (D. D.C. 2012) ("Even though merely conclusory statements

74

about necessity will not suffice, [s]ections of an affidavit framed in conclusory terminology . . . cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events.") (citations and internal quotation marks omitted); <u>United States v. Murdock</u>, 2011 WL 43503, at *2 (S.D. Ga. January 6, 2011) ("Without question, the reasons for using electronic surveillance are often similar from case to case" because "[t]here are only so many ways someone can say, we have not learned enough from informants, etc[; b]ut that does not mean that an affidavit fails to show need merely because like allegations appear in similar cases.") (citation and internal quotation marks omitted).

And, as was true with the <u>Franks</u> challenge to probable cause for the wiretap orders, Defendants' <u>Franks</u> attack in an attempt to undermine a finding of necessity for the wiretap orders also fails. The court previously set forth the burden on a defendant seeking to obtain a <u>Franks</u> hearing. The <u>Franks</u>' analysis is applicable to alleged misrepresentations pertaining to the necessity requirement, 18 U.S.C. § 2518(c). <u>See United States v. Robles</u>, 283 Fed. Appx. 726, 734-45 (11th Cir. 2008) (discussing whether, as to the necessity showing in the wiretap affidavit, the defendant was entitled to a <u>Franks</u> hearing). The focus of Defendants' challenge is Affiant's omission from the wiretap affidavits information obtained during the SEC LARO investigation.

However, as was true *supra*, Defendants have failed to make a substantial preliminary showing to entitle them to a <u>Franks</u> hearing.

In part "I.  Arguments of the Parties," the court set forth in detail the basis for Defendant Bercoon's contention that Affiant intentionally, or at least recklessly, failed to include information gathered by the SEC LARO in the affidavits presented in support of the wiretap orders and that, had that information been included, necessity for the wiretaps would have been negated.  The court also set forth in detail the Government's response to Defendant's contentions and the reasons why Defendants' replies to the Government's arguments were not persuasive.  The court is not going to recount that detailed summary or discussion but will elaborate on the reasons why Defendants' contentions are insufficient.

The court finds that Defendant Bercoon failed to present evidence, in the form of sworn affidavits or other statements relying instead on his counsel's "factual" summary, that Affiant had in his possession at the time he prepared the affidavits in June, July and August 2011 any of the information previously gathered during the SEC LARO investigation and civil litigation.  <u>See</u> <u>Flowers,</u> 531 Fed. Appx. at 981 ("<u>Franks</u> requires the defendant to offer proof that the affiant had the requisite intent[;]" noting that <u>Franks</u> offered as examples of supporting proof, "'affidavits or sworn or otherwise

76

AO 72A
(Rev.8/8
2)

reliable statements of witnesses,' apart from the warrant affidavit") (citation omitted);

United States v. Felton, 2015 WL 6750766, at *1 (M.D. Fla. November 5, 2015)

(same); Underwood, 2011 WL 2036498, at *1. Although Defendant uses the phrase

parallel SEC investigations, he points only to the "fact" that on two occasions in the

fall of 2010, the SEC ARO provided information about cooperating witnesses *to* the

SEC LARO. [Doc. 117 at 15-17; Doc. 123 at 11-12 & n.5]. Defendant's rank

speculation based on this information about parallel investigations is wholly

insufficient to infer knowledge by Affiant of the details of the SEC LARO litigation.

There is no support for a finding that prior to September 2015, prosecuting authorities

had any non-public information developed by the SEC LARO, and there is no serious

dispute that prosecuting authorities only obtained that information at the behest of

Defendants after this case was indicted in January 2015.[42] [Doc. 123 at 11]. The fact

that Defendants Bercoon and Goldstein turned over information in the Los Angeles

---

[42]As noted *supra*, if Defendants seriously contended to the contrary, the request in July 2015 would not have been for the Government to obtain the information but that the court order the Government to produce information already in its possession.

AO 72A
(Rev.8/8
2)

civil litigation simply not does attribute knowledge of the information to Affiant; at least not based on the unsupported allegations in the motion to suppress.[43]

Although not clear, if Defendant's argument is that Affiant should have at least been aware of the existence of the SEC LARO investigation and should have obtained information gathered in that investigation prior to seeking a wiretap, the Government notes that the investigation of Defendants in Los Angeles was of a different type stock fraud, related to distinct entities, not involving market manipulation. [Doc. 123 at 8 (citing SEC litigation release dated September 17, 2010)]. More importantly, for the

_____

[43]In this regard, the court notes that Defendant Bercoon paints too broad a picture of the information supplied to the SEC LARO. Apparently most of the electronic information even now is not in any government agency's possession. As the Government points out - and need not support with sworn statements as that burden is placed on Defendants not the Government, Defendants' self-serving listing of the electronic materials and other information apparently finally turned over in April 2011 per court order, did not include publically listing any passwords for email accounts. Defendants' list of information provided on April 11, 2011, in the Los Angeles litigation, also included "ninety-four computers and electronic storage devices" [Doc. 117 at 19-20]; however, the data received from SEC LARO in September 2015 did not contain any such data from non-computer storage devices. [Id.]. Based on the undisputed statement of Government counsel, prosecuting authorities in Atlanta never had any data from any electronic storage devices imaged as part of the SEC LARO case. [Doc. 123 at 11 n.5]. And it appears, as to the computers turned over to the third-party vendor who was going to conduct the search of the computers, the data from the computers "remains in legal limbo" and in the possession of the third party vendor. [Id. at 11 n.5]. Again, Defendants have not argued, elsewhere, based on a good faith belief, to the court that the Government has in its possession any such information which has not been produced.

78

court to find the argument sufficient would require the court to rely on speculation to establish both Affiant's intent and the materiality of the omitted information. The court has not been informed of the actual content of the "missing" information to support a determination that had Affiant obtained the SEC LARO information and provided details about the information to the reviewing District Judges, they would have declined to find necessity.[44] The simple fact is that Defendants have failed to point to any specific information from the SEC LARO investigation, even though in their possession since September 2015, that would have undermined the necessity showing, especially as regards the efforts to investigate ongoing and future market manipulations.[45] See Thompson, 2011 WL 4455244, at *9 (noting that the defendant "failed to provide the allegedly omitted facts with any specificity, which makes the

---

[44]The information about additional stock fraud conduct by Defendants is a double-edged sword. If included in the affidavits, that information probably would have strengthened the probable cause finding as evidencing on-going unlawful conduct, even though of different type. If inclusion could have been useful, arguments that Affiant intentionally, or even recklessly, failed to seek the information for inclusion in the affidavits is a much harder argument to support.

[45]The same deficiency noted by Affiant with respect to the financial information and SEC ARO information, that is, that the information provides historical or after-the-fact substantiation of illegal market conduct by Defendants but is of little assistance in developing evidence of on-going market manipulation schemes [See, e.g., 6/25/11 Affidavit ¶¶ 108-109, 112], is arguably applicable to the SEC LARO information - a finding difficult to make as no specifics were provided to the court.

