RECEIVED IN CHAMBERS
LEIGH MARTIN MAY
U.S.D.C. Atlanta

NUV 0 4 2020

JAMES N. HATTEN, Clerk
By: B

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| United States of America, | No. 1:15-CR-00022-LMM-JFK |
| Plaintiff | |
| v. | AND |
| MARC E. BERCOON, | No. 18-13321-EE |
| Defendant, Appellant | |

## DEFENDANT MARC E. BERCOON'S MOTION FOR BAIL PENDING APPEAL

COMES NOW, the Movant, Marc E. Bercoon ("Bercoon") and files this motion ("Motion") and says:

## INTRODUCTION

On February 21, 2018, Bercoon was convicted by a jury on twelve of the thirteen counts in an indictment ("Indictment"). Bercoon was remanded into custody after the verdicts when this court made the finding that Bercoon did not meet the statutory burden of proof for release pending sentencing under 18 U.S.C. §3143(a)(1). Bercoon files this Motion for bail pending appeal because many circumstances have changed since February 21, 2018 and Bercoon can now carry his burden of proof for bail under 18 U.S.C. §3143(b)(1). For this reason and the matters presented below, Bercoon submits that this court can and should properly grant bail pending appeal.

-1-

## BACKGROUND

Bercoon was charged in the Indictment with thirteen counts related to securities Fraud involving either MedCareers stock or an entity related to a website Find.com. After the jury verdicts he was remanded when this court ruled that Bercoon did not satisfy his statutory burden of proof of clear and convincing evidence that he was not a flight risk.

On or about July 22, 2018, Bercoon was sentenced by this court to a prison sentence of 120 months. On or about August 17, 2018, Bercoon was transferred from a federal detention facility in Lovejoy, GA ("Lovejoy") where Bercoon had been held since February 21, 2018, to the Atlanta Federal Prison. Then, on September 4, 2018, Bercoon was transported from Atlanta to Federal Prison Camp - Maxwell Air Force Base in Montgomery, AL ("FPC Montgomery") where Bercoon remains incarcerated at this date.

Bercoon's trial counsel withdrew with Bercoon's consent after sentencing at a hearing before Magistrate Judge Janet King. Bercoon qualified for and received a court-appointed attorney to represent him in his direct appeal. Briefs in the appeal were filed which included Bercoon's adopting certain appellate issues raised in William Goldstein's appellate brief. ("Goldstein" was Bercoon's co-defendant in the jury trial). Goldstein was charged and convicted of the same counts as Bercoon in the same Indictment by the same jury. Goldstein was similarly remanded to custody with Bercoon at Lovejoy also until August 17, 2018, except Goldstein was transported to a Federal Prison camp in Memphis, TN,

-2-

After all appellate briefs and reply briefs were filed, the Eleventh Circuit Court of Appeals ("Eleventh Circuit") granted appellant's request for oral argument. The oral argument took place on or around January 31, 2020. To date, no decision or mandate has issued, thus the appeal is pending.

Prior to trial, in late 2017, Bercoon brought to the attention of his trial counsel that there were several false and fabricated statements in William Cromer's ("WC") January 2015 testimony before the grand jury. (The transcript of the testimony had been provided to the defense in August 2017.) WC was the FBI's lead agent on Bercoon's case. Many of these false statements were repeated in WC's August 2017 grand jury testimony.

Bercoon's trial counsel dismissed Bercoon's observations before trial – "It doesn't matter what happens in the grand jury." Even after the trial, Bercoon's counsel said – "The jury verdict cures all ills in the grand jury." Bercoon soon learned, as discussed below, that his trial counsel was incorrect in his understanding of the current law. Bercoon's appellate counsel advised Bercoon that the grand jury issues could not be raised on appeal because trial counsel had never put them in the record.

After researching prosecutorial misconduct in the grand jury over 18 months while incarcerated with limited access to a law library, Bercoon found legal precedent to support an action to dismiss the Indictment post-conviction. In January 2020, Bercoon contacted the prosecutors in his case, in writing, and revealed several incidents that Bercoon believed constituted prosecutorial misconduct that warranted dismissal of the Indictment.

Bercoon also advised the prosecution that there was legal authority that the prosecution had a duty to report the alleged misconduct to the court. The prosecutors told Bercoon (through his counsel) that they would not be responding to or addressing the misconduct claims.