79

Court unable to determine if they were recklessly or intentionally omitted"); Underwood, 2011 WL 2036498, at *1 ("a Franks hearing is required only after a defendant has alleged *specific* instances of deliberate falsehoods or of reckless disregard for the truth") (emphasis added).  Absent a showing of what information *specifically* was omitted from the affidavits which if included would have negated necessity, instead of just generally opining that there was a lot of information gathered by the SEC LARO none of which was included in the affidavits, Defendants simply are not entitled to a Franks hearing.  See United States v. Novaton, 271 F.3d 968, 987 (11th Cir. 2001); Madiwale, 117 F.3d at 1327 (11th Cir. 1997) ("[o]missions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant [and that] even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause").  And a finding that Affiant did not exhaust all possible avenues of investigation by attempting to secure the SEC LARO information would not negate a finding of necessity, especially in light of the fact, as already pointed out, that Defendants failed to present evidence that obtaining the SEC LARO information would have assisted in achieving the goals of the investigation and negate the need for the wiretap.  See United States v. Votrobek, 2012 WL 6929276, at *12 (N.D. Ga. June

80

12, 2012) (in a prescription drug diversion investigation, after noting that the Government failed to subpoena patient files or prescription records prior to seeking the wiretap order, the court found that this fact did not undermine necessity because "it seem[ed] that such subpoenas would not have been helpful in law enforcement's attainment of its stated investigatory objectives" and because "the law does not require that all possible methods of investigation be exhausted before agents may seek a wiretap"), adopted by 2013 WL 298037 (N.D. Ga. January 23, 2013).

Finally, Defendant Bercoon's reliance on the district court decision in Rajaratnam, 09-cr-1184, is misplaced because, contrary to his contention, the facts in this case are not remotely similar to those found in Rajaratnam.  [Doc. 117 at 21-22]. The facts in Rajaratnam, as recounted by the district court in the opinion issued after the Franks hearing, established that the prosecuting authorities were well aware of and had access to information developed during a related SEC investigation of the same conduct which included strategy sessions between SEC and law enforcement authorities and the full exchange of information.  In fact, the prosecuting authorities relied heavily on the SEC investigation to develop the criminal case.  However, none of this information was disclosed to the district judge reviewing the wiretap affidavit. Rajaratnam, 2010 WL 4867402, at *15-17.  Based on the identification of specific non-

AO 72A
(Rev.8/8
2)

disclosed information gathered during the SEC investigation, the defendant pointed out specific omissions in the affidavit linked to particular traditional investigative methods undermining necessity, and the court granted a <u>Franks</u> hearing. <u>Id.</u>, at *17-18. After the hearing, and based on this particularized evidence, the district court found that the affiant recklessly omitted information that was "clearly critical" to the necessity finding. <u>Id.</u>, at *19. However, the district court declined to find, even with the omitted information included in the affidavit, that the defendant had also established the omitted information's materiality to the necessity determination and, therefore, denied the motion to suppress. <u>Id.</u>, at *19-24.[46] Defendants, herein, do not come close to the factual showing made in <u>Rajaratnam</u>, accordingly, the court finds that decision inapposite to the facts in this case. Defendants are not entitled to a <u>Franks</u> hearing on

---

[46]And, on appeal, the Second Circuit Court of Appeals rejected the district court's finding that the defendant even established that the omissions regarding the SEC investigation were made with reckless disregard for the truth. <u>Rajaratnam</u>, 719 F.3d at 153-55 (in order to make this finding, "the reviewing court must be presented with credible and probative evidence that the omission of information in a wiretap application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead'") (citation omitted). Noting that insider trading in stocks is typically conducted verbally, making electronic surveillance particularly suited to such investigations, the court concluded that inclusion of the omitted information would have strengthened not diminished the necessity showing and that, in the alternative, the defendant failed to establish that the information was material to the necessity finding. <u>Id.</u> at 155-56.

AO 72A
(Rev.8/8
2)

the issue of necessity for the wiretap orders and have failed to overcome the deference due to the District Judges' determination that each wiretap affidavit established necessity for the wiretap orders.

### c.    Good Faith

Finally, as the Government correctly notes, the good faith exception to the exclusionary rule applies to wiretap applications and orders.  See United States v. Reese, 611 Fed. Appx. 961, 967 (11th Cir. 2015); United States v. Malekzadeh, 855 F.2d 1492, 1497 (11th Cir. 1988); United States v. Jackson, 2015 WL 2236400, at *11 (M.D. Ga. May 12, 2015).  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" . . . or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" . . . or where "a warrant may be so facially deficient – i.e., in failing to particularize the

83

place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422); and see Reese, 611 Fed. Appx. at 967 (same). In making this decision, the totality of the circumstances surrounding issuance of the wiretap order may be considered. See Accardo, 749 F.2d at 1481.

Based on the totality of the circumstances in this case, the court finds that the good faith exception would be applicable even if there were errors made in issuing the wiretap orders. Defendants' attacks are based in part on an alleged lack of probable cause and necessity. However, a review of the affidavits in question demonstrates that the wiretap orders are not "based on . . . affidavit[s] 'so lacking in indicia of probable cause [or necessity] as to render official belief in its existence entirely unreasonable[,]'" Accardo, 749 F.2d at 1480 & n.4 (citations omitted), nor was Affiant dishonest or reckless in preparing the affidavits, Reese, 611 Fed. Appx. at 967.

AO 72A
(Rev.8/8
2)

## IV.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motions [Docs. 51, 75, 77, 118] to suppress intercepted communications be **DENIED**.

## Motions for Severance

Pending before the court are Defendants Bercoon's and Goldstein's motion [Doc. 46] and Defendant Veugeler's motion [Doc. 54] for severance of Counts 1 through 13 from Counts 14 through 19.   Defendants contend that these two sets of counts are improperly joined under Federal Rule of Criminal Procedure 8 and, if properly joined, should be severed due to compelling prejudice from a joint trial under Rule 14.   [Docs. 46 and 54].   The Government opposes the motions for severance. [Doc. 109 at 26-42].   For the following reasons, the court recommends that Defendants' motions be denied.

## I.    Superseding Indictment

On May 19, 2015, a superseding indictment was returned by the federal grand jury charging Defendants Bercoon, Goldstein and Veugeler with various violations of federal law.   [Doc. 61].   In Count 1, Defendants Bercoon and Goldstein are charged with a conspiracy, in violation of 18 U.S.C. § 1349, to commit mail fraud (18 U.S.C.

85

§ 1341) and wire fraud (18 U.S.C. § 1343), from approximately May 26, 2009, through at least June 3, 2010, relating to an entity identified as Find.com Acquisition, Inc. ("Find.com"). [Id., Count 1]. The conspiracy count alleges that Defendants primarily utilized sales representatives to solicit investors, with over $1.5 million paid for Find.com stock, based on written offering materials stating that investments "would be used to develop an internet search engine website business . . . ." [Id., ¶¶ 3-8, 10-12]. These statements were allegedly false with respect to how the proceeds would be used and were made to induce investments. Defendants, instead of investing all of the proceeds, except for sales commissions, into Find.com, diverted the proceeds for personal purposes and for other business ventures unrelated to Find.com. The false statements included misrepresentations as to the amount of the commission to be paid for each sale price of $1.00 per share, greatly understating the commission paid. The price per share was also misrepresented. [Id., ¶¶ 9-16, 20-22]. On June 3, 2009, Defendants opened a business checking account in the name Find.com Acquisition, Inc., at Wachovia ("Wachovia 6570 Account") and, on September 4, 2009, opened a second business checking account for Find.com at SunTrust Bank ("SunTrust 5494 Account"), with "a large portion of the funds invested in Find.com [being] withdrawn in cash from the SunTrust 5494 Account . . . ." [Id., ¶¶ 17-18, 23].

86

Counts 2 through 5 charge Defendants Bercoon and Goldstein with mail fraud relating to the Find.com scheme, occurring from February 25, 2010, through April 16, 2010, involving mail matter received from four Find.com investors living outside of Georgia.  [Id., Counts 2-5].  And Counts 6 through 9 charge Defendants Bercoon and Goldstein with wire fraud relating to the Find.com scheme, occurring from May 21, 2010, through June 3, 2010, involving wire transfers of monies into the Wachovia 6570 Account.  [Id., Counts 6-9].