In mid-February 2020, Bercoon attempted to file pro se with the 11th Circuit a "Motion Under Fed. Rule Crim. Pro. 12(b)(2) To Dismiss Indictment Charging Marc E. Bercoon And Vacate Convictions For Lack of Subject Matter Jurisdiction" (the "12(b)(2) Motion"). Bercoon Filed pro se because his appellate counsel maintained her position that issues not raised in the trial record could not be raised in the appeal. Bercoon disagrees based on:

1) Rule 12(b)(2) states that: A motion that the court lacks jurisdiction [subject matter jurisdiction] may be made at any time while the case is pending.

2) "Once a case is on direct appeal, a defendant need not waste his time... going back to the district court to challenge the jurisdictional adequacy of the charging document... Rather, he need only alert us to the potential problem... at any time before the mandate issues." U.S. v. Diveroli, 729 F.3d 1339, 1343 (11th Cir. 2013).

3) "Of course the question of whether a charging document conferred jurisdiction on the district court to act at all in a criminal case is necessarily an 'aspect of the case involved in the appeal.'" U.S. v. Diveroli, at 1341 citing U.S. v. Tovar-Rico, 61 F.3d 1529, 1532 (11th Cir. 1995). [Emphasis added]

4) "Every Federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also

that of the lower courts in a cause under review," even though the parties are prepared to concede it..." Steel Co. Citizens for a Better Environment, 523 U.S. 83, 95 (1988) citing Mitchell v. Maurer, 293 U.S. 237, 244 (1934).

Bercoon served copies of the 12(b)(2) Motion on the U.S. Attorneys office in Atlanta, Goldstein's counsel, and Bercoon's counsel. The Clerk of the Court for the 11th Circuit refused to accept the 12(b)(2) Motion based upon a **local** rule that prohibits pro se filings if a party has counsel of record. The Court Clerk then returned the 12(b)(2) Motion to Bercoon at FPC Montgomery on or about February 25, 2020. (The Court Clerk took this action even though a fellow inmate of Bercoon filed a pro se motion for en banc review of his appeal while the inmate had an attorney of record. The motion for en banc review was filed without delay and acted upon by the 11th Circuit.)

　　　Bercoon promptly responded to the Court Clerk by explaining that Bercoon was not represented by counsel on the matters covered by the 12(b)(2) Motion. Bercoon also pointed out that because he was challenging the district court's subject matter jurisdiction ("SMJ"), the 11th Circuit had an obligation to review the merits of Bercoon's claims. (Relying on Steel Co. v. Citizens for Better Environment, as discussed above, but Bercoon did not cite this case to the Court Clerk.)

　　　Bercoon was advised that a judge was reviewing Bercoon's request to accept the pro se filing. In reliance, and in consideration of expected delays caused by the pandemic, Bercoon waited until August 2020 for a response. With no response, and in an act of desperation, Bercoon requested

that his attorney withdraw so he could file the 12(b)(2)
Motion pro se. Bercoon's counsel filed the withdrawal motion
which included the explanation behind it.

On September 1, 2020, the 11th Circuit entered an order
permiting Bercoon to file the 12(b)(2) Motion prose, but denied
his counsel's request to withdraw. (See Exhibit A attached)
The Court Clerk filed the 12(b)(2) Motion, but failed to file
any of the exhibits or Bercoon's declaration which are part
this 12(b)(2) Motion. In total, the 12(b)(2) Motion is in
excess of 350 pages. To date no opinion or decision has
been handed down on the direct appeal. Because of
the length of the 12(b)(2) Motion and continued dela
to court operations because of the pandemic, a
decision may not occur for several more months,
especially if the 11th Circuit remands any issues related
to the 12(b)(2) Motion to the district court.

Since many factors that led this court to find that
Bercoon was a flight risk on February 21, 2018, have
changed dramatically; and Bercoon believes he can
meet his burden of proof on all other bail requiremen
as well; and a decision on his appeal may be
months away, Bercoon has filed this Motion. Bercoon
prays that this court will grant bail pending appeal
as is justified and right under the legal argument
provided below.

## ARGUMENT

The legal standard for release pending appeal is
codified in 18 U.S.C. §3143(b). The 11th Circuit has
interpreted this statute as follows: a person who has
been found guilty of an offense and sentenced to a term
of imprisonment, and who has filed an appeal shall

be detained unless the judicial officer finds all of th
following prongs have been satisfied.