Count 10 charges a money laundering conspiracy, pursuant to 18 U.S.C. § 1956(h), against Defendants Bercoon and Goldstein, from approximately June 16, 2009, through at least June 3, 2010, relating to the Find.com scheme and involving financial transactions in the proceeds of specified unlawful activity (the charges in Counts 1 through 9) and engaging in monetary transactions in amounts exceeding $10,000 from criminally derived property (proceeds from the charges in Counts 1 through 9).  [Id., Count 10].  Finally, Counts 11 through 13 charge these Defendants with money laundering, in violation of 18 U.S.C. § 1957, related to the Find.com scheme and the conduct alleged in Counts 1 through 9, from approximately March 3, 2010, through March 25, 2010, involving wire transfers from the SunTrust 5495 Account to a Wachovia account in the name of HMRZ Consulting, LLC ("the HMRZ

87

Account"), allegedly controlled by Defendants Bercoon and Goldstein.  [Id., Counts 11-13].

Count 14 charges Defendants Bercoon, Goldstein and Veugeler with a conspiracy to commit securities fraud (15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2) and wire fraud (18 U.S.C. § 1343), all in violation of 18 U.S.C. § 371, relating to MedCareers Group, Inc. ("MCGI"), from approximately July 2009, through September 2011.  [Id., Count 14].  Defendants Bercoon and Goldstein were alleged to be officers of MCGI, who, along with Defendant Veugeler, "sought to dominate and control virtually all of the freely trading shares of MCGI" and concealed their involvement by using nominee officers and directors during market manipulations.  Defendants utilized brokerage accounts in nominee names, designed promotional efforts to generate demand for MCGI stock and orchestrated trading activity to mislead investors.  [Id., ¶¶ 35-36, 39-45].  After nominee stock transactions, at Defendants' direction, proceeds were transferred "to themselves, their family members, and various other entities and individuals."  [Id., ¶ 46].  The overt acts alleged summarize and fairly track the outline of the events recounted by CS-1 and CS-2 and the analysis of the SEC ARO data for March and May 2010, which is set forth in the affidavits for the wiretap orders subsequently obtained in June, July and August

AO 72A
(Rev.8/8
2)

2011 and which is detailed *supra*, see Motions to Suppress Wiretap Evidence. The court will not recount those details. The overt acts explain how Defendants Bercoon and Goldstein met the other participants in the MCGI market manipulations, including Defendant Veugeler, and describe the roles each Defendant had in the market manipulations. [Id., ¶¶ 47-73, 76-77]. With respect to the proceeds of the market manipulations in March and May 2010, involving CS-1 (identified as Associate A in the indictment), the bulk of the monies were deposited into the HMRZ Account at Wachovia bank and then subsequently paid out to Defendants Bercoon and Goldstein and relatives as well as being used to pay other business debts and expenses. [Id., ¶¶ 74-75].

Counts 15 through 18 charge all three Defendants with wire fraud, in violation of 18 U.S.C. § 1343, relating to the MCGI scheme, from March 10, 2010, through May 14, 2010, involving wire transfers of funds into the HMRZ Account. [Id., Counts 15-18]. And Count 19 charges all three Defendants with securities fraud, 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, from approximately July 2009 through September 2011, relating to the MCGI scheme. [Id., Count 19]. Finally, forfeiture is sought against all three Defendants of proceeds of the alleged illegal conduct or of property involved in the illegal conduct. [Id., Forfeiture].

89

## II.     Discussion

Defendants Bercoon and Goldstein, relying on Rule 8(a), contend that Counts 1 through 13, involving making "material misrepresentations attendant to the offer or sale of nonpublic securities" relating to Find.com charge crimes that are distinct from Counts 14 through 19, involving "material omissions attendant to the public trading of securities" related to MCGI and involve distinct securities laws and regulations which would be difficult for the jury to properly apply.  [Doc. 9 at 14-15].  Defendants also contend that severance should be granted pursuant to Rule 14 because of compelling prejudice arising from the "likely taint" of the jury hearing evidence on both fraudulent schemes.  As an example of that alleged prejudice, Defendants point to the fact that "a key witness in the MCGI charges, David Levy," has prior convictions for similar conduct and that another MCGI "witness, Eric Cusimano," likewise has a prior conviction for similar conduct and that their testimony on Counts 14 through 19 "would necessarily prejudice" the jury's consideration of Counts 1 through 13.  [Id. at 14-15].

And Defendant Veugeler, pursuant to Rule 8(b), asserts that he is not charged in Counts 1 through 13, is not alleged to have participated in the activity related to Find.com and that there is no connection between the fraud involving Find.com and

AO 72A
(Rev.8/8
2)

that involving MCGI in Counts 14 through 19.  He notes the same distinctions in the type of securities fraud involved in the two conspiracies.  [Doc. 54 at 10-12]. Defendant invokes Rule 14 and summarily contends that trying all of the counts together will cause "unnecessary 'spillover'" from the evidence offered in support of Counts 1 through 13.  [Id. at 6].

In response, the Government notes that in a multi-defendant case, Rule 8(b) applies and that there is a "common thread" between both the Find.com and MCGI fraud schemes, including, an overlap of Defendants and time frame, the same type of conduct involved, that is, securities fraud, the same bank account utilized, that is, the HMRZ Account, and the same purpose, that is, to enrich Defendants with the fraudulently obtained investment funds.  [Doc. 109 at 26-30].  The Government proffers, in addition to the allegations in the indictment, that information obtained from the wiretaps establishes that the fraudulent activity was overlapping, involving similar background evidence and the same witnesses, such as, CS-1 and CS-2.  [Id. at 31-34]. The Government also asserts that Defendants have not established compelling prejudice as required to obtain a Rule 14 severance because the court can provide cautionary instructions concerning consideration of evidence which will cure any

AO 72A
(Rev.8/8
2)

prejudice and because evidence offered in support of one scheme would be admissible at a separate trial on the other scheme.  [Id. at 35-42].

To the extent Defendants Bercoon and Goldstein are relying on Rule 8(a), that reliance is misplaced because they are charged in the indictment along with co-Defendant Veugeler.  See United States v. Kopituk, 690 F.2d 1289, 1312 (11th Cir. 1982) ("It is well established that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses, whereas Rule 8(b) governs in cases involving multiple defendants."); United States v. Damiani, 2011 WL 7574628, at *17 (N.D. Ga. September 23, 2011), adopted at 2012 WL 983726 (N.D. Ga. March 20, 2012) ("Rule 8(b), as opposed to Rule 8(a), governs the joinder of multiple defendants in a single indictment."); and see United States v. Irizarry, 341 F.3d 273, 287 (3rd Cir. 2003) ("most courts have held that Rule 8(b) applies exclusively to issues of joinder of multiple defendants and that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses").  The court will, therefore, evaluate Defendants' claim of misjoinder under Rule 8(b).[47]

---

[47]The test for evaluating the appropriateness of joinder of counts and of defendants is "with one exception, more or less the same.  The critical difference between the two subsections is that Rule 8(a) allows joinder of offenses against a single defendant that 'are of the same or similar character,' even if such offenses do not arise out of the same series of acts or transactions.  Under Rule 8(b), offenses may

AO 72A
(Rev.8/8
2)

"Federal Rule of Criminal Procedure 8(b) is a pleading rule." United States v.