    1) By clear and convincing evidence the person is not
likely to flee or pose a danger to the safety of any person or
the community if released pending appeal;

    2) The appeal is not for purposes of delay;

    3) The appeal raises a substantial question of law or fact,

    4) If that substantial question is decided for the defendant
the likely result is a reversal of the convictions or an order
for a new trial on all counts on which imprisonment was
imposed. <u>U.S. v. Giancola</u>, 754 F.2d 898, 901 (11th Cir. 1985)
The burden of proof is on the defendant/appellant.

        <u>BERCOON POSES NO RISK OF FLIGHT OR</u>
      <u>DANGER TO ANY PERSON OR THE COMMUNITY</u>

    This court, on February 21, 2018, determined that Bercoon
was not a danger to any person or the community when the
court granted the government's request for remand after the
jury verdicts. The court made this finding for purposes of
18 U.S.C. §3143(a)(1). The same standard is applicable to
18 U.S.C. §3143(b)(1)(A) for release pending appeal.

    This court stated: "...I have no issue at all with the
danger to the community portion of this. I don't think
the defendants [Bercoon and Goldstein] are a danger to the
community..." [See trial transcript, docket item #488
page 1962, lines 3-5.]

    Similarly, at no time while addressing the court
during its request for remand did the government allege
or claim Bercoon was a danger. The prosecutor relied on a
claim that the defendants could not meet their burden

of proof to rebut the presumption that they were a
flight risk. [See trial transcript, docket item #488, page 195,
line 15 - page 1953, line 12.]

    Bercoon submits that no event has occurred since
February 21, 2018, that indicates that Bercoon is now a danger
to the community. Bercoon has been incarcerated at three
facilities over the past 32+ months and has no incident
reports of improper or violent behavior of any kind. The
Bureau of Prisons ("BOP") uses a "Male Pattern Risk Scoring"
system that assigns a classification for each inmate's
general risk and risk of violence. The four classifications
are: minimum, low, medium, high. A score of 10 or lower
is minimum. Bercoon scored -6 for general risk and -1
for violent risk. (See Exhibit B attached) Based upon the
foregoing, Bercoon believes he has shown by clear and
convincing evidence that he is not a danger to any person
or the community for purposes of 18 U.S.C. §3143(b)(1)(A

    <u>Bercoon is also not a flight risk</u>. In arguing in
favor of remand after the verdicts, the prosecution focused
primarily on the defendants' not being able to meet their
burden of proof that they were not a flight risk. No
evidence of any attempts to flee or intent to flee during
the six plus years the defendants were engaged with the
prosecution pre-trial was presented. The prosecution's
primary argument as to Bercoon was: "So they're [Bercoon and
Goldstein] looking at -- and I think they're facing 15 years
or more in prison. And Mr. Bercoon is 57... So they're
facing now a prison sentence that could take them into
their 70's in prison. So I think that is a very

significant change in circumstance of where they were before [pre-trial bond] and provide a great incentive to flee. And, of course, the cases would say that, that when you have a long prison sentence that you are facing, that factors in favor of an incentive to flee." [Trial transcript, docket #488 Page 1952 lines 10-18]

This court articulated its view on risk of flight on February 21, 2018, as follows: "... It is some concern that I do have about the flight risk portion of the statute. Again, the burden is on the defendants to prove by clear and convincing evidence, ... and given the number of felony convictions, as well as the age of the defendants and the potential -- I don't know what the sentence will be, but a potential for a lengthy sentence, at least as it relates to their ages, as well as access that both defendants do seem to have to significant funds, I will grant the government's motion and require remand." [Trial transcript, Docket #488, page 1962, lines 5-15]

Bercoon strongly disagreed with the court's findings, but as of today, many circumstances and factors have changed since February 21, 2018, that now demonstrate by clear and convincing evidence that Bercoon is not a flight risk if he gets bail release.

4) Bercoon's sentence was 10 years in prison, not "15 years or more." Bercoon concedes that 10 years is significant, but he has served in excess of 32 months. Bercoon maintains that risk of flight for a first time offender, like Bercoon was, is elevated pre-sentencing because of the fear of going to prison and wondering if he could handle "prison life." Also, with the threat of 15 years or more, Bercoon would have gone to a low security prison which has many more restrictions and rules than a minimum security facility like FPC Montgomery

Prison is not where Bercoon wants to be, but he is well over any fears of surviving prison life. Bercoon merely chooses to pursue his statutory right to bail pending appeal.