Scrushy, 237 F.R.D. 464, 468 (M.D. Ala. 2006). "Under Rule 8(b) . . ., '[t]wo or more

defendants may be charged in the same indictment or information if they are alleged

to have participated in the same act or transaction or in the same series of acts or

transactions constituting an offense or offenses.'" United States v. Talley, 108 F.3d

277, 279 (11th Cir. 1997) (quoting Fed. R. Crim. P. 8(b) (pre-amendment);[48] accord

United States v. Paul, 194 Fed. Appx. 792, 796 (11th Cir. 2006) (same). "In order to

meet the same series of acts or transaction requirement of Rule 8(b)[,] the government

---

not be joined unless they arise out of a series of acts or transactions, regardless of how similar they may be in character." Kopituk, 690 F.2d at 1312 (citation omitted); see also United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (Rule 8(a) allows "joinder of offenses that 'are of the same or similar character,' even if such offenses do not arise at the same time or out of the same series of acts or transactions") (citation omitted). Accordingly, joinder under Rule 8(a) is broader than that under Rule 8(b). And see United States v. Adigun, 2011 WL 2194253, at *10 n.42 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2198308 (N.D. Ga. June 3, 2011).

[48]The 2002 amendment to Rule 8(b) was not substantive. The provision currently provides:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b).

AO 72A
(Rev.8/8
2)

must demonstrate that the acts alleged are united by substantial identity of facts and/or participants[;] . . . [however, e]ach participant need not participate in all acts or even know the other participants' roles in the ventures." United States v. Holloway, 971 F.2d 675, 679 (11th Cir. 1992) (citations and internal quotation marks omitted); see also United States v. Aiken, 76 F. Supp. 2d 1346, 1351 (S.D. Fla. 1999) ("Joinder of multiple defendants is proper whenever there is a common thread between the actions charged against them.") (citation and internal quotation marks omitted).   And, "'separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions.'" United States v. Hill, 643 F.3d 807, 829 (11th Cir. 2011) (citation omitted); and see United States v. Shoemaker, 2012 WL 256520, at *3 (N.D. Miss. January 27, 2012) (same).

The government may demonstrate that joinder of defendants is proper by either relying on the indictment and/or by making a proffer of evidence that satisfies Rule 8(b). See United States v. Dominguez, 226 F.3d 1235, 1241 (11th Cir. 2000) ("If the indictment fails to show and the prosecutor fails to proffer a sufficient basis in the expected evidence to justify joinder, then a severance should be ordered.");[49] accord

---

[49]In Dominguez, the Eleventh Circuit Court of Appeals noted that, although prior cases had stated that reference should be made to the "indictment only" when deciding whether Rule 8 joinder was proper, those cases involved attempts on appeal

94

<u>Paul</u>, 194 Fed. Appx. at 796-97 (same).  Finally, in evaluating whether joinder of defendants is proper, "Rule 8 is construed broadly in favor of the initial joinder." <u>Paul</u>, 194 Fed. Appx. at 796; <u>see also</u> <u>Dominguez</u>, 226 F.3d at 1238 (same); <u>and see</u> <u>United States v. Souffrant</u>, 517 Fed. Appx. 803, 811 (11th Cir. 2013) ("Rule 8(b) permits joinder of defendants in the same indictment or information in order to achieve judicial economy and other important benefits.").

As established from the face of the indictment, both of the securities fraud and/or mail and wire fraud schemes involved Defendants Bercoon and Goldstein and the time frames for both schemes, for Find.com, from approximately May 2009 to June 2010, and for MCGI, from approximately July 2009 to September 2011, overlapped. Defendants make too much of the "distinct" nature of the fraud schemes, that is, that Find.com was a non-public stock but that MCGI was publically traded stock - the

---

to evaluate the evidence actually admitted at trial to invalidate a determination, previously made based on the four corners of the indictment, that Rule 8 joinder was proper. <u>Id.</u> at 1240-41.  The "indictment only" rule is applicable to prevent after-the-fact evaluation of joinder but the rule "is not applicable to situations when the evidence proffered by the government before trial or adduced during trial shows that initial joinder was *proper* even though the indictment may not have explicitly stated the connection between the charges." <u>Id.</u> at 1241 (emphasis in original). <u>And see</u> <u>United States v. Heard</u>, 2013 WL 1966299, at *5 (M.D. Ga. May 10, 2013) ("If the indictment fails to evince a connection, the Government may proffer evidence to show that joinder is proper.").

bottom line is that both schemes involved misleading, either by misrepresentation or by omission, potential investors in one of the two entities with the purpose being to divert the investments, that is, illegally obtained proceeds, to Defendants' personal use or for use in other businesses. Also, both schemes utilized the HMRZ Account to funnel a portion of the proceeds in Spring of 2010.

And beyond the face of the indictment, as the Government proffers [Doc. 109 at 31-33], consideration of the information provided by the confidential informants and a few of the intercepted communications recounted in the affidavits for the wiretap orders establish that the schemes were not isolated events nor were the two entities, Find.com and MCGI, unrelated but that all three Defendants were continually discussing investment deals involving not only Find.com and MCGI but other entities associated with them. CS-2's explanation of how he came to work for Defendants Bercoon and Goldstein involved both Find.com getting off the ground and then starting up MCGI. [8/25/11 Affidavit ¶¶ 60-63]. On August 16, 2011, Defendants Bercoon and Veugeler are intercepted discussing a deal involving GNZR or GenZero and Find.com, with Defendant Bercoon stating that other groups that they were talking to were demanding the same type of transaction. Later in the conversation, discussing a third party, Bakthiar, and "Go Link Up," Defendant Veugeler again proposes a deal

96

involving GNZR and Find.com.  And Bercoon inquires "how do [the investors] get money from Find?"  [Id. ¶¶ 1117-18].  Defendant Bercoon then speaks to Defendant Goldstein about Defendant Veugeler's suggestion for a deal involving Find.com.  [Id. ¶¶ 119-20].  These discussions, occurring after the charged Find.com time frame and during the time frame for the MCGI scheme, indicate that Defendants did not compartmentalize their alleged fraudulent security schemes.  The allegations in the indictment, and supplemented by the Government's proffer, establish that the two charged fraud schemes involve "substantial identity of facts and/or participants . . . ." Holloway, 971 F.2d at 679; see also Souffrant, 517 Fed. Appx. at 811 ("there must be a logical relationship between each of the [offenses] joined" in the indictment).

The cases cited by the Government, United States v. Curescu, 674 F.3d 735 (7th Cir. 2012), and United States v. Feyrer, 333 F.3d 110 (2nd Cir. 2003), support denial of Defendants' Rule 8 severance motions.  In Curescu, although, as the court noted, "the zoning and plumbing conspiracies were different, Curescu was at the heart of both, for both were conspiracies to obtain unlawful benefits for his building."  The court denied severance.  674 F.3d at 742.  Likewise, in this case, Defendants Bercoon and Goldstein were "at the heart of both" schemes which were intended to divert funds invested in their companies based on false pretenses to their, and Defendant

97

Veugeler's, personal use.  When Defendant Veugeler joined in, he had the same *modus operandi*.  In <u>Feyrer</u>, the court found that Rule 8 joinder was proper because the timing of the conspiracies overlapped, because there were common and central participants in both conspiracies and because "the two conspiracies shared a common plan, namely to generate income for Feyrer, Wolff and the Symons Group brokers through fraudulent stock transactions."  333 F.3d at 114.  Similarly, in this case, the schemes were ongoing during the same time period and involved the same central participants, that is, Defendants Bercoon and Goldstein, and involved fraudulent securities investments and the same HMRZ bank account, and there was a common plan to generate income for all three Defendants from the schemes.  <u>And see</u> <u>United States v. Ginyard</u>, 65 Fed. Appx. 837, 838-39 (3rd Cir. 2003) (rejecting the defendant's contention that the three schemes were distinct and separate, the court found a "sufficient connection and nexus between the various schemes[,]" that is, a common bank account used for depositing the checks (endorsed with the same name) from the schemes, the overlap in time period for the schemes and the name of the company involved).