B) The First Step Act passed in late 2018, which makes Bercoon eligible for home confinement ("HC") after serving 80 months. (Expected clarifications to this law would reduce the 80 months to 68 months.) Were Bercoon to flee, he would eliminate any chance of receiving HC under the First Step Act. So Bercoon is not looking at being in prison into his 70's as the prosecution argued in 2018, which was the factor that gave Bercoon the supposed incentive to flee. Now Bercoon is eligible for HC in 35 or 47 months when he will be 63 or 64.

HC does include some restrictions on movement, but Bercoon cannot fathom that they would create the stress that life on the run would cause if he were to flee. Thus Bercoon submits that his 10 year sentence versus the expected "15 years or more" and the impact of the First Step Act to a 60 year old Bercoon negate any incentive to flee. This is especially true since Bercoon has already served 32 months.

C) The world is suffering through a pandemic. International travel is greatly restricted. Bercoon relinquished his passport in 2014. Even as travel restrictions are lifted, isolation or other requirements or conditions may continue which monitor travelers' movements for a period of time. All of these factors create a practical disincentive or obstacle to a plan to flee.

D) The Centers for Disease Control and Prevention ("CDC") have identified factors that put certain individuals at a higher risk of suffering severe consequences from COVID-19. Bercoon has three of these high risk health conditions. Were Bercoon to flee and contract COVID-19, he would likely have no health insurance,

and because of his limited access to financial resources, Bercon
would likely have little access to potentially necessary health
care. This is also factor that creates a disincentive to flee.
E) In response to the pandemic, Attorney General Barr made
a finding that the BOP should transfer inmates to HC
where appropriate to decrease the risks to inmates' health.
Bercoon meets every factor listed by A.G. Barr. (See attached
Exhibit C, A.G. Barr 3/26/20 memo) For inmate eligibility for
HC. The CARES ACT passed a few days after 3/26/20
so on 4/3/20 a second memo was issued to the BOP.
(See Exhibit D attached) Although flight risk is not expressly
mentioned as a measure for HC, it is clear by the reference
to Minimum Pattern score and an obvious focus on inmates
that will likely not violate HC conditions that someone
who is viewed as a flight risk would not be eligible for HC.
   Upon information and belief, Goldstein was released from
prison in late May 2020 under the HC program discussed
in A.G. Barr's memos. Goldstein would not have been
eligible for HC if he was deemed a likely risk to violate
HC conditions (including fleeing). During the court's actions
when hearing arguments on the remand issue back on
February 21, 2018, and also in the court's findings, Bercoon
and Goldstein are always referred to as "they" or the
"defendants". (The exceptions are when their ages are mentioned
and a prosecution's reference to Goldstein's girlfriend having
an account that had funds running through it.) This
treatment shows that Bercoon and Goldstein were viewed
identically in terms of risk of flight. (See prior references
to trial record above.) Accordingly, if Goldstein was deemed
not to be a flight risk to get HC, and in fact has not

fled since late May 2020 (or whatever date is applicable)
no event has occurred to now distinguish Bercoon as
a flight risk (while Goldstein is not). [Bercoon maintains
that FPC Montgomery has at all times operated the
COVID-19 HC program in violation with or contrary
to A.G. Barr's intent. Several inmate lawsuits have
been filed on this issue against FPC Montgomery.
Bercoon believes that if he were at any other minimum
security facility, he would already be on HC and not
be filing this Motion.] Regardless, Bercoon is eligible
for bail because he is not a flight risk.

F) Bercoon is extremely close with his family, which
consists of his wife, three daughters - ages 19, 16, 16, his widowed
sister and two nephews, and his elderly parents - ages 96 and 95.
Since September 2010 when the government (SEC) froze
Bercoon's assets in an ex parte action, and later seized the
assets, Bercoon has been largely ostracized by his former
circle of friends and community. Family has been 99% of
Bercoon's support system. Bercoon speaks to his wife almost
everyday and he remains an active parent in his children's lives.
Bercoon's oldest daughter attends an out of state university, while
his younger daughters attend a local public high school.