The cases cited by Defendants, <u>United States v. Weaver</u>, 905 F.2d 1466 (11th Cir. 1990); <u>United States v. Fernandez</u>, 892 F.2d 976 (11th Cir. 1990); <u>United States</u>

v. Castro, 829 F.2d 1038 (11th Cir. 1987); and United States v. Diaz-Munoz, 632 F.2d 1330 (5th Cir. Unit B 1980), do not support their arguments for severance.  As pointed out by the Government, those cases are factually distinguishable from the case before this court.  [Doc. 109 at 34 & n.5].  Just as Judge Vineyard found in Adigun, Defendants' reliance on Diaz-Munoz is misplaced "because in that case, severance was warranted due to the fact that '[a]t trial . . . the government failed to produce any evidence tending to prove a connexity between the tax counts and the non-tax counts, and even conceded this point at oral argument.'"  Adigun,  2011 WL 2194253, at *11 (citation omitted).  However, as was true in Adigun, in this case, the Government has shown, as alleged in the indictment, a close connection between the charged offenses and a substantial identity of facts and participants.  Id.  And in Adigun, the court found that in Weaver, joinder of marijuana and cocaine conspiracies was "improper because they 'did not overlap temporally.'"  Id. (quoting Weaver, 905 F.2d at 1477).  In this case, the time periods for the charged schemes do overlap.  Additionally, as noted in Adigun, unlike the situation in Weaver where the court considered the prejudice to the defendants charged in only one of the two conspiracies, there is "no such danger to [Defendants Bercoon and Goldstein], given that [they] . . . [are] charged with the

99

offenses that [they] argue[] ought to be severed." Adigun, 2011 WL 2194253, at *11 & n.44.[50]

Additionally, the decisions in Fernandez and Castro do not support Defendant Veugeler's arguments.  In both cases, the indictments charged a single conspiracy; however, the evidence at trial was found in each case to establish two wheel conspiracies which impacted the court's analysis of the defendants' severance claims. Fernandez, 892 F.2d at 984-85;[51] Castro, 829 F.2d at 1044-45.  The superseding indictment herein charged two schemes, which as discussed contain a "common thread" satisfying Rule 8(b) joinder.  There was no initial error of allowing misjoinder based on charging a single conspiracy later found to be - based on the evidence presented at trial - multiple conspiracies.

For these reasons, the court finds that the Government has sufficiently established that the alleged unlawful conduct is part of "'the same series of acts or transactions[,]'" Talley, 108 F.3d at 279 (citation omitted), and that "there is a common thread between the actions" alleged in the indictment, Aiken, 76 F. Supp. 2d at 1351

---

[50]And, as to Defendant Veugeler, as will be discussed further *infra*, he has not established compelling prejudice from the joinder of the counts.

[51]The court also found that "[u]nder Rule 8(b), [the defendant's] claim probably would be meritless."  Id. at 985.

(citation and internal quotation marks omitted), and, accordingly, that Counts 1 through 13 are properly joined with Counts 14 through 19.  Even if joinder is proper under Rule 8, Defendants nevertheless contend that a severance should be granted under Rule 14.

Rule 14 states in pertinent part: "If it appears that a defendant or the government is prejudiced by a joinder of offenses . . . the court may order . . . separate trial of counts. . . ."  The Eleventh Circuit Court of Appeals stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendant] against the interests of judicial economy, a consideration involving substantial discretion.'"  United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004) (citation omitted).  To justify severance, a defendant must show compelling prejudice to the conduct of her defense resulting in fundamental unfairness.  See United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997).  "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'"  United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007).

In order to establish that severance of counts is mandated pursuant to Rule 14, Defendants must not only show specific prejudice but also that "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Blankenship, 382 F.3d at 1123 (citation omitted).  Additionally, Defendants must demonstrate "that a severance is the only proper remedy for that prejudice - jury instructions or some other remedy short of severance will not work." United States v. Lopez, 649 F.3d 1222, 1234 (11th Cir. 2011) ("Because limiting instructions usually will cure any prejudice resulting from a joint trial, . . . the Supreme Court has indicated that severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given.") (citation omitted).  Defendants do not present any arguments that a specific trial right would be compromised by the joint trial in this case.  [Docs. 46 and 54].

The second category mandating a severance, that is, preventing the jury from making a reliable judgment, applies generally to three situations.  "First, severance is mandated where compelling evidence that is not admissible against one or more of the

102

co-defendants is to be introduced against another co-defendant." <u>Blankenship</u>, 382 F.3d at 1123. However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. <u>See</u> <u>Baker</u>, 432 F.3d at 1236 (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants,' . . . even when the disparity is 'enormous'") (quoting <u>Schlei</u>, 122 F.3d at 984); <u>and see</u> <u>Hill</u>, 643 F.3d at 829 (same). Defendant Veugeler appears to be arguing - in his conclusory reference to Rule 14 - that the evidence offered in support of Counts 1 through 13, in which he is not charged, will unduly prejudice the jury's consideration of the evidence admitted against him on Counts 14 through 19. [Doc. 54 at 6]. Severance is also mandated upon a showing of prejudice "in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." <u>Blankenship</u>, 382 F.3d at 1124. And, "[f]inally, severance is required . . . where one defendant is being charged with a crime that, while somehow related to the other defendants or their

103

overall criminal scheme, is significantly different from those of the other defendants." Id. at 1125.  No Defendant contends that the latter two situations truly apply in this case.   However, Defendants Bercoon and Goldstein contend that the jury's consideration of the evidence on Counts 1 through 13 will be tainted because two witnesses to the MCGI conduct, charged in Counts 14 through 19, have criminal histories involving similar conduct and that the differences in the type of securities and/or wire and mail fraud alleged in the schemes will be confusing to the jury.  [Doc. 46 at 10-12].

To begin with, except as noted, Defendants offer no specific reasons why, in this case, actual prejudice will be the result of a joint trial or why, under the facts herein, limiting instructions are not adequate.  [Docs. 46 and 54].  Defendants Bercoon and Goldstein offer a single, unexplained conclusory sentence that "a curative instruction would not constitute an appropriate remedy."  [Doc. 46 at 12].  Defendant Veugeler does not even address the curative impact of cautionary instructions.  [Doc. 54].