Prior to his incarceration, Bercoon regularly tutored his
children in math, helped them in writing and other subjects, and
attended almost all of their after school activities. Were Bercoon
to flee he would be adding obstacles to remaining active in his
children's lives and make it more difficult to communicate with
his wife. Although Bercoon does not have unlimited access
to phones at FPC Montgomery, he has regular access
which he uses to freely call his family without

worrying about the call being traced to Bercoon's hypothetical location of flight. Bercoon's children are building their own lives and Bercoon would never ask them to leave their lives to join him on the run. Bercoon's wife is a dedicated mother who would never leave her children to join Bercoon on the run. Fleeing would also make communicating with Bercoon's sister and parents more difficult. So if Bercoon were to flee, he would be on his own away from everyone he loves and cares about most. If this were Bercoon's goal he could have that life at FPC Montgomery without the stress of having to constantly evade capture (As much as no one wants to be in prison, life at FPC Montgomery is not what television depicts as "hard time.")

Bercoon's closeness and devotion to his family and the relatively young ages of his children are evidence that Bercoon is not likely to flee.

G) In addition to the meritorious issues raised in his appeal by his appellate counsel and those raised in the 12(b)(2) Motion, which will be discussed below, Bercoon believes he has a very strong case for a new trial for ineffective assistance of counsel ("IAC"). All of the issues raised in the 12(b)(2) Motion were discussed with counsel prior to trial. Although the 12(b)(2) Motion is clearly not a disguised §2255 Motion for IAC, many of the supporting facts in the 12(b)(2) Motion, which challenges SMJ, should have been used to impeach certain key government witnesses and to re-open a challenge to the admissibility of the wiretap in the case.

Regardless of the statistical low success rates of §2255 motions, 12(b)(2) motions, or appeals, generally, Bercoon has a good faith belief he will prevail. Bercoon has no

-13-

to 15 minutes with 30 minute waits between calls. Email access has the same time restrictions plus all incoming and outgoing emails are delayed significantly. If Bercoon were granted bail, he would devote a lot of his time to his two younger daughters' schooling as he did with all three of his children prior to incarceration. Were Bercoon to flee, he would be less able to tutor his daughters than he can now. (Also see Exhibit E)

(J) On February 21, 2018, the court found that Bercoon was a flight risk in part because of his age [Bercoon never knew how old he apparently is until he was convicted.] "as well as access that both defendants do seem to have to significant funds ..." [Trial Transcript, Docket #488, page 1962, lines 13-14] Bercoon disputes this finding as of when it was made and today.

As mentioned, Bercoon's assets were seized in 2011 by the government. This included seizure of Bercoon's retirement account. Bercoon and his wife each filed for protection from creditors under Chapter 7 of the Bankruptcy Code and received discharges. (Bercoon filed in 2012. His wife filed in 2016) Since September 2010, Bercoon's parents have been the primary means of financial support for Bercoon and his immediate family. That support is solely a function of Bercoon's parents caring about the well-being of their innocent grandchildren. Bercoon's parents' resources are dwindling and, in fact, his parents have been forced to reduce their in-home care help in order to continue to support Bercoon's family.

Bercoon's oldest daughter earned scholarship aid plus she qualified for and received additional financial aid in order to attend her university. All of Bercoon's children received financial aid in order to continue to attend

a private religious elementary school since the time Bercoon's assets were frozen. Two bankruptcy trustees, a private elementary school, a state university, and the SEC have all reviewed and/or searched for assets held by Bercoon. The only assets Bercoon has are the few neglible assets he was permitted to keep under the Bankruptcy Code.

Bercoon maintains that the courts finding that Bercoon had access to substantial assets (as of February 21, 2018) is based on a myth perpetuated by the prosecution dating back to pre-trial motions by the defendants to remove their ankle monitors while on pre-trial bond. There is no evidence that Bercoon currently has access to any amount of funds in an amount that could cause an inference of an ability to flee - because he has no access to funds. Any funds Bercoon's parents provide to support Bercoon's family are not available to finance a hypothetical plan to flee. Thus, regardless of the court's prior finding Bercoon feels he has shown strong evidence of the fact that he has no access to funds of any substance.

The Giancola court noted that the legislative history of what is today 18 U.S.C. §3143 is not to eliminate bail pending appeal, but limit its availability by reversing the burden of proof to the defendant. So although Bercoon is burdened with proving a negative (that he will not flee) which is always difficult, Giancola tells us that the courts should not interpret this as impossible. Because of the totality of the circumstances above, Bercoon believes he has satisfied his statutory burden of proof that he is not a flight risk. Giancola at Page 900.