And, as to Defendants Bercoon's and Goldstein's contention that the jury's knowledge of the criminal histories of two witnesses establishes compelling prejudice, the former Fifth Circuit Court of Appeals has rejected that type of argument even when applied to a co-defendant standing trial.  In United States v. Davis, 546 F.2d 617 (5th

104

Cir. 1977), the defendants contended "that they were prejudiced by the admission of the prior importation schemes of" a co-defendant. Id. at 620.  The court, rejecting the defendants' conclusory claim of prejudice, stated, "Our court has held that the admission of past misconduct of some defendants does not dictate a severance to protect the other co-defendants from an inference of guilt by association." Id. (citing United States v. Perez, 489 F.2d 51, 67 (5th Cir. 1973) ("It is further asserted by some appellants that the criminal records of their co-defendants below were prejudicial to their defense and should have been sufficient to warrant a severance.  Similar grounds have generally been rejected. . . .  These grounds have been held insufficient even if the prior convictions were for similar offenses.")); accord United States v. Walton, 2011 WL 3665145, at *5 (E.D. La. August 19, 2011) ("the Fifth Circuit has stated that, 'evidence of the reputation or past crimes of one co-defendant, although clearly inadmissible against the other co-defendants, does not ordinarily justify severance'") (quoting United States v. Rocha, 916 F.2d 219, 228 (5th Cir. 1990)); United States v. Brown, 894 F. Supp. 1150, 1157 (N.D. Ill. 1995) ("Severance is not required . . . when the prosecution introduces evidence of a co-defendant's past criminal record unless the defendant can show that actual prejudice will result."). "Rather[, the court has] relied on careful instructions at the time such evidence is admitted to protect co-defendants

105

AO 72A
(Rev.8/8
2)

in a . . . trial from the risk of guilt transference."  <u>Davis</u>, 546 F.2d at 620; <u>see also</u>

<u>United States v. Ramirez</u>, 426 F.3d 1344, 1352 (11th Cir. 2005) ("Ramirez did not meet

his burden to show compelling prejudice that the judge's first limiting instruction to

the jury, regarding the evidence of [co-defendant] Quinones's prior acts and their lack

of relevance to Ramirez, was ineffectual or that the jury could not make an

individualized determination as to his guilt or innocence.").  The Defendants offer no

reasoning as to why the same analysis would not apply to prior bad conduct by

witnesses.

Defendant Veugeler's general and conclusory allegation of prejudice flowing

from not being charged in the Find.com scheme does not carry his burden to establish

compelling prejudice nor come close to demonstrating that the trial court's limiting

instructions will not cure any potential prejudice.  Similarly, Defendants Bercoon's and

Goldstein's general contentions that the jury will be unable to separate and consider

the evidence as to each charged scheme are insufficient.  The indictment in this case

is not nearly so complex, nor the charges so complicated, that with proper jury

instructions, the jury will not be able "to sort through the evidence and issues and

reliably determine the guilt or innocence of [Defendants] on each charge" based solely

on the evidence admissible against each Defendant on the charge under consideration.

106

Lopez, 649 F.3d at 1235; see also United States v. Jackson, 367 Fed. Appx. 55, 57 (11th Cir. 2010) ("Severance is not required if the possible prejudice may be cured by a cautionary instruction."); Hersh, 297 F.3d at 1244 (observing "that the district court affirmatively and repeatedly acted to reduce any unfair prejudice[,]" particularly instructing the jury on the limitation on the consideration of evidence as to each count of the indictment, appellate court found no error in refusal to grant Rule 14 severance).

Additionally, as argued by the Government with respect to Defendants Bercoon and Goldstein, if a severance of Counts 1 through 13 from Counts 14 through 19 is granted, there is a strong likelihood that evidence of each scheme would be admissible at the trial of Defendants on the other scheme because such evidence is inextricably intertwined or as extrinsic evidence of other bad acts pursuant to Fed. R. Evid. 404(b). [Doc. 109 at 36-41]. For this reason, the Government contends that Defendants cannot establish compelling prejudice. See United States v. Baradji, 479 Fed. Appx. 301, 303 (11th Cir. 2012) (finding that the defendant "failed to show that evidence related to the conspiracy charge created a prejudicial spillover effect on his conviction for [another charge] because the challenged evidence would likely have been admissible at a severed trial under Rule 404(b) as evidence of his intent and absence of mistake").

AO 72A
(Rev.8/8
2)

Because evidence about each fraudulent scheme is linked in time, participants and circumstances and will include the testimony of the confidential informants about how the schemes developed, including how Defendants acquired interests in Find.com and MCGI, their relationship with Defendants, and Defendants' statements to them during execution of the schemes, the Government contends that the two charged conspiracies are inextricably intertwined.  [Doc. 109 at 37-39].  In the alternative, the Government argues that evidence of each conspiracy is admissible under Fed. R. Evid. 404(b) because the evidence about simultaneously occurring conspiracies to defraud investors demonstrate Defendants' intent and knowledge and the absence of mistake on their part in engaging in the charged conduct.  [Id. at 39-41].  The Government's overview of the evidence presents a strong case for finding that evidence about both schemes can be considered by the jury in determining Defendants Bercoon's and Goldstein's guilt or innocence on each charged scheme and the related substantive counts.

In United States v. Roberts, 464 Fed. Appx. 796 (11th Cir. 2012), the Eleventh Circuit Court of Appeals explained the interaction between intrinsic and extrinsic evidence in relationship to Rule 404(b).  The court stated,

108

AO 72A
(Rev.8/8
2)

> The structure of [Rule 404(b)] creates a two-step admissibility inquiry. First, an uncharged crime or bad act may be intrinsic to the case, and therefore outside the scope of Rule 404(b), if it is: "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." . . . Second, evidence regarding acts not part of the charged crimes but pertaining to the context, motive, and set-up of the crimes is properly admitted if it is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." . . . If the prior bad act or conviction is not intrinsic to the charged crime, Federal Rule of Evidence 404(b) will determine its admissibility.

Id. at 800 (citations omitted). "Evidence is inextricably intertwined when 'it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted.'" United States v. Stapleton, 455 Fed. Appx. 896, 897 (11th Cir. 2012). And, while Rule 404(b) "extrinsic evidence of a prior bad act is not admissible as proof of a defendant's character or to show that a specific action is in conformity with that character[,]" such evidence "is admissible for other purposes, like proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." United States v. Prophete, 522 Fed. Appx. 583, 585 (11th Cir. 2013) ("Extrinsic evidence is relevant 'where the state of mind required for the charged and extrinsic offenses is the same.'") (citation omitted). Having pled not guilty, Defendants' intent is a material issue in this case. See Roberts,

AO 72A
(Rev.8/8
2)

464 Fed. Appx. at 801 ("'In every conspiracy case . . . a not guilty plea renders the defendant's intent a material issue. . . . Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless he affirmatively takes the issue of intent out of the case.'") (citation omitted); United States v. McNair, 605 F.3d 1152, 1203 (11th Cir. 2010) (same).

The evidence, as outlined by the Government, concerning the overlapping conspiracies is intrinsic and involves actions taken and statements made by Defendants Bercoon and Goldstein during the two schemes, which this court has already determined to be part of the same series of transactions and having a substantial connection in participants and facts. Evidence about the operation of the schemes, without attempting to extract parts of the evidence solely pertinent to one of the schemes, is necessary to complete the story about Defendants' conduct for the jury. See, e.g., Prophete, 522 Fed. Appx. at 586 (finding that evidence about the defendant's participation in an uncharged bank fraud scheme with the same co-conspirator was admissible because of its similarity to the charged bank fraud scheme, because the evidence assisted in explaining why the defendant was recruited to join the charged conspiracy, and because the evidence "formed 'an integral and natural part of the witness's accounts of the circumstances surrounding the offenses' for which Prophete

110

was indicted") (citation omitted); <u>United States v. Benavides</u>, 470 Fed. Appx. 782, 787-88 (11th Cir. 2012) (allowing the Government to introduce evidence of uncharged Medicare fraud because the "testimony described Benavides' participation in a scheme involving the same manner of fraud . . ., using the same type of company . . ., hiring the same intermediaries to bill the claims and launder the money . . ., and involving the same main players . . .").