## BERCOON'S APPEAL IS NOT FOR PURPOSES OF DELAY

Bercoon is incarcerated and has been for more than **32** months, so there is no basis to presume or conclude his appeal was filed to delay his reporting to prison. Bercoon's appeal raises substantial questions of law or fact, as discussed below, which further shows the appeal was not for purposes of delay.

## BERCOON'S APPEAL RAISES Substantial Questions of Fact or Law

This prong of the statute is controlled by *U.S. v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985). "In short, a 'substantial' 'question' is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well **could be decided** the other way... Whether a question is 'substantial' must be determined on a case by case basis."

The following is a summary of the appellate issues raised by Bercoon's counsel in her brief. (For a full review of the brief please refer to the appellate court docket or record.)

1) The district court erred by denying Bercoon's request for a "Franks" hearing because he made a substantial showing that: a) the affidavit filed in support of the wiretap motion contained significant omissions; (b) the affiant acted recklessly or deliberately; and (c) if the omitted information had been included the district court could not have found that the wiretap was necessary.

2) The wiretap should have been suppressed because the government failed to show that the wiretap applications and orders met the statutory necessity requirement.

3) The government presented evidence that constituted a material variance at trial.

-17-

4) The government argued at four separate points in closing that the government could infer Bercoon's guilt from the fact that he never called law enforcement after Peter Veugeler ("Veugeler") contacted Bercoon about conducting an alleged market manipulation after Bercoon was cooperating with the government. (In truth, Bercoon through counsel had contacted the government seeking guidance on how to respond to Veugeler. Therefore, the prosecutor's statements at closing were not true and were prosecutorial misconduct as the false statements implied that Bercoon had a duty to contact law enforcement when he did not. This prejudiced Bercoon.

5) The wiretaps should have been suppressed because the probable cause was stale.

The appellate briefs on these issues cite case law in support of cogent arguments as to why the district court erred in its rulings. Giancola expressly does not require that the district court acknowledge or concede that it erred in its rulings. Rather, the district court only needs to acknowledge that the issue(s) of those rulings could have been decided in the defendant's favor. U.S. v. Giancola, at 900. The fact that the 11th Circuit granted oral argument on these appellate issues supports a finding that at least some substantial questions of law or fact were raised or the 11th Circuit would have been able to make its findings solely on the briefs.

## THE 12(b)(2) MOTION

The 12(b)(2) Motion, which under Diveroli, is part of Bercoon's direct appeal, also raises substantial questions of law and fact. The appellate court has an obligation to confirm that the district court had SMJ over Bercoon's case. (see citations to Steel Co. v. Citizens for a Better Environment, above on pages 4 and 5 of this Motion.)

None of the issues and supporting facts cited in the 12(b)(2) Motion have ever been ruled upon by any court because Bercoon's trial counsel failed to raise them to become part of the trial record. The 12(b)(2) Motion's challenge to the district court's SMJ is supported by _Bank of Nova Scotia v. U.S._, 487 U.S. 250 (1988) which held that an indictment can be dismissed post-conviction for prosecutorial misconduct in the grand jury: "If it is established that the violation [misconduct] substantially influenced the grand jury's decision to indict" or "there is grave doubt that the decision to indict was free from the substantial influence of such violations." _Bank of Nova Scotia v. U.S._, at 256.

The _Bank of Nova Scotia v. U.S._ decision did not expressly reverse _U.S. v. Mechanik_, 475 U.S. 66 (1986), but it did severely limited its application. _Mechanik_ stood for the principle that a jury trial verdict cured all ills in the grand jury process. However, the prosecutorial misconduct in _Mechanik_ was harmless error. The holding in _Bank of Nova Scotia_ actually adopts Justice O'Connor's concurring opinion's reasoning that in order to analyze misconduct in the grand jury, the focus of the review should be what occurred in the grand jury — not the subsequent jury trial. Justice O'Connor agreed that the misconduct did not warrant dismissal of the indictment in _Mechanik_ because the misconduct was harmless error. Harmless error will never satisfy the holding in _Bank of Nova Scotia_ for a dismissal because harmless error would not influence the decision to indict.

The 11th Circuit has expressly limited the reach of the holding in _Mechanik_ in grand jury misconduct cases:

"We decline to adopt such a broad reading of Mechanik. [that it prevents post-conviction dismissal of the indictment] The abuse alleged here differs from the rather techical violation at issue in that case [Mechanik] ... We thus conclude that Mechanik does not preclude relief [post-conviction] for the type of prosecutorial abuse alleged in this case..." U.S. v. Kramer, 864 F. 2d 99, 101 (11th Cir. 1988).