Furthermore, if evidence about one of the schemes is deemed extrinsic to the other, that evidence is quite likely admissible pursuant to Rule 404(b).  The evidence outlined by the Government is relevant to an issue other than Defendants' character, that is, the evidence relates to their intent and knowledge and ability to engage in the conduct, as well as to establish absence of mistake.  <u>See United States v. McCrimmon</u>, 362 F.3d 725, 730 n.2 (11th Cir. 2004) (evidence that the defendant had worked with a third party on another scheme before the scheme under indictment "was relevant and probative as to the relationship between [the defendant and the third party] and, more importantly, it aided in explaining the chain of events that led to the formation of [the charged scheme]"); <u>United States v. Hooshmand</u>, 931 F.2d 725, 736 (11th Cir. 1991) (noting that extrinsic act evidence is relevant when the government has to prove intent to commit the crime and "to show a defendant's ability and experience to execute a

111

fraudulent scheme"). The evidence is based upon a proffer of proof that will permit the jury to find that Defendants committed the extrinsic act, that is, each charged fraud scheme, and the probative value of the evidence arguably outweighs any potential prejudice to Defendant. See Roberts, 464 Fed. Appx. at 800.

While not dispositive of the Rule 14 severance issue before the court, the fact that this evidence would probably be admissible at separate trials of the charged offenses undermines Defendants' showing of compelling prejudice. See Baradji, 479 Fed. Appx. at 303. Defendants are not entitled to a Rule 14 severance.

## III. Conclusion

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 46 and 54] for severance be **DENIED**.

### Motion to Strike Surplusage

Defendant Goldstein, also on behalf of Defendants Bercoon and Veugeler, filed a motion [Doc. 53], pursuant Fed. R. Civ. P. 7(d), to strike surplusage from the superseding indictment. Without explanation as to how or why, Defendants seek to strike references in the indictment to the phrase "pump and dump" contending that such references are "unnecessary, inflammatory, and prejudicial." [Id. at 2]. Defendants point to six references of the phrase in the superseding indictment: at page

112

18, "Preparing for the Pump and Dump"; at page 19, "The March 2010, MCGI Pump and Dump"; in paragraph 67, "during the March[] 2010 pump and dump, even greater numbers of shares were sold by entities controlled by VEUGELER"; at page 22, "The May[] 2010 Pump and Dump"; in paragraph 77, "Trader A sent a text message to GOLDSTEIN attempting to collect payment for his work in the pump and dump scheme."; and at page 26, "by participating in pump and dump schemes involving securities of MedCareers Group, Inc. . . ." [Id.]. Defendants do not contend that the "pump and dump" references in the superseding indictment are irrelevant to the offenses charged therein. [Id.]. In opposition, the Government argues that Defendants have failed to establish that the references lack relevancy to the charged offenses *and* are unduly prejudicial. [Doc. 109 at 23-26]. The Government is correct.

Rule 7(d) of the Federal Rules of Criminal Procedure provides that, "Upon the defendant's motion, the court may strike surplusage from the indictment . . . ." Fed. R. Crim. P. 7(d) (as amended 2009). Although Rule 7(d) "authorizes the Court to strike surplusage from an indictment on motion of the defendant[,]" Fed. R. Crim. P. 7(d), "[a] motion to strike surplusage from an indictment should not be granted unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. . . . [T]his is a most exacting standard." <u>United States v. Awan</u>, 966 F.2d

113

1415, 1426 (11ᵗʰ Cir. 1992) (citations and internal quotation marks omitted); <u>accord</u> <u>United States v. Brye</u>, 318 Fed. Appx. 878, 880 (11ᵗʰ Cir. 2009) (same); <u>United States</u> <u>v. Smallwood</u>, 2011 WL 2784434, at *10 (N.D. Tex. July 15, 2011) ("the court will not strike allegations that are *relevant*, no matter how prejudicial or inflammatory they may be to the defendant") (emphasis in original).  And, in order to determine whether the allegations are relevant to the charges and the evidence introduced at trial, "[t]he Court may reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial." <u>United States v. Al-Arian</u>, 308 F. Supp. 2d 1322, 1333 (M.D. Fla. 2004).  The Government suggests that the court in this case reserve ruling on the motion pending admission of evidence at trial.  [Doc. 109 at 24].

However, because Defendants failed to offer any reasons supporting the motion to strike, such as, why the phrase "pump and dump" is prejudicial, and have failed to even argue that the phrase is irrelevant to the charges in the superseding indictment, the court finds that Defendants' motion is due to be denied.  <u>See</u> <u>United States v.</u> <u>Kelley</u>, 2009 WL 2176347, at *2 (S.D. Ala. July 17, 2009) (Because "the defendants, without any specificity, argue[d] that [the cited] paragraphs contain immaterial, irrelevant, argumentative, inaccurate, and conclusory language that is calculated to prejudice the jury[,]" the court did "not believe that such a blanket request without

114

more specificity meets the 'exacting standard' required by Eleventh Circuit precedent."). Just because Defendants do not like the sound of the phrase used in the indictment, that dislike does not satisfy their burden. See <u>United States v. Behrens</u>, 2010 WL 427784, at *3 (D. Neb. January 26, 2010) (denying the defendant's motion to strike the phrase "Ponzi scheme" as "surplusage, irrelevant, inflammatory and unduly prejudicial[,]" the court stated that the phrase "is a common term used in the financial world, and while evocative of recent headlines, merely describes the alleged conduct of the defendant in a succinct fashion" and "is not surplusage"); <u>United States v. Williams</u>, 2008 WL 4867748, at *4 (S.D. Fla. November 10, 2008) (refusing to strike word "corrupt" to describe hedge fund manager and "sham" to describe nature of consulting agreement because the descriptors were relevant to Government's contentions regarding the defendant's criminal conduct). And, as the Government points out, the phrase "pump and dump" is utilized by courts in describing the type of fraudulent stock scheme in which Defendants allegedly engaged in March and May 2010 involving MCGI. [Doc. 109 at 25-26 (citing cases)].

Because Defendants must prove both that the challenged allegations are not relevant as well as being inflammatory and prejudicial, see <u>United States v. Salvagno</u>, 306 F. Supp. 2d 258, 268 (N.D. N.Y. 2004) ("[I]f evidence of the allegation is

admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.") (citations and internal quotation marks omitted), the court recommends that the motion to strike be denied and that any reconsideration of the motion occur after introduction of the Government's evidence at trial.  See Kelley, 2009 WL 2176347, at *2 ("After the court has heard all the evidence, the defendants may make a motion to reconsider this ruling as to specific surplus language that they contend is unfairly prejudicial and inflammatory); United States v. Alexander, 2008 WL 2130185, at *4 (W.D. La. May 18, 2008) (noting, to the extent the defendant contends some of the allegations in the indictment are not admissible, the court may address these concerns by summarizing the indictment for the jury, instead of reading it, at the beginning of trial, and to the extent evidence is held inadmissible, related allegations in the indictment can be stricken before the indictment is provided to the jury for deliberations).[52]

For the foregoing reasons, the court **RECOMMENDS** that Defendants' motion [Doc. 53] to strike surplusage be **DENIED**.

---

[52]The Eleventh Circuit Court of Appeals "ha[s] found that a defendant was not unduly prejudiced by language that was not stricken from an indictment where the court provided the jury with only a summary of the indictment that did not include references to the disputed language." Byre, 318 Fed. Appx. at 880.