Since the 12(b)(2) Motion has never been ruled upon, this court must review enough of the 12(b)(2) Motion in order to determine whether it raises enough facts and questions of law, such that the 12(b)(2) could be granted for Bercoon. This court need not actually decide if it would rule in Bercoon's Favor. For purposes of 18 U.S.C. § 3143(b)(1)(B).

The 12(b)(2) Motion is attached to this Motion. Because the 12(b)(2) Motion is so voluminous, Bercoon has highlighted below two of the many instances of prosecutorial misconduct that Bercoon believes satisfy the Bank of Nova Scotia requirements for dismissal of the Indictment post-conviction.

1) WC testified before the grand jury in January 2015, that David and Donna Levy were indicted for participating in numerous stock manipulations "including the activities related to this MedCareers Stock. They were indicted... they went to trial and they were found guilty. So they're currently in jail." [See Item 1, page 21, 12(b)(2) Motion]

The grand jury requires a very low probable cause burden of proof for the government to get an indictment.

The Levys are presented as co-conspirators with Bercoon and Goldstein. This testimony occurred 11 pages into a 97 page transcript of WC's testimony. Based on pages 1-10, it appears that WC is the first and only grand jury witness in the case. (Introductions are made, WC's background is presented. Bercoon and Goldstein are introduced.) Since this damaging testimony was so early in the grand jury proceeding, the testimony was a virtual first punch knock-out. Bercoon sees no reasonable manner in which the grand jury could not have indicted him for market manipulation of MedCareers stock after hearing this testimony.

The truth, however, is that neither David nor Donna Levy was indicted for anything related to MedCareers. In fact, the prosecutors in the Levys' case were prohibited from mentioning or allowing any witness to testify about Med-Careers. So WC's testimony was absolutely false and Bercoon believes his prosecutors knew it (or at a minimum were deemed to know it.) Alan Weiner ("AW"), a cooperating source for the government in Bercoon's case and the source of most of WC's testimony, was on the witness stand in the Levys joint trial when the MedCareers prohibition was discussed at length in a side bar. AW was the person who caused the investigation of Bercoon and Goldstein to start. Bercoon sees no way that the prosecutors did not review AW's testimony in the Levys' 2013 trial at any time in the 21 months prior to WC's testimony. WC obviously knew the Levys went to trial for something. There is no indication in the transcript that Bercoon's prosecutor was surprised at all by WC's testimony. So at an absolute minimum

Bercoon's prosecutors were reckless in their disregard for the truth, which is prosecutorial misconduct. Bercoon also believes the prosecutors had and still have a continuing duty to report this false testimony to this court and/or the 11th Circuit for purposes of determining if the Indictment should be dismissed. [See Item 1, page 21 of 12(b)(2) Motion.]

2) WC testified that AW directly observed Goldstein and Veugeler, sitting side by side, each with a laptop computer, while both were trading in MedCareers stock, on approximately March 2-4, 2010. WC's testimony continued to point out that AW looked at Goldstein's computer screen and that AW directly observed that Goldstein was trading in Marc Rosenberg ("MR") Scottrade account.

These exact events were included in the FBI agent's [Agent Taylor] affidavit in support of the wiretap in this case. The affiant included his conclusions to summarize the effect of what AW "directly observed" – Goldstein's and Veugeler's side-by-side coordinated trading was "market manipulation and as such constituted mail and wire fraud." Since the prosecution relied on the affidavit in its wiretap application, the prosecution must agree with the affiant's conclusions.

This testimony is of an eye-witness account of Goldstein and Veugeler engaged in the act of committing the crimes – market manipulation, mail fraud, and wire fraud. Again, Bercoon does not see how a grand jury could not indict Bercoon on the basis of this testimony alone. [Because of the conspiracy charge, Goldstein's acts are attributed to Bercoon. So Bercoon is, in effect, observed committing three of the charges in the Indictment the grand jury was asked to consider.]

-22-

The truth is that there was absolutely no trading in MR's Scottrade account during the March 2010 period referred to in WC's testimony. The prosecution knew this because the prosecution provided MR's Scottrade brokerage statements (including March 2010) to the defense in their initial production. All trading in an MR account during this period was in an account that was not set up for online or computer trading at all. Accordingly, Goldstein could not have been trading on his laptop computer as WC claimed and the entire eye-witness account of the commission of crimes is false. To permit this prejudicial false testimony is prosecutorial misconduct.