116

AO 72A
(Rev.8/8
2)

## **Motion for Bill of Particulars**

Defendant Goldstein, on behalf of Defendants Bercoon and Veugeler, filed a motion [Doc. 48] seeking a bill of particulars that includes requests for detailed information concerning the specific facts and/or evidence the Government will use to support allegations in the superseding indictment at trial.  The charged offenses and the allegations in support of the charged offenses asserted in the superseding indictment are set forth *supra*, <u>see</u> Motion for Severance.  The information available to Defendants to prepare for trial, provided by the Government and from other sources (and identified by the Government [Doc. 109 at 9-23]), as Defendants acknowledge, is voluminous and includes the four affidavits offered in support of the wiretap orders, the contents of which are discussed in detail *supra*, <u>see</u> Motions to Suppress Wiretap Evidence.  In response to the motion for a bill of particulars, although opposing providing some of the exacting detail requested about the evidence to be introduced at trial, the Government agrees to provide, and the court finds has sufficiently provided, responses to most of Defendants' specific requests for information.  [Doc. 109 at 9-23].[53]  To the extent that the Government declines to provide additional

---

[53]In response to a number of the requests, after providing information, the Government points out that as preparation for trial is not complete, additional evidence of wrongdoing supporting the allegations in the superseding indictment may be

evidentiary detail, for the reasons stated below, the court declines to grant the bill of particulars.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the

_____

developed which will be identified for Defendants, with adequate notice, in witness and exhibit lists and as required by Fed. R. Evid. 404(b) before trial.

118

information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)).   The counts in the indictment, which have been set out in detail *supra*, sufficiently allege each charge by stating the elements of each offense charged therein and by providing details regarding the manner and means - or the scheme to defraud - by which Defendants participated in and committed the charged offenses.  [Doc. 61].

The court notes that the fact that discovery materials are provided to a defendant is an appropriate factor to consider in deciding whether a bill of particulars is warranted.  See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("a bill of particulars is not typically warranted in so far as it seeks information already available through other sources") (citing United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")); see also United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the

119

AO 72A
(Rev.8/8
2)

government's file); United States v. Caputo, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003) (same); United States v. Cooper, 283 F. Supp. 2d 1215 (D. Kan. 2003) (same).

As the Government outlines, in addition to the factual allegations in the indictment, Defendants were provided with a wealth of information in discovery, and the Government, in response to specific requests in the bill of particulars, points out where in that discovery, for example, in the affidavits for the wiretap orders, or from what other sources, for example, a SEC website, Defendants can locate answers to their inquiries. [Doc. 109 at 17-18, 20-21]. The Government also points to specific allegations in the indictment which provide answers to one or more requests in the bill of particulars. [Id. at 13-16, 18-20]. With respect to Defendants' requests for additional evidentiary detail, such as, a comprehensive listing of false statements and material omissions and details about evidence underlying the securities fraud allegations [Doc. 48, requests no. 2, 3, 4 and 17], the court finds that these requests seek evidentiary detail - in light of the information already set forth in the indictment and provided by the Government in discovery and in the response to the bill of particulars - that is not appropriate in a bill of particulars. See United States v. Levy, 2013 WL 664712, at *13 (S.D. N.Y. February 25, 2013) (defendant's "request for a recounting of each specific misrepresentation and omission alleged is simply a request

120

to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and internal quotation marks omitted); United States v. Ghavami, 2012 WL 2878126, at *4 (S.D. N.Y. July 13, 2012) (finding that the defendant's request for the exact misrepresentations made, as well as specific details about the harm caused, is not properly the subject of a bill of particulars).

And the court finds that Defendants' reliance on United States v. Langford, 946 F.2d 798 (11th Cir. 1991), as a basis for obtaining the information being sought is misplaced. The facts in Langford were unusual in that the security fraud counts were based on "only a single sale of securities (the sale of the entire capital stock of a bank)[.]" United States v. Goodwin, 2004 WL 769312, at *1 (D. Mass. April 12, 2004). The case involved a single transaction to a single buyer upon which three security fraud counts were based due to multiple mailings. Langford, 946 F.2d at 804. The multiplicity issue arose in Langford, because based on those unique facts the unit of prosecution, that is, "the use of a manipulative device or contrivance . . . as clarified by . . . Rule 10b-5" happened to be established solely by 10b-5(2), the "mak[ing of] any false statement of material fact (or to make a material omission)" and did not involve the other subsections. Id. at 803. The court deemed the three counts multiplicitous. Id. at 803-04. Count 19, as charged in instant case, which is based on

121

a market manipulation of MCGI stock, involving multiple sales of stock from different nominee accounts to numerous buyers, does not pose the same charging concerns. Langford only held that the unit of prosecution ("the use of a manipulative device or contrivance") does not have to encompass the complete scheme to defraud but can be based on a "false statement of material fact in connection with a discrete purchase or sale of a security." Id. at 803-04 (in that situation, specifics as to the false statement or omission should be alleged). As courts interpreting Langford have found (based on facts similar to those in this case), on-going and multi-layered conduct, arguably establishing proof under two or more subsections of 10b-5, may be charged as a single securities fraud offense. See United States v. Haddy, 134 F.3d 542, at 548-59 (3rd Cir. 1998); United States v. Regensberg, 604 F. Supp. 2d 625, 630 (S.D. N.Y. 2009); Goodwin, 2004 WL 769312, at **1-2. Count 19, which incorporates explanatory paragraphs 35-77 of the superseding indictment, properly charges the security fraud offense in this case in a single count and provides Defendants with sufficient notice, considering the additional information disclosed in discovery, of the alleged offense.

A bill of particulars "'is not designed to compel the government to [provide] detailed exposition of its evidence'" before trial. Roberts, 174 Fed. Appx. at 477 (citation omitted); and see United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D.

AO 72A
(Rev.8/8
2)

Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge.  The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law.  It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The ultimate test in deciding whether a bill of particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense.").  "Case law is also clear that the Government is not required to identify . . . specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants." United States v. Leiva-Portillo, 2007 WL 1706351, at *15 (N.D. Ga. June 12, 2007) (citing, *inter alia*, Rosenthal, 793 F.2d at 1227); and see United States v. Wilson, 2013 WL 820726, at *2 (S.D. Ala. March 5, 2013) ("'[a] bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy[; n]or is the government required to provide defendants with all overt acts that might be proven at trial'") (quoting Rosenthal, 793 F.2d at 1227)).

AO 72A
(Rev.8/8
2)

Furthermore, Defendants seek the details about the acts in which *the*y engaged in commission of the charged offenses.  It is doubtful that Defendants could establish that, without the Government providing further details about this evidence, they were not able to prepare a defense to the charged offenses or were surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'"  United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).

In light of the allegations contained in the superseding indictment, the discovery and other information provided to Defendants, including in the Government's response to the bill of particulars, the court find that Defendants have not demonstrated that the additional information requested in the bill of particulars is essential to preparation of their defense at trial.  For the reasons stated, the court **DENIES** the motion [Doc. 48]

AO 72A
(Rev.8/8
2)

for a bill of particulars to the extent the Government has not agreed to provide the requested information.

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS**:

(1) that Defendants Bercoon's, Goldstein's and Veugeler's motions [Docs. 51, 75, 77 and 118] to suppress evidence obtained from wiretaps be **DENIED**;

(2) that Defendants Bercoon's, Goldstein's and Veugeler's motions [Docs. 46 and 54] for severance of counts be **DENIED**; and

(3) that Defendant Goldstein's motion [Doc. 53], filed also on behalf of Defendants Bercoon and Veugeler, to strike surplusage be **DENIED**;

and the court **ORDERS** that:

(1) that Defendants Bercoon's, Goldstein's and Veugeler requests for a <u>Franks</u> hearing, contained within the motions [Docs. 51, 75, 77 and 118] to suppress, be **DENIED**; and

(2) that Defendant Goldstein's motion [Doc. 48], filed also on behalf of Defendants Bercoon and Veugeler, for a bill of particulars be **DENIED**.

125

The remaining pending motions before the Magistrate Judge will be addressed in a supplemental order and report and recommendation; accordingly, this action *is not* ready for trial.

**SO RECOMMENDED AND ORDERED,** this 31st day of August, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

126