These are only two examples of prosecutorial mis-conduct that require dismissal of the Indictment under Bank of Nova Scotia v. U.S. If the court is not satisfied by these two examples, Bercoon prays that the court will read the entire 12(b)(2) Motion to assess the magnitude and amount of prosecutorial misconduct. Regardless, Bercoon believes the 12(b)(2) Motion raises issues on appeal that present substantial questions of law or fact that could very well be decided in Bercoon's favor in satisfaction of his burden in 18 U.S.C. §3143(b)(1)(B). IF THE SUBSTANTIAL QUESTION OF FACT OR LAW IS DETERMINED FAVORABLY TO BERCOON ON APPEAL, A REVERSAL OF THE CONVICTION OR AN ORDER FOR A NEW TRIAL IS LIKELY

To satisfy this prong of the bail requirements: "A court may find that reversal or a new trial is likely only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a

~23~

new trial." U.S.v. Giancola, at 900 citing U.S.v. Miller, 753 F. 2d 19, 23 (3rd Cir. 1985).

The wiretap evidence in Bercoon's case was used extensively by the prosecution at trial and one call that was played for the jury could be interpreted as a confession. (See trial transcript-Docket Item #479, page 18, line 6 - page 19, line 23 - wiretap referred to in prosecution's opening statement; Docket Item #485 page 1771 lines 4-13 - prosecution's closing, and page 1783, lines 11-24; Docket item #480 page 395, line 2 - page 415, line 14 - WC's testimony.) The wiretap was extremely prejudicial to Bercoon. All of the wiretap is from 2011, more than one year after the charged offenses. This certainly brings up the question of whether probable cause was stale amongst the other wiretap appellate issues. If the wiretap is ruled inadmissible on appeal a new trial would probably, not merely likely, be ordered. Statements that are arguably a confession have to be considered "integral to the merits of the conviction." [The fact Bercoon believes that the confession-type phone call was manipulated by the government to create inaccurate context goes to Bercoon's IAC issues and is evidence why he would not flee. This IAC claim is not relevant to this prong addressing appellate matters only.]

The material variance issue relates to the Fino.com charges and goes directly to whether the defendants were not only provided adequate notice of the matters the defendants needed to defend, but also if the government made misrepresentations in its response to the defendants' bill of particulars. This issue was addressed extensively in the oral argument. (See Exhibit F attached) Almost certainly a new trial would be ordered if the 11th Circuit ruled in Bercoon's favor on the material variance issue. Otherwise, the 11th Circuit would be allowing an unfair trial

-24-

A ruling in Bercoon Favor on the 12(b)(2) Motion would mean that the district court did not have SMJ over Bercoon so all convictions would be reversed. "No person shall be held to answer for a capital... crime, unless on a [a] ... indictment of a Grand Jury." (5ᵀᴴ Amendment - U.S. Const. A ruling in Bercoon's favor also means that the prosecutorial misconduct in the grand jury rose to the level that the Indictment was dismissed under Bank of Nova Scotia. "Only a defect so fundamental that it causes the grand jury to no longer be a grand jury, or an indictment to no longer be an indictment, gives rise to the right not to be tried." Justice Scalia in Midland Asphalt v. US., 489 U.S. 794, 802 (1989). The Indictment is what gave the district court the appearance of SMJ. Without SMJ Bercoon's case is dismissed. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co., at 94 internal cites omitted.

<u>CONCLUSION</u>

Bercoon understands that courts are only going to overturn convictions in extraordinary circumstances. Regardless of Bercoon's belief that his case is extraordinary, For purposes of bail pending appeal, he does not need to prove he will prevail on appeal. Bercoon only needs to carry his burden of proof to satisfy the statutory requirements of 18 U.S.C. §§ 3143 (b)(1) (A) and (B). For the reasons set forth in this Motion Bercoon believes he has satisfied those requirements and prays that this court promptly grant Bercoon bail pending resolution of his 11ᵗʰ Circuit Appeal.

DATED: OCTOBER 29, 2020

Respectfully Submitted,

*Marc E. Bercoon*

MARC E. BERCOON, Pro Se
Reg # 66081-019
MONTGOMERY DORM "B" WING
Federal Prison CAMP
MONTGOMERY, AL 36112

Defendant-Appellant

-26-